**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| HANC & BRUBAKER HOLDINGS a Montana Company; HANC HOLDINGS, a Montana Company; ALGON ECOM, LLC, a Delaware Company; ECOM DYNAMICS, LLC, a Delaware Company; ELEVATIONS IN ECOM, LLC, a Delaware Company; LEVEL SET ECOM, LLC, a Delaware Company; LEVEL SET ECOM, LLC, a Delaware Company; SRUNE ECOM, LLC, a Delaware Company; STELB ECOM, LLC, a Delaware Company; REDSTONE ECOM, LLC, a Delaware Company; PARKCAM, LLC a Delaware Company, | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| NXT LVL SERVICES, LLC, a Florida company; UPGRADED LIFESTYLE, LLC, a Florida company; ONE UP, LLC a Florida company; MICHAEL WALDING, individually and as CEO of NXT LVL SERVICES, LLC, ONE UP, LLC and UPGRADED LIFESTYLE, LLC, | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Case No.

Judge

## **COMPLAINT**

NOW COME the Plaintiffs, HANC & BRUBAKER HOLDINGS, LLC, HANC

HOLDINGS, LLC, ALGON ECOM, LLC, ECOM DYNAMICS, LLC, ELEVATIONS IN

ECOM, LLC, LEVEL SET ECOM, LLC, LEVEL SET ECOM, LLC, SRUNE ECOM, LLC,

STELB ECOM, LLC, REDSTONE ECOM, LLC, PARKCAM, LLC, by and through their

attorneys, Griffin Williams McMahon & Walsh, LLP, and present their Complaint against NXT

LVL SERVICES, LLC, UGRADED LIFESTYLE, LLC, ONE UP, LLC, and MICHAEL WALDING and in support thereof, complain as follows:

## PARTIES TO THE ACTION

1.      Plaintiff HANC & BRUBAKER HOLDINGS, LLC ("H & B HOLDINGS") is a Montana company with its principal place of business in St. Charles, Illinois, which is within the jurisdictional boundaries of the United States District Court for the Northern District of Illinois, Eastern Division.  H & B HOLDINGS regularly does business within the State of Illinois.

2.      Plaintiff HANC HOLDINGS, LLC ("HANC HOLDINGS") is a Montana company with its principal place of business in St. Charles, Illinois, which is within the jurisdictional boundaries of the United States District Court for the Northern District of Illinois, Eastern Division.  HANC HOLDINGS regularly does business within the State of Illinois.

3.      Plaintiff ALGON ECOM, LLC ("ALGON") is a Delaware company with its principal place of business in St. Charles,  Illinois, which is within the jurisdictional boundaries of the United States District Court for the Northern District of Illinois, Eastern Division.  ALGON is owned and operated by H & B HOLDINGS and regularly does business within the State of Illinois.

4.      Plaintiff ECOM DYNAMICS, LLC ("ECOM") is a Delaware company with its principal place of business in St. Charles, Illinois, which is within the jurisdictional boundaries of the United States District Court for the Northern District of Illinois, Eastern Division.  ECOM is owned and operated by H & B Holdings and regularly does business within the State of Illinois.

5.      Plaintiff ELEVATIONS IN ECOM, LLC ("ELEVATIONS") is a Delaware company with its principal place of business in St. Charles, Illinois, which is within the jurisdictional boundaries of the United States District Court for the Northern District of Illinois,

Eastern Division. ELEVATIONS is owned and operated by HANC HOLDINGS and regularly does business within the State of Illinois.

6.     Plaintiff LEVEL SET ECOM, LLC ("LEVEL SET") is a Delaware company with its principal place of business in St. Charles, Illinois, which is within the jurisdictional boundaries of the United States District Court for the Northern District of Illinois, Eastern Division. LEVEL SET is owned and operated by H & B HOLDINGS and regularly does business within the State of Illinois.

7.     Plaintiff SRUNE ECOM, LLC ("SRUNE") is a Delaware company with its principal place of business in St. Charles, Illinois, which is within the jurisdictional boundaries of the United States District Court for the Northern District of Illinois, Eastern Division. SRUNE is owned and operated by H & B HOLDINGS LLC and regularly does business within the State of Illinois.

8.     Plaintiff STELB ECOM, LLC ("STELB") is a Delaware company with its principal place of business in St. Charles, Illinois, which is within the jurisdictional boundaries of the United States District Court for the Northern District of Illinois, Eastern Division. SRUNE is owned and operated by H & B HOLDINGS LLC and regularly does business within the State of Illinois.

9.     Plaintiff REDSTONE ECOM, LLC ("REDSTONE") is a Delaware company with its principal place of business in St. Charles, Illinois, which is within the jurisdictional boundaries of the United States District Court for the Northern District of Illinois, Eastern Division. REDSTONE is owned by HANC HOLDINGS and regularly does business within the State of Illinois.

10.    Plaintiff PARKCAM ECOM, LLC ("PARKCAM") is a Delaware company with its principal place of business in St. Charles, Illinois, which is within the jurisdictional boundaries

3

of the United States District Court for the Northern District of Illinois, Eastern Division. PARKCAM is owned by HANC HOLDINGS and regularly does business within the State of Illinois.

11.     Defendant NXT LVL SERVICES, LLC ("NXT LVL") is a Florida company headquartered in Miami, Florida.

12.     Defendant UPGRADED LIFESTYLE, LLC ("UPGRADED") is a Florida company headquartered in Miami, Florida.

13.     Defendant ONE UP, LLC ("ONE UP") is a Florida company headquartered in Miami, Florida.

14.     Defendant MICHAEL WALDING ("Mr. Walding") is the Chief Executive Officer of NXT LVL, UPGRADED and ONE UP and is a resident of the State of Florida.  He is sued individually and as CEO of NXT LVL, UPGRADED and ONE UP.

15.     This is a civil action for damages to redress deprivations for breach of contract, fraud, and the Illinois Consumer Fraud and Deceptive Practices Act.

<u>**JURISDICTION AND VENUE**</u>

16.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. 1332(a) in that every member of the Plaintiff LLCs resides in a different state than each Defendant and the amount in controversy exceeds $75,000.00.

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) where the Plaintiff LLCs are headquartered, and its members reside, within the Northern District of Illinois.  Venue is proper where Defendants reached out to Plaintiffs in the Northern District of Illinois to induce them to do business, the contracts at issue in this matter were executed within the Northern District

of Illinois, and Defendants knew that harm alleged would be felt solely within the Northern District of Illinois.

## STATEMENT OF FACTS

18.     NXT LVL is Florida company headquartered in Miami, Florida.  Mr. Walding is NXT LVL's CEO, owner, and operator.

19.     NXT LVL claims to be in the business of acquiring and managing ecommerce retail stores on Amazon and Walmart's internet platforms on behalf of investors.

20.     UPGRADED is Florida company headquartered in Miami, Florida.  Mr. Walding is UL's CEO, owner, and operator.

21.     UPGRADED claims to be in the business of acquiring and managing ecommerce retail stores on Amazon and Walmart's internet platforms on behalf of investors.

22.     ONE UP is Florida company headquartered in Miami, Florida.  Mr. Walding is ONE UP's CEO, owner, and operator.

23.     ONE UP claims to be in the business of acquiring and managing ecommerce retail stores on Amazon and Walmart's internet platforms on behalf of investors.

24.     Mr. Walding is a resident of Miami Florida and the owner of and operator of NXT LVL, UPGRADED and ONE UP and claims to be in the business of acquiring and managing ecommerce retail stores on Amazon and Walmart's internet platforms on behalf of investors.

25.     H & B HOLDINGS is an entity owned and operated by Brian Hanc ("Mr. Hanc") and Rockne Brubaker ("Mr. Brubaker").  Mr. Hanc resides in St. Charles, Illinois and Mr. Brubaker resides in Batavia, Illinois.  H & B HOLDINGS is headquartered and operated in Geneva, Illinois.

26.     HANC HOLDINGS is an entity owned and operated by Mr. Hanc.  HANC HOLDINGS is headquartered and operated in St. Charles, Illinois.

27.     On or near November 4, 2020, an acquaintance of Mr. Hanc's told him about investing in ecommerce stores through NXT LVL.  The acquaintance told Michael Tibor that Mr. Hanc might be interested in investing in ecommerce stores.

28.     Mr. Tibor was an employee and agent of NXT LVL, UPGRADED, ONE UP and Mr. Walding.  Mr. Tibor reached out to Mr. Hanc and Mr. Brubaker in Illinois numerous times throughout November 2020 for purposes of inducing them to invest in NXT LVL.

29.     For instance, Mr. Tibor initiated his relationship with Plaintiffs by exchanging emails with Mr. Hanc to induce him to invest in NXT LVL.  Mr. Tibor understood that Mr. Hanc and Mr. Brubaker resided in Illinois during these communications.

30.     On or near November 6, 2020, Mr. Tibor called Mr. Hanc in Illinois to describe NXT LVL's alleged services and to convince him to invest with NXT LVL and Mr. Walding.  Mr. Tibor told Mr. Hanc he could expect substantial profitability when investing in NXT LVL.

31.     During the calls, Mr. Tibor explained that NXT LVL was an e-commerce management company that sold online stores and managed the stores as part of a proposed ecommerce relationship.

32.     Mr. Tibor explained that typically purchasers would provide financing to NXT LVL and/or Mr. Walding and that NXT LVL would purchase stores for investors and then manage the ecommerce stores on Amazon or Walmart's internet platforms.

33.     Mr. Tibor explained that NXT LVL would charge a "consulting fee" to purchase and manage the stores.   He also explained that Mr. Hanc could purchase an "aged store" or a "new store."

34.    A "new store" is an ecommerce store with no sales history.  A new store must go through a process referred to as "scaling up" whereby sales would be increased slowly and incrementally.  New stores that sold too many products too quickly were subject to suspension or permanent removal, if not corrected, from Amazon or Walmart's internet platforms.

35.    New stores generally required an initial $11,250.00 "consulting fee."  Mr. Tibor explained that clients of NXT LVL would also be required to pay the greater of $300.00 per month or 35% of net sales to NXT LVL in addition to the initial consulting fee.

36.    An "aged store" is an ecommerce store with an established sales history on Amazon's internet platform.  An aged store does not need to be "scaled up" because it should have already completed the scaling process.

37.    Mr. Tibor explained that an aged store would cost $22,500.00, along with monthly payments of the greater of $300.00 or 35% of net sales.

38.    On or near November 7, 2020, Mr. Tibor claimed during a call with Mr. Hanc that each store procured and managed by NXT LVL would see between $30,000.00 and $75,000.00 in monthly gross sales within three to four months of opening.

39.    On November 7, 2020, Mr. Hanc emailed a spreadsheet to Mr. Tibor containing his revenue projections based upon Mr. Tibor's representations.  See Exhibit 1, November 7, 2020, Spreadsheet.  Mr. Hanc projected $10,317.50 in net profit from a "low tier" and $26,600 in net profit from a "high tier" store after the first year.  *Id.*

40.    On November 7, 2020, Mr. Tibor reviewed Mr. Hanc's revenue projection spreadsheet and returned it to him with upwardly revised projections.  Mr. Tibor projected $23,387.50 in net profit for a new store and $56,700.00 in net profit for an aged store after the first

year. See Exhibit 2, November 7, 2020, Revised Spreadsheet. Mr. Tibor sent the revised revenue projections to Mr. Hanc in Illinois to induce him to invest in NXT LVL and Mr. Walding.

41. In November 2020, Mr. Tibor enlisted consultants to reach out to Mr. Hanc and Mr. Brubaker in Illinois to instruct them on "stacking" credit cards to maximize the credit available to invest in ecommerce stores procured and managed by NXT LVL.

42. Mr. Tibor sent references to Mr. Hanc in Illinois for purposes of inducing him to invest in NXT LVL. Mr. Tibor also sent instructions to Mr. Hanc in Illinois on how to set up LLCs for purposes of investing in NXT LVL.

43. Mr. Tibor sent excel spreadsheets to Mr. Hanc in Illinois containing alleged sales figures for Mr. Walding's Walmart test store. Mr. Tibor sent the spreadsheets to Mr. Hanc in Illinois to induce him to invest in NXT LVL.

44. In November 2020, Mr. Tibor reached out to Mr. Hanc in Illinois and asked him to arrange additional phone and Zoom calls with Mr. Brubaker for purposes of inducing Mr. Brubaker to invest in NXT LVL.

45. On November 15, 2020, Mr. Tibor contacted Mr. Hanc in Illinois to counsel H & B HOLDINGS and HANC HOLDINGS on obtaining lines of credit in Illinois for purposes of investing with NXT LVL.

46. On November 24, 2020, Mr. Tibor contacted Mr. Hanc in Illinois to show him alleged examples of Amazon ecommerce store productivity to induce him to invest with NXT LVL.

47. On November 30, 2020, Mr. Tibor forwarded contracts from Florida to Illinois to be executed by H & B HOLDINGS, HANC HOLDINGS, ALGON, ECOM, ELEVATION and LEVEL SET within the State of Illinois.

**THE AMAZON AGREEMENTS**

48.     On December 10, 2020, H & B HOLDINGS, HANC HOLDINGS, ALGON, ECOM, ELEVATION and LEVEL SET (collectively "the Amazon Clients") executed four "E-Commerce Consulting Agreements" ("Amazon Agreements") in Illinois with NXT LVL and Mr. Walding.  See Exhibits 3-6.

49.     The Amazon Agreements required that NXT LVL perform services for the Amazon Clients, including, but not limited to, the following:

      a.      Procure an ecommerce store on the client's behalf;

      b.      Maintain the client's store, including configuring the Amazon storefront and configuring the front and back end systems necessary to manage the Store;

      c.      Review, research, source, select and list products for the Client's Store;

      d.      Maintain oversight of Client's Store and its financial performance. Ex. 1 ¶ 1.

50.     The Amazon Agreements required the Amazon Clients to obtain a credit card for each store with a minimum credit limit of $30,000.00 with which Defendants were supposed to obtain merchandise to sell on the various ecommerce stores.  Plaintiffs maintained a requisite credit line at all relevant times.

51.     The Amazon Agreements required Plaintiffs to pay a one-time consulting fee, spread into two payments.  Plaintiffs always paid the initial fees and second fee when invoiced by Defendants.

52.     The Amazon Agreements also required that Plaintiffs pay the greater of $300.00 per month or 35% of net profit to NXT LVL and Mr. Walding unless there was no activity in a store for more than 15 days of a month-long period.  Plaintiffs paid the additional consulting fees

where required and were billed by Defendants and paid for such fees even where stores had no activity for months.

53.     The Amazon Agreements required the parties to "discuss in a professional and private manner," "any issues or problems that either party has regarding the other with respect to this Agreement…" Ex. 1 at ¶ 6. As explained in greater detail below, Defendants routinely refused to discuss issues and problems with their conduct relative to the Amazon Agreements.

54.     The Amazon Agreements contained a liquidated damages provision based on the representation that "damages to Client resulting from breach of this Agreement by Consultant are difficult and impractical, if not impossible to calculate, Consultant shall only be liable to the extent actual damages incurred by client, not to exceed a total of $5,000.00 USD." Ex. 1 at ¶ 11.

55.     The liquidated damages provision simultaneously required the parties to accept that actual damages were perhaps "impossible" to calculate but required Plaintiffs to calculate actual damages in excess of $5,000.00.

56.     Contrary to the liquidated damages clause and as explained more fully below, actual damages were easily quantified and estimated.

57.     The $5,000.00 liquidated damages provision was never a reasonable estimate of the actual damages that Plaintiffs might, and ultimately did, suffer. As explained more fully below, Plaintiffs ultimately lost more than $130,000.00 in approximately 10 months through Defendants' fraud, negligence and mismanagement.

58.     In comparison, the Amazon Agreements contained a $50,000.00 liquidated damages provision *per breach* in the event Plaintiffs violated the "Non-Disclosure" or "Confidentiality" provisions of the agreements. Ex. 1 at ¶¶ 13 (M); 9 (C), (D).

59.     The Amazon Agreements guaranteed that "the Services provided by Consultant to Client pursuant to this Agreement shall where practical be consistent with Amazon's current policies."  Ex. 1 ¶ 12.

60.     On or near December 1, 2020, H & B HOLDINGS and HANC HOLDINGS made their initial wire transfers on behalf of ALGON, ECOM, ELEVATIONS and LEVEL SET to NXT LVL and Mr. Walding as required by the Contracts.

61.     On December 1, 2020, Mr. Tibor told Mr. Hanc he was "the luckiest SOB ever that they were still available and that he honored the invoice price."

62.     The Amazon Clients were instructed by NXT LVL and Mr. Walding to log into their Amazon accounts and "click around" for five-to-ten minutes each day so that Amazon would not shut the store down based upon "suspicion of unauthorized access."  The Amazon Clients always complied with this instruction.

63.     In January, Mr. Tibor arranged for an interview with Mr. Brubaker in Illinois for purposes of inducing him to invest in Defendants' scheme.

**ALGON ECOM**

64.     On December 1, 2020, H & B HOLDINGS paid $11,250.00 to NXT LVL and Mr. Walding on ALGON's behalf for a new ecommerce store to be featured on Amazon's internet platform.  ALGON's store was approved by Amazon in January 2021.

65.     H & B HOLDINGS paid additional $300.00 monthly consulting fees on ALGON's behalf to NXT LVL and Mr. Walding in March and June 2021.

66.     By May 7, 2021, there were no products listed on ALGON's store.  On May 13, 2021, the ALGON store launched on Amazon's internet platform.

67. On July 15, 2021, NXT LVL employee and agent Tim Richards ("Mr. Richards") claimed that ALGON never "got off the ground" because of "warehouse issues." Mr. Richards claimed that NXT LVL was entitled to 90 days to launch/scale up a store, which would have ended in June 2021.

68. Mr. Richards told ALGON and Mr. Hanc that a store needed to have "a minimum" of a few hundred items to be profitable. By September 2021, ALGON only had a handful of items listed on the store, had sold 31 items for a total of $416.16 in gross sales.

69. On September 23, 2021, ALGON turned off the store's listings due to NXT LVL refusing to stock the store and to stop NXT LVL or Mr. Walding from making charges on ALGON's credit card.

70. NXT LVL and Mr. Walding fraudulently misrepresented its services with respect to ALGON. NXT LVL and Mr. Walding at all times knew that it would not maintain or stock ALGON with products.

71. NXT LVL and Mr. Walding failed to maintain ALGON, including configuring the Amazon storefront and configuring the front and back end systems necessary to manage the Store;

72. NXT LVL and Mr. Walding failed to review, research, source, select and list products for ALGON.

73. NXT LVL and Mr. Walding failed to maintain oversight of ALGON, failed to maintain oversight of ALGON's financial performance.

74. NXT LVL and Mr. Walding refused repeated requests to reimburse the consulting fees paid by H & B HOLDINGS and ALGON and ultimately converted the fees.

**ECOM DYNAMICS**

75.     On December 1, 2020, H & B HOLDINGS paid $11,250.00 on ECOM's behalf in consulting fees to NXT LVL and Mr. Walding for a new ecommerce store to be featured on Amazon's internet platform.  ECOM also paid approximately $1,800.00 to NXT LVL in additional consulting fees to manage ECOM's store.

76.     On January 12, 2021, ECOM was finalized and approved for sales, but NXT LVL told ECOM that the launch was delayed until March 9, 2021, due to an alleged warehouse opening.

77.     ECOM's launch was supposed to take ninety days, but there were no real sales on ECOM during the ninety-day launch period.  The gross sales for ECOM between March 9, 2021, and June 1, 2021, were $147.84.

78.     On June 10, 2021, Mr. Richards told H & B HOLDINGS that there was a two-month delay to complete the launch process due to warehouse issues.

79.     On July 8, 2021, Mr. Richards asked H & B HOLDINGS to open an Amazon Business Prime account from Illinois.  He explained that that an ABP account would allow NXT LVL to avoid Amazon packages showing a different retailer on the return address of the Amazon package.

80.     On August 7, 2021, Amazon notified ECOM that it was reviewing ECOM and refusing to transfer funds to the account because "Your current sales volumes are not supported by buyer feedback or an established sales history."  That meant NXT LVL scaled the store too quickly in violation of Amazon's policies.

81.     On August 18, 2021, H & B HOLDINGS and ECOM were notified that Amazon was shutting down the ABP account due to "violating the terms of our Conditions of Use

agreement. When we close your account for violating the terms of an agreement, you cannot open a new account or use another account to place orders on our site."

82.     NXT LVL and Mr. Walding were purchasing items from Amazon on the ABP account and selling the products on ECOM's store. NXT LVL and Mr. Walding knew this practice violated Amazon's rules and was a way to defraud H & B HOLDINGS and ECOM.

83.     NXT LVL and Mr. Walding were responsible for violating the terms of the Conditions of Use agreement. There were no additional sales on ECOM after Amazon shut the ABP account.

84.     On August 26, 2021, H & B HOLDINGS and ECOM were notified that the account was flagged because ECOM's Valid Tracking Rate ("VTR") rate was below 95%. Amazon requires all sellers to have a VTR above 95%.

85.     On September 3, 2021, H & B HOLDINGS and ECOM sent an email to NXT LVL demanding answers about the VTR rate. NXT LVL did not respond.

86.     On October 4, 2021, H & B HOLDINGS and ECOM received an email from Amazon noting there were problems with ECOM's orders.

87.     ECOM's total net sales were approximately $198.00. The store lost approximately $11,052.00 inclusive of the consulting fees.

88.     NXT LVL and Mr. Walding fraudulently misrepresented its services with respect to ECOM. NXT LVL and Mr. Walding at all times knew that it would not maintain or stock ALGON with products.

89.     NXT LVL and Mr. Walding failed to maintain ECOM, including configuring the Amazon storefront and configuring the front and back end systems necessary to manage the Store;

14

90.     NXT LVL and Mr. Walding failed to review, research, source, select and list products for ECOM.

91.     NXT LVL and Mr. Walding failed to maintain oversight of ECOM, failed to maintain oversight of ECOM's financial performance.

92.     NXT LVL and Mr. Walding refused repeated requests to reimburse the consulting fees paid by H & B HOLDINGS and ECOM and ultimately converted the fees.

**ELEVATIONS IN ECOM**

93.     On December 1, 2020, HANC HOLDINGS executed a wire transfer of $20,000.00 to UPGRADED LIFESTYLE and Mr. Walding on ELEVATION's behalf for purchase of an aged store called "TOMIS," as identified by NXT LVL and Mr. Walding.

94.     On December 1, 2020, HANC HOLDINGS executed a second wire transfer of $11,250.00 to NXT LVL on ELEVATION's behalf in consulting fees related to TOMIS.

95.     The receipt for the wire transfers listed the address of the payee as a property purportedly owned by Mr. Walding.

96.     On February 12, 2021, HANC HOLDINGS attempted to log in to perform daily activities related to the transition period, but the TOMIS account deactivated. HANC HOLDINGS requested assistance from NXT LVL.

97.     On February 16, 2021, Mr. Richards responded, "keep up the good work" and "our team is addressing this and will get it resolved ASAP."

98.     On February 19, 2021, HANC HOLDINGS notified NXT LVL that TOMIS was deactivated and that they were locked out of the account. Mr. Richards responded that he would be "checking with the previous owner."

99.     NXT LVL did not respond to requests for further updates until March 1, 2021, when Mr. Richards assured Mr. Hanc that NXT LVL was working to reactivate the store.

100.     On March 22, 2021, Mr. Richards claimed that NXT LVL ran into a "reverification detour on the launch process" with TOMIS.  He claimed they were coordinating with the broker, who was recovering from a recent surgery, and that the situation was "not a big deal."

101.     On April 9, 2021, when asked for a status update on the TOMIS purchase, Mr. Richards told HANC HOLDINGS that NXT LVL was "working on it with the vendor…we're getting through it though, so once it's finalized, we'll launch it as fast as possible and scale it heavily."

102.     On May 6, 2021, Mr. Hanc had a conference call with Mr. Walding and Mr. Richards.  During the call, Mr. Walding for the first time admitted to Mr. Hanc that "someone ran off" with TOMIS and that ELEVATIONS would not recover the money it paid for the store.

103.     On May 13, 2021, Mr. Richards told Mr. Hanc that HANC HOLDINGS would own two aged stores by June 6, 2021.

104.     Rather than procure two aged stores, Mr. Walding offered to adjust all percentages between HANC HOLDINGS and Defendants to 70% / 30% and recover each store.  Mr. Richards promised to "take over" and participate in weekly meetings to get solutions in place.

105.     Mr. Richards attended less than half of those meetings and, in many cases, never bothered to provide Mr. Hanc with advance notice.  Mr. Hanc waited 45 minutes at times for Mr. Richards to appear on Zoom for the scheduled meetings.

106.     NXT LVL and Mr. Walding retained the consulting fees paid by ELEVATIONS for TOMIS despite the alleged theft, along with any profit it may have earned from the purchase of TOMIS.  Not long thereafter, ELEVATIONS was locked and closed down.

107. NXT LVL and Mr. Walding then claimed they would transfer another aged store, EMIL3434, to PARKCAM, LLC, as a replacement for TOMIS.

108. On June 24, 2021, EMIL3434 was transferred to PARKCAM. NXT LVL and Mr. Walding fraudulently misrepresented that EMIL3434 was an "aged store."

109. In reality, EMIL3434 was not an aged store as promised and thus not a "replacement." EMIL3434 was owned by a woman in Romania and had no product or sales history.

110. In August 2021, Plaintiffs requested that Mr. Walding and NXT LVL produce the following information:

    a. Documents indicating that a wire transfer was made from NXT LVL to TOMIS's owner or possessor, including the total amount paid to TOMIS by NXT LVL;

    b. Documents indicating that Mr. Walding and/or his designee filed a criminal complaint against the owner and/or possessor of TOMIS;

    c. All contact information NXT LVL and/or Mr. Walding have for the owner and/or possessor of TOMIS;

    d. Documents indicating that Mr. Walding and/or NXT LVL filed an insurance claim related to the alleged theft.

111. NXT LVL and Mr. Walding refused to produce any of the documentation requested by HANC HOLDINGS with respect to alleged TOMIS purchase.

112. On August 23, 2021, Mr. Hanc asked NXT LVL to identify the name of the Amazon store that HANC HOLDINGS spent $31,250.00 to purchase. NXT LVL refused to respond.

113.    On September 8, 2021, ELEVATIONS and HANC HOLDINGS were locked out of the EMIL3434 account without any sales.

114.    NXT LVL and Mr. Walding refused to reimburse ELEVATIONS and HANC HOLDINGS for the consulting fees paid for TOMIS or EMIL 3434.

115.    NXT LVL and Mr. Walding fraudulently misrepresented its services with respect to ELEVATIONS. NXT LVL and Mr. Walding at all times knew that it would not maintain or stock ELEVATIONS with products.

116.    NXT LVL and Mr. Walding failed to maintain ELEVATIONS, including configuring the Amazon storefront and configuring the front and back end systems necessary to manage the Store;

117.    NXT LVL and Mr. Walding failed to review, research, source, select and list products for ELEVATIONS.

118.    NXT LVL and Mr. Walding failed to maintain oversight of ELEVATIONS and failed to maintain oversight of ELEVATIONS' financial performance.

119.    NXT LVL and Mr. Walding refused repeated requests to reimburse the consulting fees paid by H & B HOLDINGS and ECOM and ultimately converted the fees.

**LEVEL SET ECOM**

120.    On December 1, 2020, H & B HOLDINGS transferred $20,000.00 on LEVEL SET's behalf to UPGRADED LIFESTYLE, NXT LVL and Mr. Walding to purchase an aged store for LEVEL SET.  NXT LVL and Mr. Walding assured H & B HOLDINGS that an "aged store would be transferred" to LEVEL SET.

121.    H & B HOLDINGS paid an additional $11,250.00 consulting fee on LEVEL SET's behalf to NXT LVL and Mr. Walding for the aged store supposedly earmarked for LEVEL SET.

The address of the payee for purchase price and consulting fee was a property purportedly owned by Mr. Walding.

122.   On January 19, 2021, NXT LVL's "Director of New Client Onboarding" EJ Hernandez notified Mr. Hanc that NXL LVL acquired "your 2 aged stores."

123.   On May 6, 2021, Mr. Walding claimed that someone "ran off" with the stores and that he was unable to recover them.

124.   Neither NXT LVL nor Mr. Walding purchased an ecommerce store for LEVEL SET, much less an aged store, in return for the $31,250.00 consulting fees.

125.   NXT LVL and Mr. Walding refused to refund the $31,250.00 it received from H & B HOLDINGS for an aged store for LEVEL SET.

126.   H & B HOLDINGS and LEVEL SET made repeated requests for information surrounding the payment.  NXT LVL and Mr. Walding refused to respond.

127.   In August 2021, H & B HOLDINGS and LEVEL SET requested that NXT LVL and Mr. Walding identify:

   a.   "The name of the alleged aged store and the identity of the store owner or possessor to whom NXT LVL paid funds on behalf of Mr. Brubaker and Mr. Hanc, including corporate name, individual name, address, email address, cellular and office telephone numbers."

   b.   Documents indicating that a wire transfer was made from NXT LVL to the owner or possessor of the aforementioned aged store, including the total amount paid to the owner and/or possessor of the aged store by NXT LVL;

   c.   Documents indicating that Mr. Walding and/or his designee filed a criminal complaint against the owner and/or possessor of the aforementioned aged store.

d.      Documents indicating that Mr. Walding and/or NXT LVL filed an insurance claim related to the alleged theft.

128.    NXT LVL and Mr. Walding refused to provide responsive information to any of the requests identified in the preceding paragraph.

129.    On September 23, 2021, Mr. Hanc asked Mr. Walding to identify the name of the Amazon aged store it allegedly purchased for LEVEL SET, but he refused to do so.

130.    NXT LVL and Mr. Walding fraudulently misrepresented its services with respect to LEVEL SET. NXT LVL and Mr. Walding at all times knew that it would not maintain or stock LEVEL SET with products.

131.    NXT LVL and Mr. Walding failed to maintain LEVEL SET, including configuring the Amazon storefront and configuring the front and back end systems necessary to manage the Store;

132.    NXT LVL and Mr. Walding failed to review, research, source, select and list products for LEVEL SET.

133.    NXT LVL and Mr. Walding failed to maintain oversight of LEVEL SET and failed to maintain oversight of LEVEL SET's financial performance.

134.    NXT LVL and Mr. Walding refused repeated requests to reimburse the consulting fees paid by H & B HOLDINGS and LEVEL SET and ultimately converted the fees.

**THE WALMART AGREEMENTS**

135.    On March 4, 2021 and March 16, 2021, H & B HOLDINGS, HANC HOLDINGS, SRUNE, STELB and REDSTONE (collectively "the Walmart Clients") executed three "E-Commerce Consulting Agreements" ("the Walmart Agreements") in Illinois with ONE UP and Mr. Walding. See Exhibits 7-9.

136.    The Walmart Agreements required that NXT LVL perform services for the Walmart Clients including, but not limited to, the following:

      a.     Perform all acts and do all things necessary to apply for a Store on Client's behalf.  In the event Walmart denies Consultant's application not open a Store, Consultant shall reapply for a Store on Client's behalf until such time as Walmart grants Consultant's application to open a Store;

      b.     Maintain the client's store, including configuring the Walmart storefront and configuring the front and back end systems necessary to manage the Store;

      c.     Review, research, source, select and list products for the Client's Store;

      d.     Maintain oversight of Client's Store and its financial performance. Ex. 5 ¶ 1.

      e.     Manage a replacement Store for Client for the remainder of the Agreement if the Store is closed due to no fault of the Client.

137.    The Walmart Agreements required the Walmart Clients to obtain a credit card for each store with a minimum credit limit of $30,000.00 with which Defendants were supposed to obtain merchandise to sell on the various ecommerce stores.  The Walmart Clients maintained a requisite credit line at all relevant times.

138.    The Walmart Agreements required the Walmart Clients to pay a one-time consulting fee, spread into two payments.  The Walmart Clients always paid the initial fees and second fee when invoiced by Defendants.

139.    The Walmart Agreements also required the Walmart Clients to pay the greater of $249.00 per month or 50% of net profit to ONE UP and Mr. Walding unless there was no activity in a store for more than 15 days of a month-long period.  The Walmart Clients paid the additional

consulting fees where required and were billed by Defendants and paid for such fees even where stores had no activity for months.

140.     The Walmart Agreements required the parties to "discuss in a professional and private manner," "any issues or problems that either party has regarding the other with respect to this Agreement…" Ex. 5 at ¶ 6.  As explained in greater detail below, Defendants routinely refused to discuss issues and problems with their conduct relative to the Walmart Agreements.

141.     The Walmart Agreements contained a liquidated damages provision based on the representation that "damages to Client resulting from breach of this Agreement by Consultant are difficult and impractical, if not impossible to calculate, Consultant shall only be liable to the extent actual damages incurred by client, not to exceed a total of $5,000.00 USD."  Ex. 5 at ¶ 11.

142.     The liquidated damages provision simultaneously required to parties to accept that actual damages were perhaps "impossible" to calculate but required Plaintiffs to calculate actual damages in excess of $5,000.00.

143.     Contrary to the liquidated damages clause and as explained more fully below, actual damages were easily quantified and estimated.

144.     The $5,000.00 liquidated damages provision was never a reasonable estimate of the actual damages that Plaintiffs might, and ultimately did, suffer.  As explained more fully below, Plaintiffs ultimately lost more than $130,000.00 in approximately 10 months through Defendants' fraud, negligence and mismanagement.

145.     In comparison, the Walmart Agreements contained a $50,000.00 liquidated damages provision *per breach* in the event Plaintiffs violated the "Non-Disclosure" or "Confidentiality" provisions of the agreements.  Ex. 5 at ¶¶ 13 (M); 9 (C), (D).

146. The Amazon Agreements guaranteed that "the Services provided by Consultant to Client pursuant to this Agreement shall where practical be consistent with Walmart's current policies." Ex. 5 ¶ 12 (D).

147. On or near December 1, 2020, H & B HOLDINGS and HANC HOLDINGS made their initial wire transfers on behalf of SRUNE, STELB, and REDSTONE to ONE UP and Mr. Walding as required by the Walmart Agreements.

148. The Walmart Clients were instructed by NXT LVL and Mr. Walding to log into their Walmart accounts and "click around" for five-to-ten minutes each day so that Walmart would not shut the store down based upon "suspicion of unauthorized access." The Walmart Clients always complied with this instruction where possible.

**SRUNE ECOM, LLC**

149. In December 2020, HANC HOLDINGS paid $7,500.00 to ONE UP and Mr. Walding on behalf of SRUNE as one-half of the fee to purchase an ecommerce store to be featured on Walmart's internet platform.

150. On or near March 3, 2021, ONE UP and Mr. Walding requested the second half of the fee. On March 4, 2021, HANC HOLDINGS paid the second $7,500.00 fee to ONE UP and Mr. Walding for SRUNE's ecommerce store.

151. On March 16, 2021, SRUNE, Mr. Hanc, ONE UP and Mr. Walding executed an E-Commerce Consulting Agreement with respect to the SRUNE ecommerce store on Walmart's internet platform. See Exhibit 5.

152. On May 29, 2021, ONE UP emailed SRUNE to note that the store was ready to go live. Mr. Richards told Mr. Hanc and Mr. Brubaker that an ecommerce store need "over 1000

[product] listings to perform."  In early June 2021, only approximately 257 items were listed on the store.

153.    On June 10, 2021, Mr. Richards assured Mr. Hanc that ONE UP would double the number of listings available on the store within two weeks. By June 24, 2021, the number of listings had only increased to 297.  By July 1, 2021, the number of listings had increased to 341, or 34% of the minimum number of listings needed to "perform."

154.    On or near August 20, 2021, Walmart suspended the store's operations due to policy violations committed by ONE UP and Mr. Walding.

155.    On or near August 25, 2021, Walmart terminated the account for policy violations committed by ONE UP and Mr. Walding.

156.    SRUNE's total gross sales were $6,670.45.  The net sales, before consulting fees, were $704.55.  Net sales, inclusive of consulting fees, were -$7,542.00.

157.    On September 8, 2021, ONE UP and Mr. Walding sent an invoice to SRUNE for additional consulting fees even though the store was shut down due to their policy violations.

158.    ONE UP and Mr. Walding fraudulently misrepresented its services with respect to SRUNE.  ONE UP and Mr. Walding at all times knew that it would not maintain or stock SRUNE's with enough products to comply with its required services.

159.    ONE UP and Mr. Walding failed to maintain SRUNE, including configuring the Amazon storefront and configuring the front and back end systems necessary to manage the Store;

160.    ONE UP and Mr. Walding failed to review, research, source, select and list products for SRUNE.

161.    ONE UP and Mr. Walding failed to maintain oversight of SRUNE and failed to maintain oversight of SRUNE's financial performance.

162.    ONE UP and Mr. Walding refused repeated requests to reimburse the consulting fees paid by HANC HOLDINGS and SRUNE and ultimately converted the fees.

**STELB ECOM, LLC**

163.    On December 1, 2020, H & B HOLDINGS paid $15,000.00 to ONE UP and Mr. Walding on STELB's behalf for a new ecommerce store on the Walmart internet platform.

164.    On January 7, 2021, ONE UP and Mr. Walding began to set up STELB.  On January 29, 2021, ONE UP and Mr. Walding notified Mr. Hanc that STELB's set up would require another eight weeks.

165.    On March 29, 2021, ONE UP and Mr. Walding claimed to Mr. Hanc that Walmart had changed their processes.

166.    On April 11, 2021, ONE UP asked that it be added as a user on STELB's ABP account.

167.    On April 14, 2021, ONE UP notified Mr. Hanc that Walmart rejected STELB's application but that ONE UP would (1) cover a new LLC (2) submit a new application for STELB, and (3) "move your application to the front of the line."  None of this was ever done.

168.    On May 7, 2021, Mr. Hanc had a meeting with Mr. Richards and Mr. Tibor about STELB's closure.  Mr. Richards suggested holding weekly meetings to discuss the ecommerce stores.  Mr. Richards ultimately skipped most of those meetings.

169.    On August 5, 2021, ONE UP and Mr. Walding notified STELB that they were appealing Walmart's rejection of the store.

170.    On August 16, 2021, Mr. Brubaker and Mr. Hanc asked a representative for ONE UP and Mr. Walding for the following information with respect to their alleged appeal of Walmart's rejection of STELB:

a. "In what forum is the rejection being appealed?

b. What stage is the appeal in?

c. Please provide documents indicating that this store's status is being appealed, the forum in which the appeal is proceeding and the current status of the appeal."

171. ONE UP and Mr. Walding refused to provide any responsive information or documents requested. STELB never received a store for placement on Walmart's internet platform and ONE UP and Mr. Walding refused to reimburse STELB for the $15,000.00 it paid for a store.

172. ONE UP and Mr. Walding fraudulently misrepresented its services with respect to STELB. ONE UP and Mr. Walding at all times knew that it would not maintain or stock STELB with enough products to comply with its required services.

173. ONE UP and Mr. Walding failed to maintain STELB, including configuring the Amazon storefront and configuring the front and back end systems necessary to manage the Store;

174. ONE UP and Mr. Walding failed to review, research, source, select and list products for STELB.

175. ONE UP and Mr. Walding failed to maintain oversight of STELB and failed to maintain oversight of SRUNE's financial performance.

176. ONE UP and Mr. Walding refused repeated requests to reimburse the consulting fees paid by H & B HOLDINGS and STELB and ultimately converted the fees.

**REDSTONE ECOM, LLC**

177. On December 1, 2020, HANC HOLDINGS paid $7,500.00 to ONE UP and Mr. Walding on REDSTONE's behalf for an ecommerce store on Walmart's internet platform.

178. On December 1, 2020, ONE UP and Mr. Walding purchased an ecommerce store for REDSTONE.

179. On April 14, 2021, ONE UP notified Mr. Hanc that Walmart rejected REDSTONE's store due to ONE UP and Mr. Walding failing to comply with Walmart's operating procedures with respect to managing ecommerce stores.

180. In August 2021, ONE UP and Mr. Walding notified REDSTONE that they were appealing Walmart's rejection of the store.

181. In August 2021, REDSTONE requested the following information from Defendants with respect to ONE UP and Mr. Walding's alleged appeal of Walmart's rejection of REDSTONE:

    a.    "In what forum is the rejection being appealed?

    b.    What stage is the appeal in?

    c.    Please provide documents indicating that this store's status is being appealed, the forum in which the appeal is proceeding and the current status of the appeal."

182. ONE UP and Mr. Walding refused to provide any responsive information or documents requested. REDSTONE's ecommerce store was never placed on Walmart's internet platform and ONE UP and Mr. Walding never reimbursed REDSTONE for the $7,500.00 it paid for REDSTONE's store.

183. ONE UP and Mr. Walding fraudulently misrepresented its services with respect to REDSTONE. ONE UP and Mr. Walding at all times knew that it would not maintain or stock REDSTONE with enough products to comply with its required services.

184.    ONE UP and Mr. Walding failed to maintain REDSTONE, including configuring the Walmart storefront and configuring the front and back end systems necessary to manage the Store.

185.    ONE UP and Mr. Walding failed to review, research, source, select and list products for REDSTONE.

186.    ONE UP and Mr. Walding failed to maintain oversight of REDSTONE and failed to maintain oversight of REDSTONE'S financial performance.

**PARKCAM ECOM, LLC**

187.    On June 25, 2021, the funds paid by REDSTONE were transferred to PARKCAM and an ecommerce store was procured for PARKCAM.   PARKCAM essentially replaced REDSTONE after Walmart rejected REDSTONE for failing to follow its policies.

188.    On July 17, 2021, Walmart notified PARKCAM that $7,000.00 in sales was at risk due to past due orders.  On August 3, 2021, Walmart paid $1,029.14 to PARKCAM.

189.    On August 6, 2021, Walmart suspended PARKCAM due to ONE UP and Mr. Walding failing to comply with Walmart's procedures.  The specific violation was "Operational Performance: On-Time Delivery."

190.    Walmart noted that during the ninety-day period preceding August 6, 2021, the on-time shipping rate was 57.63% and the on-time delivery rate was 90%.  Walmart withheld $9,341.38 in revenue due to ONE UP and Mr. Walding's policy violations.

191.    On or near September 7, 2021, Walmart removed PARKCAM from suspension and it became active again.

192.    On September 24, 2021, ONE UP was notified that it was no longer authorized to act for PARKCAM.   At that point, PARKCAM's net sales were approximately -$18,000.00.

Despite the notification, ONE UP processed $3,500.00 in additional purchases on PARKCAM's credit card between September 25, 2021, and September 28, 2021.

193.    Defendants' failure to maintain PARKCAM and comply with Walmart's policies was a breach of the agreement between PARKCAM and Defendants.

194.    Defendants also utilized "drop shipping" to fulfill orders placed through Amazon, which was in violation of Amazon's restriction on drop shipping to fulfill orders.

195.    Plaintiffs lost approximately $134,000.08 due to Defendants' aforementioned conduct.

## COUNT I – VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE PRACTICES ACT

196.    Plaintiffs repeat, re-allege and incorporate by reference the factual allegations of paragraphs one through 195 as if fully set forth herein.

197.    At all relevant times, there was in full force and effect a statute called the Illinois Consumer Fraud and Deceptive Business Practices Act ("the Act").

198.    The Act provides:

"Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act.  815 ILCS 505/2.

199.    As described more fully above, Defendants engaged in a scheme whereby through deception, fraud, false pretense, false promise, misrepresentation and concealment would induce prospective clients to pay large consulting fees for the purchase and management of ecommerce

stores but either fail to purchase the stores or fail to manage the stores, leading to their removal from Amazon or Walmart's internet platform, but retain the consulting fees.

200.    As described more fully above, Defendants employed deception, fraud, false pretense, false promise, misrepresentation and concealment to induce Plaintiffs to rely thereupon and invest in Defendants' businesses.

201.    Plaintiffs in fact relied on Defendants' deception, fraud, false pretense, false promise representation as an inducement to invest in Defendants' businesses.

202.    Plaintiffs lost in excess of $150,000.00 as a result of Defendants engaging in the aforementioned fraudulent and deceptive business practices.

WHEREFORE, H & B HOLDINGS, HANC HOLDINGS, ALGON, ECOM, ELEVATIONS, LEVEL SET, SRUNE, STELB, REDSTONE and PARKCAM demand judgment be entered in their favor and against NXT LVL, UGRADED, ONE UP and MICHAEL WALDING in an amount in excess of $150,000.00 in compensatory damages, punitive damages, attorney fees, costs of suit, and for any other relief the Court deems appropriate.

## COUNT II – FRAUDULENT MISREPRESENTATION

203.    Plaintiffs repeat, re-allege and incorporate by reference the factual allegations of paragraphs one through 195 as if fully set forth herein.

204.    As described more fully above, Defendants made statements of material fact that they knew or believed to be false.

205.    Defendants' false statements and promises were part of an overall scheme to defraud Plaintiffs.

206.    As described more fully above, Defendants intended to induce Plaintiffs to rely on those statements.

207.    As described more fully above, Plaintiffs acted in reasonable reliance on the truth of those statements and were damaged as a result.

208.    Plaintiffs lost in excess of $150,000.00 as a result of Defendants engaging in the aforementioned fraudulent and deceptive business practices.

WHEREFORE, H & B HOLDINGS, HANC HOLDINGS, ALGON, ECOM, ELEVATIONS, LEVEL SET, SRUNE, STELB, REDSTONE and PARKCAM demand judgment be entered in their favor and against NXT LVL, UGRADED, ONE UP and MICHAEL WALDING in an amount in excess of $150,000.00 in compensatory, punitive damages, and for any other relief the Court deems appropriate.

## COUNT III – UNJUST ENRICHMENT

209.    Plaintiffs repeat, re-allege, and incorporate by reference the factual allegations of paragraphs one through 195 as if fully set forth herein.

210.    As described more fully above, Defendants unjustly retained "consulting fees" to the Plaintiffs' detriment.

211.    Defendants' retention of those consulting fees violates the fundamental principles of justice, equity, and good conscience.

WHEREFORE, H & B HOLDINGS, HANC HOLDINGS, ALGON, ECOM, ELEVATIONS, LEVEL SET, SRUNE, STELB, REDSTONE and PARKCAM demand judgment be entered in their favor and against NXT LVL, UGRADED, ONE UP and MICHAEL WALDING in an amount in excess of $150,000.00 in compensatory damages and for any other relief the Court deems appropriate.

## COUNT IV – CONVERSION

212.     Plaintiffs repeat, re-allege, and incorporate by reference the factual allegations of paragraphs one through 195 as if fully set forth herein.

213.     Plaintiffs have a right to reimbursement for the money tendered to Defendants to purchase ecommerce stores and the consulting fees paid to defendants to manage those stores.

214.     Plaintiffs have an absolute and unconditional right to the immediate reimbursement of the money tendered to Defendants to purchase ecommerce stores and the consulting fees paid to defendants to manage those stores.

215.     In August 2021, Plaintiffs made a demand to Defendants for reimbursement of the money tendered to Defendants to purchase ecommerce stores and the consulting fees paid to defendants to manage those stores.

216.     Defendants refused to reimburse the money tendered to Defendants to purchase ecommerce stores and the consulting fees paid to defendants to manage those stores and instead wrongfully and without authorization assumed control, dominion, or ownership over the property.

WHEREFORE, H & B HOLDINGS, HANC HOLDINGS, ALGON, ECOM, ELEVATIONS, LEVEL SET, SRUNE, STELB, REDSTONE and PARKCAM demand judgment be entered in their favor and against NXT LVL, UGRADED, ONE UP and MICHAEL WALDING in an amount in excess of $150,000.00 and for punitive damages, attorney fees, costs of suit, and for any other relief the Court deems appropriate.

## COUNT V – BREACH OF CONTRACT – H & B HOLDINGS AND ALGON V. NXT LVL AND MICHAEL WALDING

217.     H & B HOLDINGS and ALGON repeat, re-allege and incorporate by reference the factual allegations of paragraphs one through 195 as if fully set forth herein.

218.    H & B HOLDINGS and ALGON executed a valid and enforceable contract with NXT LVL and Mr. Walding.  See Exhibit 3.

219.    H & B HOLDINGS and ALGON performed all their obligations as required by the contract.

220.    NXT LVL and Mr. Walding breached the contract as describe more fully above.

221.    As a result of NXT LVL and Mr. Walding breaching the contract, H & B HOLDINGS and ALGON suffered compensatory damages in excess of $13,000.00.

WHEREFORE, H & B HOLDINGS and ALGON demand judgment be entered in their favor and against NXT LVL and Mr. Walding in an amount in excess of $13,000.00 plus attorney fees, cost of suit, and for any other relief the Court deems appropriate.

## COUNT VI – BREACH OF CONTRACT – H & B HOLDINGS AND ECOM V. NXT LVL AND MICHAEL WALDING

222.    H & B HOLDINGS and ECOM repeat, re-allege and incorporate by reference the factual allegations of paragraphs one through 195 as if fully set forth herein.

223.    H & B HOLDINGS and ECOM executed a valid and enforceable contract with NXT LVL and Mr. Walding.  See Exhibit 4.

224.    H & B HOLDINGS and ECOM performed all their obligations as required by the contract.

225.    NXT LVL and Mr. Walding breached the contract as describe more fully above.

226.    As a result of NXT LVL and Mr. Walding breaching the contract, H & B HOLDINGS and ECOM suffered compensatory damages in excess of $25,000.00.

WHEREFORE, H & B HOLDINGS and ECOM demand judgment be entered in their favor and against NXT LVL and Mr. Walding in an amount in excess of $25,000.00 plus attorney fees, cost of suit, and for any other relief the Court deems appropriate.

## COUNT VII – BREACH OF CONTRACT – HANC HOLDINGS AND ELEVATIONS V. NXT LVL, UPGRADED AND MICHAEL WALDING

227. HANC HOLDINGS and ELEVATIONS repeat, re-allege and incorporate by reference the factual allegations of paragraphs one through 195 as if fully set forth herein.

228. HANC HOLDINGS and ELEVATIONS executed a valid and enforceable contract with NXT LVL, UPGRADED and Mr. Walding. See Exhibit 5.

229. HANC HOLDINGS and ELEVATIONS performed all their obligations as required by the contract.

230. NXT LVL, UPGRADED and Mr. Walding breached the contract as describe more fully above.

231. As a result of NXT LVL, UPGRADED and Mr. Walding breaching the contract, HANC HOLDINGS and ELEVATIONS suffered compensatory damages in excess of $25,000.00.

WHEREFORE, H & B HOLDINGS and ELEVATIONS demand judgment be entered in their favor and against NXT LVL, UPGRADED and Mr. Walding in an amount in excess of $25,000.00 plus attorney fees, cost of suit, and for any other relief the Court deems appropriate.

## COUNT VIII – BREACH OF CONTRACT – H & B HOLDINGS AND LEVEL SET V. NXT LVL, UPGRADED AND MICHAEL WALDING

232. H & B HOLDINGS and LEVEL SET repeat, re-allege and incorporate by reference the factual allegations of paragraphs one through 195 as if fully set forth herein.

233. H & B HOLDINGS and LEVEL SET executed a valid and enforceable contract with NXT LVL, UPGRADED and Mr. Walding. See Exhibit 6.

234. H & B HOLDINGS and LEVEL SET performed all their obligations as required by the contract.

235. NXT LVL, UPGRADED and Mr. Walding breached the contract as describe more fully above.

236. As a result of NXT LVL, UPGRADED and Mr. Walding breaching the contract, H & B HOLDINGS and LEVEL SET suffered compensatory damages in excess of $25,000.00.

WHEREFORE, H & B HOLDINGS and LEVEL SET demand judgment be entered in their favor and against NXT LVL, UPGRADED and Mr. Walding in an amount in excess of $25,000.00 plus attorney fees, cost of suit, and for any other relief the Court deems appropriate.

## COUNT IX – BREACH OF CONTRACT – HANC HOLDINGS AND SRUNE V. ONE UP AND MICHAEL WALDING

237. HANC HOLDINGS and SRUNE repeat, re-allege and incorporate by reference the factual allegations of paragraphs one through 195 as if fully set forth herein.

238. HANC HOLDINGS and SRUNE executed a valid and enforceable contract with ONE UP and Mr. Walding. See Exhibit 7.

239. HANC HOLDINGS and SRUNE performed all their obligations as required by the contract.

240. ONE UP and Mr. Walding breached the contract as describe more fully above.

241. As a result of ONE UP and Mr. Walding breaching the contract, HANC HOLDINGS and SRUNE suffered compensatory damages in excess of $17,500.00.

WHEREFORE, HANC HOLDINGS and SRUNE demand judgment be entered in their favor and against ONE UP and Mr. Walding in an amount in excess of $17,500.00 plus attorney fees, cost of suit, and for any other relief the Court deems appropriate.

## COUNT X – BREACH OF CONTRACT – H & B HOLDINGS AND STELB V. ONE UP AND MICHAEL WALDING

242.    H & B HOLDINGS and STELB repeat, re-allege and incorporate by reference the factual allegations of paragraphs one through 195 as if fully set forth herein.

243.    H & B HOLDINGS and STELB executed a valid and enforceable contract with ONE UP and Mr. Walding.  See Exhibit 8.

244.    H & B HOLDINGS and STELB performed all their obligations as required by the contract.

245.    ONE UP and Mr. Walding breached the contract as describe more fully above.

246.    As a result of ONE UP and Mr. Walding breaching the contract, H & B HOLDINGS and STELB suffered compensatory damages in excess of $17,500.00.

WHEREFORE, H & B HOLDINGS and STELB demand judgment be entered in their favor and against ONE UP and Mr. Walding in an amount in excess of $17,500.00 plus attorney fees, cost of suit, and for any other relief the Court deems appropriate.

## COUNT XI – BREACH OF CONTRACT – HANC HOLDINGS AND REDSTONE V. ONE UP AND MICHAEL WALDING

247.    HANC HOLDINGS and REDSTONE repeat, re-allege and incorporate by reference the factual allegations of paragraphs one through 195 as if fully set forth herein.

248.    HANC HOLDINGS and REDSTONE executed a valid and enforceable contract with ONE UP and Mr. Walding.  See Exhibit 9.

249.    HANC HOLDINGS and REDSTONE performed all their obligations as required by the contract.

250.    ONE UP and Mr. Walding breached the contract as describe more fully above.

251.    As a result of ONE UP and Mr. Walding breaching the contract, HANC HOLDINGS and REDSTONE suffered compensatory damages in excess of $17,500.00.

WHEREFORE, HANC HOLDINGS and REDSTONE demand judgment be entered in their favor and against ONE UP and Mr. Walding in an amount in excess of $17,500.00 plus attorney fees, cost of suit, and for any other relief the Court deems appropriate.

## COUNT XII – BREACH OF CONTRACT – HANC HOLDINGS AND PARKCAM V. ONE UP AND MICHAEL WALDING

252.    HANC HOLDINGS and PARKCAM repeat, re-allege and incorporate by reference the factual allegations of paragraphs one through 195 as if fully set forth herein.

253.    HANC HOLDINGS and PARKCAM executed a valid and enforceable oral contract with ONE UP and Mr. Walding.

254.    HANC HOLDINGS and PARKCAM performed all their obligations as required by the contract.

255.    ONE UP and Mr. Walding breached the contract as describe more fully above.

256.    As a result of ONE UP and Mr. Walding breaching the contract, HANC HOLDINGS and PARKCAM suffered compensatory damages in excess of $17,500.00.

WHEREFORE, HANC HOLDINGS and PARKCAM demand judgment be entered in their favor and against ONE UP and Mr. Walding in an amount in excess of $17,500.00 plus attorney fees, cost of suit, and for any other relief the Court deems appropriate.

## RULE 38 JURY DEMAND

The Plaintiffs demand trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

GRIFFIN WILLIAMS
MCMAHON & WALSH, LLP

By: /s/ Patrick J. Walsh
         Patrick J. Walsh, Esq.

Patrick J. Walsh, Esq.
GRIFFIN WILLIAMS
MCMAHON & WALSH, LLP
21 N. Fourth Street
Geneva, Illinois 60134
(630) 457-4242
ARDC No. 6287629
pwalsh@gwmwlaw.com