**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

HANC & BRUBAKER HOLDINGS )
a Montana Company; HANC HOLDINGS, )
a Montana Company; ALGON ECOM, LLC, )
a Delaware Company; ECOM DYNAMICS, )
LLC, a Delaware Company; ELEVATIONS )
IN ECOM, LLC, a Delaware Company; )
LEVEL SET ECOM, LLC, a Delaware )
Company; LEVEL SET ECOM, LLC, a )
Delaware Company; SRUNE ECOM, LLC, )
a Delaware Company; STELB ECOM, LLC, )
a Delaware Company; REDSTONE ECOM, )
LLC, a Delaware Company; PARKCAM, LLC )
a Delaware Company, )
                                       )
          Plaintiffs, )
                                       )
       v. )     Case No.: 1:22-cv-01526
                                         )
NXT LVL SERVICES, LLC, a Florida )     Honorable Matthew F. Kennelly
company; UPGRADED LIFESTYLE, )
LLC, a Florida company; ONE UP, LLC )
a Florida company; MICHAEL WALDING, )
individually and as CEO of NXT LVL )
SERVICES, LLC, ONE UP, LLC and )
UPGRADED LIFESTYLE, LLC, )
                                       )
          Defendants. )
_____ )

## SECOND AMENDED COMPLAINT

    NOW COME the Plaintiffs, HANC & BRUBAKER HOLDINGS, LLC, HANC

HOLDINGS, LLC, ALGON ECOM, LLC, ECOM DYNAMICS, LLC, ELEVATIONS IN

ECOM, LLC, LEVEL SET ECOM, LLC, LEVEL SET ECOM, LLC, SRUNE ECOM, LLC,

STELB ECOM, LLC, REDSTONE ECOM, LLC, PARKCAM, LLC, by and through their

attorneys, Griffin Williams McMahon & Walsh, LLP, and present their Complaint against NXT

LVL SERVICES, LLC, UGRADED LIFESTYLE, LLC, ONE UP, LLC, and MICHAEL WALDING and in support thereof, complain as follows:

## PARTIES TO THE ACTION

1.      Plaintiff HANC & BRUBAKER HOLDINGS, LLC ("H & B HOLDINGS") is a Montana company with its principal place of business in St. Charles, Illinois, which is within the jurisdictional boundaries of the United States District Court for the Northern District of Illinois, Eastern Division. H & B HOLDINGS regularly does business within the State of Illinois.

2.      Brian Hanc and Rockne Brubaker are the only members of H & B HOLDINGS and both are citizens of the State of Illinois.

3.      Plaintiff HANC HOLDINGS, LLC ("HANC HOLDINGS") is a Montana company with its principal place of business in St. Charles, Illinois, which is within the jurisdictional boundaries of the United States District Court for the Northern District of Illinois, Eastern Division. HANC HOLDINGS regularly does business within the State of Illinois.

4.      Brian Hanc is the only member of HANC HOLDINGS. He is a citizen of the State of Illinois.

5.      Plaintiff ALGON ECOM, LLC ("ALGON") is a Delaware company with its principal place of business in St. Charles, Illinois, which is within the jurisdictional boundaries of the United States District Court for the Northern District of Illinois, Eastern Division. ALGON is owned and operated by H & B HOLDINGS and regularly does business within the State of Illinois.

6.      Brian Hanc and Rockne Brubaker are the only members of ALGON and both are citizens of the State of Illinois.

7.      Plaintiff ECOM DYNAMICS, LLC ("ECOM") is a Delaware company with its principal place of business in St. Charles, Illinois, which is within the jurisdictional boundaries of

2

the United States District Court for the Northern District of Illinois, Eastern Division. ECOM is owned and operated by H & B Holdings and regularly does business within the State of Illinois.

8. Brian Hanc and Rockne Brubaker are the only members of ECOM and both are citizens of the State of Illinois.

9. Plaintiff ELEVATIONS IN ECOM, LLC ("ELEVATIONS") is a Delaware company with its principal place of business in St. Charles, Illinois, which is within the jurisdictional boundaries of the United States District Court for the Northern District of Illinois, Eastern Division. ELEVATIONS is owned and operated by HANC HOLDINGS and regularly does business within the State of Illinois.

10. Brian Hanc is the only member of ELEVATIONS and his is a citizen of the State of Illinois.

11. Plaintiff LEVEL SET ECOM, LLC ("LEVEL SET") is a Delaware company with its principal place of business in St. Charles, Illinois, which is within the jurisdictional boundaries of the United States District Court for the Northern District of Illinois, Eastern Division. LEVEL SET is owned and operated by H & B HOLDINGS and regularly does business within the State of Illinois.

12. Brian Hanc and Rockne Brubaker are the only members of LEVEL SET and both are citizens of the State of Illinois.

13. Plaintiff SRUNE ECOM, LLC ("SRUNE") is a Delaware company with its principal place of business in St. Charles, Illinois, which is within the jurisdictional boundaries of the United States District Court for the Northern District of Illinois, Eastern Division. SRUNE is owned and operated by H & B HOLDINGS LLC and regularly does business within the State of Illinois.

14.     Brian Hanc and Rockne Brubaker are the only members of SRUNE and both are citizens of the State of Illinois.

15.     Plaintiff STELB ECOM, LLC ("STELB") is a Delaware company with its principal place of business in St. Charles, Illinois, which is within the jurisdictional boundaries of the United States District Court for the Northern District of Illinois, Eastern Division. SRUNE is owned and operated by H & B HOLDINGS LLC and regularly does business within the State of Illinois.

16.     Brian Hanc and Rockne Brubaker are the only members of STELB and both are citizens of the State of Illinois.

17.     Plaintiff REDSTONE ECOM, LLC ("REDSTONE") is a Delaware company with its principal place of business in St. Charles, Illinois, which is within the jurisdictional boundaries of the United States District Court for the Northern District of Illinois, Eastern Division. REDSTONE is owned by HANC HOLDINGS and regularly does business within the State of Illinois.

18.     Brian Hanc is the only member of REDSTONE and he is a citizen of the State of Illinois.

19.     Plaintiff PARKCAM ECOM, LLC ("PARKCAM") is a Delaware company with its principal place of business in St. Charles, Illinois, which is within the jurisdictional boundaries of the United States District Court for the Northern District of Illinois, Eastern Division. PARKCAM is owned by HANC HOLDINGS and regularly does business within the State of Illinois.

20.     Brian Hanc is the only member of PARKCAM and he is both are citizens of the State of Illinois.

4

21.　　Defendant NXT LVL SERVICES, LLC ("NXT LVL") is a Florida company headquartered in Miami, Florida. Every member of NXT LVL is a citizen of the State of Florida.

22.　　Defendant UPGRADED LIFESTYLE, LLC ("UPGRADED") is a Florida company headquartered in Miami, Florida. Every member of UPGRADED is a citizen of the State of Florida.

23.　　Defendant ONE UP, LLC ("ONE UP") is a Florida company headquartered in Miami, Florida. Every member of ONE UP is a citizen of the State of Florida.

24.　　Defendant MICHAEL WALDING ("Mr. Walding") is the Chief Executive Officer of NXT LVL, UPGRADED and ONE UP and is a citizen of the State of Florida. He is sued individually and as CEO of NXT LVL, UPGRADED and ONE UP.

25.　　This is a civil action for damages to redress deprivations for breach of contract, fraud, and the Illinois Consumer Fraud and Deceptive Practices Act.

## JURISDICTION AND VENUE

26.　　This Court has jurisdiction over this matter pursuant to 28 U.S.C. 1332(a) in that every member of the Plaintiff LLCs resides in a different state than each Defendant and the amount in controversy exceeds $75,000.00.

27.　　Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) where the Plaintiff LLCs are headquartered, and its members reside, within the Northern District of Illinois. Venue is proper where Defendants reached out to Plaintiffs in the Northern District of Illinois to induce them to do business, the contracts at issue in this matter were executed within the Northern District of Illinois, and Defendants knew that harm alleged would be felt solely within the Northern District of Illinois.

## STATEMENT OF FACTS

28.     NXT LVL is Florida company headquartered in Miami, Florida.  Mr. Walding is NXT LVL's CEO, owner, and operator.

29.     NXT LVL claims to be in the business of acquiring and managing ecommerce retail stores on Amazon and Walmart's internet platforms on behalf of investors.

30.     UPGRADED is Florida company headquartered in Miami, Florida.  Mr. Walding is UL's CEO, owner, and operator.

31.     UPGRADED claims to be in the business of acquiring and managing ecommerce retail stores on Amazon and Walmart's internet platforms on behalf of investors.

32.     ONE UP is Florida company headquartered in Miami, Florida.  Mr. Walding is ONE UP's CEO, owner, and operator.

33.     ONE UP claims to be in the business of acquiring and managing ecommerce retail stores on Amazon and Walmart's internet platforms on behalf of investors.

34.     Mr. Walding is a resident of Miami Florida and the owner of and operator of NXT LVL, UPGRADED and ONE UP and claims to be in the business of acquiring and managing ecommerce retail stores on Amazon and Walmart's internet platforms on behalf of investors.

35.     H & B HOLDINGS is an entity owned and operated by Brian Hanc ("Mr. Hanc") and Rockne Brubaker ("Mr. Brubaker").  Mr. Hanc resides in St. Charles, Illinois and Mr. Brubaker resides in Batavia, Illinois.  H & B HOLDINGS is headquartered and operated in Geneva, Illinois.

36.     HANC HOLDINGS is an entity owned and operated by Mr. Hanc.  HANC HOLDINGS is headquartered and operated in St. Charles, Illinois.

37. On or near November 4, 2020, an acquaintance of Mr. Hanc's told him about investing in ecommerce stores through NXT LVL. The acquaintance told Michael Tibor that Mr. Hanc might be interested in investing in ecommerce stores.

38. Mr. Tibor was an employee and agent of NXT LVL, UPGRADED, ONE UP and Mr. Walding. Mr. Tibor reached out to Mr. Hanc and Mr. Brubaker in Illinois numerous times throughout November 2020 for purposes of inducing them to invest in NXT LVL.

39. For instance, Mr. Tibor initiated his relationship with Plaintiffs by exchanging emails with Mr. Hanc to induce him to invest in NXT LVL. Mr. Tibor understood that Mr. Hanc and Mr. Brubaker resided in Illinois during these communications.

40. On or near November 6, 2020, Mr. Tibor called Mr. Hanc in Illinois to describe NXT LVL's alleged services and to convince him to invest with NXT LVL and Mr. Walding. Mr. Tibor told Mr. Hanc he could expect substantial profitability when investing in NXT LVL.

41. During the calls, Mr. Tibor explained that NXT LVL was an e-commerce management company that sold online stores and managed the stores as part of a proposed ecommerce relationship.

42. Mr. Tibor explained that typically purchasers would provide financing to NXT LVL and/or Mr. Walding and that NXT LVL would purchase stores for investors and then manage the ecommerce stores on Amazon or Walmart's internet platforms.

43. Mr. Tibor explained that NXT LVL would charge a "consulting fee" to purchase and manage the stores. He also explained that Mr. Hanc could purchase an "aged store" or a "new store."

44. A "new store" is an ecommerce store with no sales history. A new store must go through a process referred to as "scaling up" whereby sales would be increased slowly and

incrementally. New stores that sold too many products too quickly were subject to suspension or permanent removal, if not corrected, from Amazon or Walmart's internet platforms.

45. New stores generally required an initial $25,000.00 "consulting fee," although at times the fee was negotiated. Mr. Tibor explained that clients of NXT LVL would also be required to pay the greater of $300.00 per month or 35% of net sales to NXT LVL in addition to the initial consulting fee.

46. An "aged store" is an ecommerce store that is supposed to have an established sales history on Amazon's internet platform. An aged store should not need to be "scaled up" because it should have already completed the scaling process.

47. Defendants would typically charge clients $25,000.00 for the consulting fee and $25,000.00 for the "aged store" itself, although at times that fee was negotiated. Defendants would charge clients $25,000.00 for an "aged store" even though an "aged store" would cost Defendants as little as $10,000.00.

48. Mr. Tibor explained that an aged store would cost Plaintiffs $22,500.00, along with monthly payments of the greater of $300.00 or 35% of net sales.

49. It was Defendants' practice to tell prospective clients that it would take six to nine months to obtain returns on a new store, but that an "aged store" could expect returns within thirty days to induce them to pay an additional $25,000.00 for an aged store.

50. Defendants induced investors, including the Plaintiffs, to purchase aged stores despite knowing there was no difference in the rate of return between new and aged stores.

51. Defendants claimed to investors, including Plaintiffs, that it sold "aged stores" without verifying that the stores had any sales history.

8

52.     On or near November 7, 2020, Mr. Tibor claimed during a call with Mr. Hanc that each store procured and managed by NXT LVL would see between $30,000.00 and $75,000.00 in monthly gross sales within three to four months of opening.

53.     On November 7, 2020, Mr. Hanc emailed a spreadsheet to Mr. Tibor containing his revenue projections based upon Mr. Tibor's representations. See Exhibit 1, November 7, 2020, Spreadsheet. Mr. Hanc projected $10,317.50 in net profit from a "low tier" and $26,600 in net profit from a "high tier" store after the first year. *Id.*

54.     On November 7, 2020, Mr. Tibor reviewed Mr. Hanc's revenue projection spreadsheet and returned it to him with upwardly revised projections. Mr. Tibor projected $23,387.50 in net profit for a new store and $56,700.00 in net profit for an aged store after the first year. See Exhibit 2, November 7, 2020, Revised Spreadsheet. Mr. Tibor sent the revised revenue projections to Mr. Hanc in Illinois to induce him to invest in NXT LVL and Mr. Walding.

55.     In November 2020, Mr. Tibor enlisted consultants to reach out to Mr. Hanc and Mr. Brubaker in Illinois to instruct them on "stacking" credit cards to maximize the credit available to invest in ecommerce stores procured and managed by NXT LVL.

56.     Mr. Tibor sent references to Mr. Hanc in Illinois for purposes of inducing him to invest in NXT LVL. Mr. Tibor also sent instructions to Mr. Hanc in Illinois on how to set up LLCs for purposes of investing in NXT LVL.

57.     Mr. Tibor sent excel spreadsheets to Mr. Hanc in Illinois containing alleged sales figures for Mr. Walding's Walmart test store. Mr. Tibor sent the spreadsheets to Mr. Hanc in Illinois to induce him to invest in NXT LVL.

58.     In November 2020, Mr. Tibor reached out to Mr. Hanc in Illinois and asked him to arrange additional phone and Zoom calls with Mr. Brubaker for purposes of inducing Mr. Brubaker to invest in NXT LVL.

59.     On November 15, 2020, Mr. Tibor contacted Mr. Hanc in Illinois to counsel H & B HOLDINGS and HANC HOLDINGS on obtaining lines of credit in Illinois for purposes of investing with NXT LVL.

60.     On November 24, 2020, Mr. Tibor contacted Mr. Hanc in Illinois to show him alleged examples of Amazon ecommerce store productivity to induce him to invest with NXT LVL.

61.     On November 30, 2020, Mr. Tibor forwarded contracts from Florida to Illinois to be executed by H & B HOLDINGS, HANC HOLDINGS, ALGON, ECOM, ELEVATION and LEVEL SET within the State of Illinois.

62.     Defendants staff their sales department in order to obtain new clients.  Defendants intentionally do not staff the operations department tasked with maintaining the ecommerce stores.

63.     Defendants outsourced "customer relations" to the Philippines, but later transferred that service to Jamaica due to language issues.

64.     Mr. Walding and management employee Tim Richards ("Mr. Richards") would express a "that just happens" attitude when a store would be shut down by Amazon or Walmart

**THE AMAZON AGREEMENTS**

65.     On December 10, 2020, H & B HOLDINGS, HANC HOLDINGS, ALGON, ECOM, ELEVATION and LEVEL SET (collectively "the Amazon Clients") executed four "E-Commerce Consulting Agreements" ("Amazon Agreements") in Illinois with NXT LVL and Mr. Walding.  See Exhibits 3-6.

10

66.     The Amazon Agreements required that NXT LVL perform services for the Amazon Clients, including, but not limited to, the following:

    a.     Procure an ecommerce store on the client's behalf;

    b.     Maintain the client's store, including configuring the Amazon storefront and configuring the front and back end systems necessary to manage the Store;

    c.     Review, research, source, select and list products for the Client's Store;

    d.     Maintain oversight of Client's Store and its financial performance. Ex. 1 ¶ 1.

67.     The Amazon Agreements required the Amazon Clients to obtain a credit card for each store with a minimum credit limit of $30,000.00 with which Defendants were supposed to obtain merchandise to sell on the various ecommerce stores. Plaintiffs maintained a requisite credit line at all relevant times.

68.     The Amazon Agreements required Plaintiffs to pay a one-time consulting fee, spread into two payments. Plaintiffs always paid the initial fees and second fee when invoiced by Defendants.

69.     The Amazon Agreements also required that Plaintiffs pay the greater of $300.00 per month or 35% of net profit to NXT LVL and Mr. Walding unless there was no activity in a store for more than 15 days of a month-long period. Plaintiffs paid the additional consulting fees where required and were billed by Defendants and paid for such fees even where stores had no activity for months.

70.     The Amazon Agreements required the parties to "discuss in a professional and private manner," "any issues or problems that either party has regarding the other with respect to

this Agreement…" Ex. 1 at ¶ 6. As explained in greater detail below, Defendants routinely refused to discuss issues and problems with their conduct relative to the Amazon Agreements.

71.     The Amazon Agreements contained a liquidated damages provision based on the representation that "damages to Client resulting from breach of this Agreement by Consultant are difficult and impractical, if not impossible to calculate, Consultant shall only be liable to the extent actual damages incurred by client, not to exceed a total of $5,000.00 USD." Ex. 1 at ¶ 11.

72.     The liquidated damages provision simultaneously required the parties to accept that actual damages were perhaps "impossible" to calculate but required Plaintiffs to calculate actual damages in excess of $5,000.00.

73.     Contrary to the liquidated damages clause and as explained more fully below, actual damages were easily quantified and estimated.

74.     The $5,000.00 liquidated damages provision was never a reasonable estimate of the actual damages that Plaintiffs might, and ultimately did, suffer. As explained more fully below, Plaintiffs ultimately lost more than $130,000.00 in approximately 10 months through Defendants' fraud, negligence and mismanagement.

75.     In comparison, the Amazon Agreements contained a $50,000.00 liquidated damages provision *per breach* in the event Plaintiffs violated the "Non-Disclosure" or "Confidentiality" provisions of the agreements. Ex. 1 at ¶¶ 13 (M); 9 (C), (D).

76.     The Amazon Agreements guaranteed that "the Services provided by Consultant to Client pursuant to this Agreement shall where practical be consistent with Amazon's current policies." Ex. 1 ¶ 12.

77.     On or near December 1, 2020, H & B HOLDINGS and HANC HOLDINGS made their initial wire transfers on behalf of ALGON, ECOM, ELEVATIONS and LEVEL SET to NXT LVL and Mr. Walding as required by the Contracts.

78.     On December 1, 2020, Mr. Tibor told Mr. Hanc he was "the luckiest SOB ever that they were still available and that he honored the invoice price."

79.     The Amazon Clients were instructed by NXT LVL and Mr. Walding to log into their Amazon accounts and "click around" for five-to-ten minutes each day so that Amazon would not shut the store down based upon "suspicion of unauthorized access." The Amazon Clients always complied with this instruction.

80.     In January, Mr. Tibor arranged for an interview with Mr. Brubaker in Illinois for purposes of inducing him to invest in Defendants' scheme.

**ALGON ECOM**

81.     On December 1, 2020, H & B HOLDINGS paid $11,250.00 to NXT LVL and Mr. Walding on ALGON's behalf for a new ecommerce store to be featured on Amazon's internet platform. ALGON's store was approved by Amazon in January 2021.

82.     H & B HOLDINGS paid additional $300.00 monthly consulting fees on ALGON's behalf to NXT LVL and Mr. Walding in March and June 2021.

83.     By May 7, 2021, there were no products listed on ALGON's store. On May 13, 2021, the ALGON store launched on Amazon's internet platform.

84.     On July 15, 2021, NXT LVL employee and agent Tim Richards ("Mr. Richards") claimed that ALGON never "got off the ground" because of "warehouse issues." Mr. Richards claimed that NXT LVL was entitled to 90 days to launch/scale up a store, which would have ended in June 2021.

85.     Mr. Richards told ALGON and Mr. Hanc that a store needed to have "a minimum" of a few hundred items to be profitable. By September 2021, ALGON only had a handful of items listed on the store, had sold 31 items for a total of $416.16 in gross sales.

86.     On September 23, 2021, ALGON turned off the store's listings due to NXT LVL refusing to stock the store and to stop NXT LVL or Mr. Walding from making charges on ALGON's credit card.

87.     NXT LVL and Mr. Walding fraudulently misrepresented its services with respect to ALGON. NXT LVL and Mr. Walding at all times knew that it would not maintain or stock ALGON with products.

88.     NXT LVL and Mr. Walding failed to maintain ALGON, including configuring the Amazon storefront and configuring the front and back end systems necessary to manage the Store;

89.     NXT LVL and Mr. Walding failed to review, research, source, select and list products for ALGON.

90.     NXT LVL and Mr. Walding failed to maintain oversight of ALGON, failed to maintain oversight of ALGON's financial performance.

91.     NXT LVL and Mr. Walding refused repeated requests to reimburse the consulting fees paid by H & B HOLDINGS and ALGON and ultimately converted the fees.

**ECOM DYNAMICS**

92.     On December 1, 2020, H & B HOLDINGS paid $11,250.00 on ECOM's behalf in consulting fees to NXT LVL and Mr. Walding for a new ecommerce store to be featured on Amazon's internet platform. ECOM also paid approximately $1,800.00 to NXT LVL in additional consulting fees to manage ECOM's store.

93.     On January 12, 2021, ECOM was finalized and approved for sales, but NXT LVL told ECOM that the launch was delayed until March 9, 2021, due to an alleged warehouse opening.

94.     ECOM's launch was supposed to take ninety days, but there were no real sales on ECOM during the ninety-day launch period. The gross sales for ECOM between March 9, 2021, and June 1, 2021, were $147.84.

95.     On June 10, 2021, Mr. Richards told H & B HOLDINGS that there was a two-month delay to complete the launch process due to warehouse issues.

96.     On July 8, 2021, Mr. Richards asked H & B HOLDINGS to open an Amazon Business Prime account from Illinois. He explained that that an ABP account would allow NXT LVL to avoid Amazon packages showing a different retailer on the return address of the Amazon package.

97.     On August 7, 2021, Amazon notified ECOM that it was reviewing ECOM and refusing to transfer funds to the account because "Your current sales volumes are not supported by buyer feedback or an established sales history." That meant NXT LVL scaled the store too quickly in violation of Amazon's policies.

98.     At one point, upon information and belief, Amazon shut down all of Defendants' ecommerce stores because they were linked to other stores and engaged in "dropped shipping" in knowing violation of Amazon's policies.

99.     On August 18, 2021, H & B HOLDINGS and ECOM were notified that Amazon was shutting down the ABP account due to "violating the terms of our Conditions of Use agreement. When we close your account for violating the terms of an agreement, you cannot open a new account or use another account to place orders on our site."

100.    NXT LVL and Mr. Walding were purchasing items from Amazon on the ABP account and selling the products on ECOM's store.  NXT LVL and Mr. Walding knew this practice violated Amazon's rules and was a way to defraud H & B HOLDINGS and ECOM.

101.    NXT LVL and Mr. Walding were responsible for violating the terms of the Conditions of Use agreement.  There were no additional sales on ECOM after Amazon shut the ABP account.

102.    On August 26, 2021, H & B HOLDINGS and ECOM were notified that the account was flagged because ECOM's Valid Tracking Rate ("VTR") rate was below 95%.  Amazon requires all sellers to have a VTR above 95%.

103.    On September 3, 2021, H & B HOLDINGS and ECOM sent an email to NXT LVL demanding answers about the VTR rate.  NXT LVL did not respond.

104.    On October 4, 2021, H & B HOLDINGS and ECOM received an email from Amazon noting there were problems with ECOM's orders.

105.    ECOM's total net sales were approximately $198.00.  The store lost approximately $11,052.00 inclusive of the consulting fees.

106.    NXT LVL and Mr. Walding fraudulently misrepresented its services with respect to ECOM.  NXT LVL and Mr. Walding at all times knew that it would not maintain or stock ALGON with products.

107.    NXT LVL and Mr. Walding failed to maintain ECOM, including configuring the Amazon storefront and configuring the front and back end systems necessary to manage the Store;

108.    NXT LVL and Mr. Walding failed to review, research, source, select and list products for ECOM.

109.    NXT LVL and Mr. Walding failed to maintain oversight of ECOM, failed to maintain oversight of ECOM's financial performance.

110.    NXT LVL and Mr. Walding refused repeated requests to reimburse the consulting fees paid by H & B HOLDINGS and ECOM and ultimately converted the fees.

**ELEVATIONS IN ECOM**

111.    On December 1, 2020, HANC HOLDINGS executed a wire transfer of $20,000.00 to UPGRADED LIFESTYLE and Mr. Walding on ELEVATION's behalf for purchase of an aged store called "TOMIS," as identified by NXT LVL and Mr. Walding.

112.    On December 1, 2020, HANC HOLDINGS executed a second wire transfer of $11,250.00 to NXT LVL on ELEVATION's behalf in consulting fees related to TOMIS.

113.    The receipt for the wire transfers listed the address of the payee as a property purportedly owned by Mr. Walding.

114.    On February 12, 2021, HANC HOLDINGS attempted to log in to perform daily activities related to the transition period, but the TOMIS account deactivated. HANC HOLDINGS requested assistance from NXT LVL.

115.    On February 16, 2021, Mr. Richards responded, "keep up the good work" and "our team is addressing this and will get it resolved ASAP."

116.    On February 19, 2021, HANC HOLDINGS notified NXT LVL that TOMIS was deactivated and that they were locked out of the account. Mr. Richards responded that he would be "checking with the previous owner."

117.    NXT LVL did not respond to requests for further updates until March 1, 2021, when Mr. Richards assured Mr. Hanc that NXT LVL was working to reactivate the store.

118. On March 22, 2021, Mr. Richards claimed that NXT LVL ran into a "reverification detour on the launch process" with TOMIS. He claimed they were coordinating with the broker, who was recovering from a recent surgery, and that the situation was "not a big deal."

119. On April 9, 2021, when asked for a status update on the TOMIS purchase, Mr. Richards told HANC HOLDINGS that NXT LVL was "working on it with the vendor...we're getting through it though, so once it's finalized, we'll launch it as fast as possible and scale it heavily."

120. On May 6, 2021, Mr. Hanc had a conference call with Mr. Walding and Mr. Richards. During the call, Mr. Walding for the first time admitted to Mr. Hanc that "someone ran off" with TOMIS and that ELEVATIONS would not recover the money it paid for the store.

121. On May 13, 2021, Mr. Richards told Mr. Hanc that HANC HOLDINGS would own two aged stores by June 6, 2021.

122. Rather than procure two aged stores, Mr. Walding offered to adjust all percentages between HANC HOLDINGS and Defendants to 70% / 30% and recover each store. Mr. Richards promised to "take over" and participate in weekly meetings to get solutions in place.

123. Mr. Richards attended less than half of those meetings and, in many cases, never bothered to provide Mr. Hanc with advance notice. Mr. Hanc waited 45 minutes at times for Mr. Richards to appear on Zoom for the scheduled meetings.

124. NXT LVL and Mr. Walding retained the consulting fees paid by ELEVATIONS for TOMIS despite the alleged theft, along with any profit it may have earned from the purchase of TOMIS. Not long thereafter, ELEVATIONS was locked and closed down.

125. NXT LVL and Mr. Walding then claimed they would transfer another aged store, EMIL3434, to PARKCAM, LLC, as a replacement for TOMIS.

126.    On June 24, 2021, EMIL3434 was transferred to PARKCAM.  NXT LVL and Mr. Walding fraudulently misrepresented that EMIL3434 was an "aged store."

127.    In reality, EMIL3434 was not an aged store as promised and thus not a "replacement."  EMIL3434 was owned by a woman in Romania and had no product or sales history.

128.    In August 2021, Plaintiffs requested that Mr. Walding and NXT LVL produce the following information:

>    a.    Documents indicating that a wire transfer was made from NXT LVL to TOMIS's owner or possessor, including the total amount paid to TOMIS by NXT LVL;

>    b.    Documents indicating that Mr. Walding and/or his designee filed a criminal complaint against the owner and/or possessor of TOMIS;

>    c.    All contact information NXT LVL and/or Mr. Walding have for the owner and/or possessor of TOMIS;

>    d.    Documents indicating that Mr. Walding and/or NXT LVL filed an insurance claim related to the alleged theft.

129.    NXT LVL and Mr. Walding refused to produce any of the documentation requested by HANC HOLDINGS with respect to alleged TOMIS purchase.

130.    On August 23, 2021, Mr. Hanc asked NXT LVL to identify the name of the Amazon store that HANC HOLDINGS spent $31,250.00 to purchase.  NXT LVL refused to respond.

131.    On September 8, 2021, ELEVATIONS and HANC HOLDINGS were locked out of the EMIL3434 account without any sales.

132.    NXT LVL and Mr. Walding refused to reimburse ELEVATIONS and HANC HOLDINGS for the consulting fees paid for TOMIS or EMIL 3434.

133.    NXT LVL and Mr. Walding fraudulently misrepresented its services with respect to ELEVATIONS. NXT LVL and Mr. Walding at all times knew that it would not maintain or stock ELEVATIONS with products.

134.    NXT LVL and Mr. Walding failed to maintain ELEVATIONS, including configuring the Amazon storefront and configuring the front and back end systems necessary to manage the Store;

135.    NXT LVL and Mr. Walding failed to review, research, source, select and list products for ELEVATIONS.

136.    NXT LVL and Mr. Walding failed to maintain oversight of ELEVATIONS and failed to maintain oversight of ELEVATIONS' financial performance.

137.    NXT LVL and Mr. Walding refused repeated requests to reimburse the consulting fees paid by H & B HOLDINGS and ECOM and ultimately converted the fees.

**LEVEL SET ECOM**

138.    On December 1, 2020, H & B HOLDINGS transferred $20,000.00 on LEVEL SET's behalf to UPGRADED LIFESTYLE, NXT LVL and Mr. Walding to purchase an aged store for LEVEL SET. NXT LVL and Mr. Walding assured H & B HOLDINGS that an "aged store would be transferred" to LEVEL SET.

139.    H & B HOLDINGS paid an additional $11,250.00 consulting fee on LEVEL SET's behalf to NXT LVL and Mr. Walding for the aged store supposedly earmarked for LEVEL SET. The address of the payee for purchase price and consulting fee was a property purportedly owned by Mr. Walding.

140.    On January 19, 2021, NXT LVL's "Director of New Client Onboarding" EJ Hernandez notified Mr. Hanc that NXL LVL acquired "your 2 aged stores."

141.    On May 6, 2021, Mr. Walding claimed that someone "ran off" with the stores and that he was unable to recover them.

142.    Neither NXT LVL nor Mr. Walding purchased an ecommerce store for LEVEL SET, much less an aged store, in return for the $31,250.00 consulting fees.

143.    NXT LVL and Mr. Walding refused to refund the $31,250.00 it received from H & B HOLDINGS for an aged store for LEVEL SET.

144.    H & B HOLDINGS and LEVEL SET made repeated requests for information surrounding the payment.  NXT LVL and Mr. Walding refused to respond.

145.    In August 2021, H & B HOLDINGS and LEVEL SET requested that NXT LVL and Mr. Walding identify:

       a.    "The name of the alleged aged store and the identity of the store owner or possessor to whom NXT LVL paid funds on behalf of Mr. Brubaker and Mr. Hanc, including corporate name, individual name, address, email address, cellular and office telephone numbers."

       b.    Documents indicating that a wire transfer was made from NXT LVL to the owner or possessor of the aforementioned aged store, including the total amount paid to the owner and/or possessor of the aged store by NXT LVL;

       c.    Documents indicating that Mr. Walding and/or his designee filed a criminal complaint against the owner and/or possessor of the aforementioned aged store.

       d.    Documents indicating that Mr. Walding and/or NXT LVL filed an insurance claim related to the alleged theft.

146. NXT LVL and Mr. Walding refused to provide responsive information to any of the requests identified in the preceding paragraph.

147. On September 23, 2021, Mr. Hanc asked Mr. Walding to identify the name of the Amazon aged store it allegedly purchased for LEVEL SET, but he refused to do so.

148. NXT LVL and Mr. Walding fraudulently misrepresented its services with respect to LEVEL SET. NXT LVL and Mr. Walding at all times knew that it would not maintain or stock LEVEL SET with products.

149. NXT LVL and Mr. Walding failed to maintain LEVEL SET, including configuring the Amazon storefront and configuring the front and back end systems necessary to manage the Store;

150. NXT LVL and Mr. Walding failed to review, research, source, select and list products for LEVEL SET.

151. NXT LVL and Mr. Walding failed to maintain oversight of LEVEL SET and failed to maintain oversight of LEVEL SET's financial performance.

152. NXT LVL and Mr. Walding refused repeated requests to reimburse the consulting fees paid by H & B HOLDINGS and LEVEL SET and ultimately converted the fees.

**THE WALMART AGREEMENTS**

153. On March 4, 2021, and March 16, 2021, H & B HOLDINGS, HANC HOLDINGS, SRUNE, STELB and REDSTONE (collectively "the Walmart Clients") executed three "E-Commerce Consulting Agreements" ("the Walmart Agreements") in Illinois with ONE UP and Mr. Walding. See Exhibits 7-9.

22

154. Defendants accepted consulting fees to open Walmart stores despite not knowing how to complete an application to place a store on Walmart's internet platform until at least November 2021.

155. Even so, the Walmart Agreements required that NXT LVL perform services for the Walmart Clients including, but not limited to, the following:

      a. Perform all acts and do all things necessary to apply for a Store on Client's behalf. In the event Walmart denies Consultant's application not open a Store, Consultant shall reapply for a Store on Client's behalf until such time as Walmart grants Consultant's application to open a Store;

      b. Maintain the client's store, including configuring the Walmart storefront and configuring the front and back end systems necessary to manage the Store;

      c. Review, research, source, select and list products for the Client's Store;

      d. Maintain oversight of Client's Store and its financial performance. Ex. 5 ¶ 1.

      e. Manage a replacement Store for Client for the remainder of the Agreement if the Store is closed due to no fault of the Client.

156. The Walmart Agreements required the Walmart Clients to obtain a credit card for each store with a minimum credit limit of $30,000.00 with which Defendants were supposed to obtain merchandise to sell on the various ecommerce stores. The Walmart Clients maintained a requisite credit line at all relevant times.

157. The Walmart Agreements required the Walmart Clients to pay a one-time consulting fee, spread into two payments. The Walmart Clients always paid the initial fees and second fee when invoiced by Defendants.

23

158.    The Walmart Agreements also required the Walmart Clients to pay the greater of $249.00 per month or 50% of net profit to ONE UP and Mr. Walding unless there was no activity in a store for more than 15 days of a month-long period.  The Walmart Clients paid the additional consulting fees where required and were billed by Defendants and paid for such fees even where stores had no activity for months.

159.    The Walmart Agreements required the parties to "discuss in a professional and private manner," "any issues or problems that either party has regarding the other with respect to this Agreement..." Ex. 5 at ¶ 6.  As explained in greater detail below, Defendants routinely refused to discuss issues and problems with their conduct relative to the Walmart Agreements.

160.    The Walmart Agreements contained a liquidated damages provision based on the representation that "damages to Client resulting from breach of this Agreement by Consultant are difficult and impractical, if not impossible to calculate, Consultant shall only be liable to the extent actual damages incurred by client, not to exceed a total of $5,000.00 USD." Ex. 5 at ¶ 11.

161.    The liquidated damages provision simultaneously required to parties to accept that actual damages were perhaps "impossible" to calculate but required Plaintiffs to calculate actual damages in excess of $5,000.00.

162.    Contrary to the liquidated damages clause and as explained more fully below, actual damages were easily quantified and estimated.

163.    The $5,000.00 liquidated damages provision was never a reasonable estimate of the actual damages that Plaintiffs might, and ultimately did, suffer.  As explained more fully below, Plaintiffs ultimately lost more than $130,000.00 in approximately 10 months through Defendants' fraud, negligence and mismanagement.

164.    In comparison, the Walmart Agreements contained a $50,000.00 liquidated damages provision *per breach* in the event Plaintiffs violated the "Non-Disclosure" or "Confidentiality" provisions of the agreements. Ex. 5 at ¶¶ 13 (M); 9 (C), (D).

165.    The Amazon Agreements guaranteed that "the Services provided by Consultant to Client pursuant to this Agreement shall where practical be consistent with Walmart's current policies." Ex. 5 ¶ 12 (D).

166.    On or near December 1, 2020, H & B HOLDINGS and HANC HOLDINGS made their initial wire transfers on behalf of SRUNE, STELB, and REDSTONE to ONE UP and Mr. Walding as required by the Walmart Agreements.

167.    The Walmart Clients were instructed by NXT LVL and Mr. Walding to log into their Walmart accounts and "click around" for five-to-ten minutes each day so that Walmart would not shut the store down based upon "suspicion of unauthorized access." The Walmart Clients always complied with this instruction where possible.

**SRUNE ECOM, LLC**

168.    In December 2020, HANC HOLDINGS paid $7,500.00 to ONE UP and Mr. Walding on behalf of SRUNE as one-half of the fee to purchase an ecommerce store to be featured on Walmart's internet platform.

169.    On or near March 3, 2021, ONE UP and Mr. Walding requested the second half of the fee. On March 4, 2021, HANC HOLDINGS paid the second $7,500.00 fee to ONE UP and Mr. Walding for SRUNE's ecommerce store.

170.    On March 16, 2021, SRUNE, Mr. Hanc, ONE UP and Mr. Walding executed an E-Commerce Consulting Agreement with respect to the SRUNE ecommerce store on Walmart's internet platform. See Exhibit 5.

171.     On May 29, 2021, ONE UP emailed SRUNE to note that the store was ready to go live. Mr. Richards told Mr. Hanc and Mr. Brubaker that an ecommerce store need "over 1000 [product] listings to perform." In early June 2021, only approximately 257 items were listed on the store.

172.     On June 10, 2021, Mr. Richards assured Mr. Hanc that ONE UP would double the number of listings available on the store within two weeks. By June 24, 2021, the number of listings had only increased to 297. By July 1, 2021, the number of listings had increased to 341, or 34% of the minimum number of listings needed to "perform."

173.     Between July and December 2021, Walmart purged ecommerce store owners that were engaging in "drop shipping" in violation of its policy prohibiting drop shipping. During that time, Defendants total stores on the Walmart ecommerce platform went from approximately three hundred to three.

174.     Defendants knew at all times that drop shipping was violative of Walmart's policy, would lead to the stores being shut down, and allow Defendants to retain the purchase and consulting fees.

175.     On or near August 20, 2021, Walmart suspended the store's operations due to policy violations committed by ONE UP and Mr. Walding.

176.     On or near August 25, 2021, Walmart terminated the account for policy violations committed by ONE UP and Mr. Walding.

177.     SRUNE's total gross sales were $6,670.45. The net sales, before consulting fees, were $704.55. Net sales, inclusive of consulting fees, were -$7,542.00.

178.     On September 8, 2021, ONE UP and Mr. Walding sent an invoice to SRUNE for additional consulting fees even though the store was shut down due to their policy violations.

179.    ONE UP and Mr. Walding fraudulently misrepresented its services with respect to SRUNE. ONE UP and Mr. Walding at all times knew that it would not maintain or stock SRUNE's with enough products to comply with its required services.

180.    ONE UP and Mr. Walding failed to maintain SRUNE, including configuring the Amazon storefront and configuring the front and back end systems necessary to manage the Store;

181.    ONE UP and Mr. Walding failed to review, research, source, select and list products for SRUNE.

182.    ONE UP and Mr. Walding failed to maintain oversight of SRUNE and failed to maintain oversight of SRUNE's financial performance.

183.    ONE UP and Mr. Walding refused repeated requests to reimburse the consulting fees paid by HANC HOLDINGS and SRUNE and ultimately converted the fees.

**STELB ECOM, LLC**

184.    On December 1, 2020, H & B HOLDINGS paid $15,000.00 to ONE UP and Mr. Walding on STELB's behalf for a new ecommerce store on the Walmart internet platform.

185.    On January 7, 2021, ONE UP and Mr. Walding began to set up STELB. On January 29, 2021, ONE UP and Mr. Walding notified Mr. Hanc that STELB's set up would require another eight weeks.

186.    On March 29, 2021, ONE UP and Mr. Walding claimed to Mr. Hanc that Walmart had changed their processes.

187.    On April 11, 2021, ONE UP asked that it be added as a user on STELB's ABP account.

188.     On April 14, 2021, ONE UP notified Mr. Hanc that Walmart rejected STELB's application but that ONE UP would (1) cover a new LLC (2) submit a new application for STELB, and (3) "move your application to the front of the line." None of this was ever done.

189.     On May 7, 2021, Mr. Hanc had a meeting with Mr. Richards and Mr. Tibor about STELB's closure. Mr. Richards suggested holding weekly meetings to discuss the ecommerce stores. Mr. Richards ultimately skipped most of those meetings.

190.     On August 5, 2021, ONE UP and Mr. Walding notified STELB that they were appealing Walmart's rejection of the store.

191.     On August 16, 2021, Mr. Brubaker and Mr. Hanc asked a representative for ONE UP and Mr. Walding for the following information with respect to their alleged appeal of Walmart's rejection of STELB:

a.     "In what forum is the rejection being appealed?

b.     What stage is the appeal in?

c.     Please provide documents indicating that this store's status is being appealed, the forum in which the appeal is proceeding and the current status of the appeal."

192.     ONE UP and Mr. Walding refused to provide any responsive information or documents requested. STELB never received a store for placement on Walmart's internet platform and ONE UP and Mr. Walding refused to reimburse STELB for the $15,000.00 it paid for a store.

193.     ONE UP and Mr. Walding fraudulently misrepresented its services with respect to STELB. ONE UP and Mr. Walding at all times knew that it would not maintain or stock STELB with enough products to comply with its required services.

194.    ONE UP and Mr. Walding failed to maintain STELB, including configuring the Amazon storefront and configuring the front and back end systems necessary to manage the Store;

195.    ONE UP and Mr. Walding failed to review, research, source, select and list products for STELB.

196.    ONE UP and Mr. Walding failed to maintain oversight of STELB and failed to maintain oversight of SRUNE's financial performance.

197.    ONE UP and Mr. Walding refused repeated requests to reimburse the consulting fees paid by H & B HOLDINGS and STELB and ultimately converted the fees.

**REDSTONE ECOM, LLC**

198.    On December 1, 2020, HANC HOLDINGS paid $7,500.00 to ONE UP and Mr. Walding on REDSTONE's behalf for an ecommerce store on Walmart's internet platform.

199.    On December 1, 2020, ONE UP and Mr. Walding purchased an ecommerce store for REDSTONE.

200.    On April 14, 2021, ONE UP notified Mr. Hanc that Walmart rejected REDSTONE's store due to ONE UP and Mr. Walding failing to comply with Walmart's operating procedures with respect to managing ecommerce stores.

201.    In August 2021, ONE UP and Mr. Walding notified REDSTONE that they were appealing Walmart's rejection of the store.

202.    In August 2021, REDSTONE requested the following information from Defendants with respect to ONE UP and Mr. Walding's alleged appeal of Walmart's rejection of REDSTONE:

    a.    "In what forum is the rejection being appealed?

    b.    What stage is the appeal in?

29

       c.     Please provide documents indicating that this store's status is being appealed, the forum in which the appeal is proceeding and the current status of the appeal."

203. ONE UP and Mr. Walding refused to provide any responsive information or documents requested. REDSTONE's ecommerce store was never placed on Walmart's internet platform and ONE UP and Mr. Walding never reimbursed REDSTONE for the $7,500.00 it paid for REDSTONE's store.

204. ONE UP and Mr. Walding fraudulently misrepresented its services with respect to REDSTONE. ONE UP and Mr. Walding at all times knew that it would not maintain or stock REDSTONE with enough products to comply with its required services.

205. ONE UP and Mr. Walding failed to maintain REDSTONE, including configuring the Walmart storefront and configuring the front and back end systems necessary to manage the Store.

206. ONE UP and Mr. Walding failed to review, research, source, select and list products for REDSTONE.

207. ONE UP and Mr. Walding failed to maintain oversight of REDSTONE and failed to maintain oversight of REDSTONE'S financial performance.

**PARKCAM ECOM, LLC**

208. On June 25, 2021, the funds paid by REDSTONE were transferred to PARKCAM and an ecommerce store was procured for PARKCAM. PARKCAM essentially replaced REDSTONE after Walmart rejected REDSTONE for failing to follow its policies.

209. On July 17, 2021, Walmart notified PARKCAM that $7,000.00 in sales was at risk due to past due orders. On August 3, 2021, Walmart paid $1,029.14 to PARKCAM.

210. On August 6, 2021, Walmart suspended PARKCAM due to ONE UP and Mr. Walding failing to comply with Walmart's procedures. The specific violation was "Operational Performance: On-Time Delivery."

211. Walmart noted that during the ninety-day period preceding August 6, 2021, the on-time shipping rate was 57.63% and the on-time delivery rate was 90%. Walmart withheld $9,341.38 in revenue due to ONE UP and Mr. Walding's policy violations.

212. On or near September 7, 2021, Walmart removed PARKCAM from suspension and it became active again.

213. On September 24, 2021, ONE UP was notified that it was no longer authorized to act for PARKCAM. At that point, PARKCAM's net sales were approximately -$18,000.00. Despite the notification, ONE UP processed $3,500.00 in additional purchases on PARKCAM's credit card between September 25, 2021, and September 28, 2021.

214. Defendants' failure to maintain PARKCAM and comply with Walmart's policies was a breach of the agreement between PARKCAM and Defendants.

215. Defendants also utilized "drop shipping" to fulfill orders placed through Amazon, which was in violation of Amazon's restriction on drop shipping to fulfill orders.

216. Plaintiffs lost approximately $134,000.08 due to Defendants' aforementioned conduct.

**OTHER VICTIMS**

217. Upon information and belief, more than 90% of all Defendants' ecommerce investors had their stores shut down due to Defendants' failure to comply with Amazon's and Walmart's policies and lost their entire investment to Defendants.

218. There are hundreds of victims throughout the United States who have lost their entire investments to Defendants without receiving functioning stores from Defendants.

219. For example, in September 2020, a client paid $25,000.00 for a new Amazon ecommerce store. In June 2021, Amazon shut down the store because Defendants linked the store to Walmart to fulfill any orders in a knowing violation of Amazon's drop shipping policy and items were shipped using Walmart packaging.

220. In June 2021, that same client paid Defendants for a Walmart ecommerce store. Defendants claimed they could not get the store opened. The store never opened and Defendants refused to refund the funds paid for the store.

221. In November 2020, a client paid $25,000.00 to Defendants for an Amazon ecommerce store. Amazon closed the store permanently after the first sale because Defendants failed to comply with Amazon's policies. Defendants refused to refund the client's money. Defendants claimed they appealed the shutdown to Amazon, but refused to provide any evidence to the client that an appeal was filed.

222. A former client lost $100,000.00 to Defendants when three Amazon ecommerce stores and a Walmart store were shut down by Amazon and Walmart due to Defendants' failure to comply with their policies and without any significant sales.

223. Another former client paid $25,000.00 for a Walmart store that was shut down by Walmart after the first product was sold because Defendants failed to comply with Walmart's policies.

224. Another former client paid Defendants $22,500.00 for a new Walmart ecommerce store and $22,500.00 for a new Amazon ecommerce store. Defendants then charged

32

approximately $7,000.00 to the client's credit card. The Walmart store never opened and the payment was not refunded. The Amazon store had approximately $3,000.00 in gross sales.

225.    In June 2021, fourteen clients paid Defendants for twenty-one Walmart and Amazon ecommerce stores. Not one of the fourteen clients received a store from Defendants and Defendants refused to refund any of the payments.

226.    In July 2021, another former client paid Defendants $105,000.00 for three Amazon ecommerce stores, one Walmart ecommerce store and one Facebook ecommerce store after Defendants induced the client with "sample sales results." The Walmart store was never approved, an "aged" Amazon store was immediately deactivated because it was linked to Walmart, and the other stores sold approximately 34 units before being shut down.

227.    In August 2021, another former client paid $37,500.00 for what Defendants claimed was a "premium aged store." Defendants only stocked the store with thirty-eight items, more than half of which were inactive or out of stock. By June 2022, the store had sold less than $300.00 in merchandise.

228.    In August 2021, a client paid $22,000.00 to Defendants for a Walmart store. In or near September 2021, Defendants sent at least that client's credit card information to the "customer service" department in Jamaica. From there, the client's credit card was used to make fraudulent purchases that were delivered to various addresses in the continental United States.

229.    In December 2021, Defendants opened a new Walmart for the client that was linked to Amazon so that orders could be filled through impermissible drop shipping. When the client made a fraud complaint to the credit card company based on the purchases from Jamaica, Amazon was notified, and the client was banned from making wholesale purchases from Amazon.

230.    At the time Amazon barred the client from making wholesale purchases, the client's store contained nine items valued between $1 and $9 each.  The store did not make a single sale in four months and Defendants refused to refund the clients investment.

231.    In August 2021, another former client gave Defendants an $11,000.00 down payment on a new store.  The client later declined to purchase a store, but Defendants kept the $11,000.00.

232.    In November 2021, another client paid $23,000.00 for one Amazon ecommerce store and one Walmart ecommerce store.  The stores were never "onboarded," but Defendants refused to reimburse the client. When the client threatened to sue, one of Defendants' employees said, "the lawsuits haven't gone anywhere."

233.    In November 2021, another client paid $24,000.00 for an Amazon ecommerce store.  The store never opened, and Defendants have refused to give a refund.

234.    In 2022, a partnership paid $22,500.00 to Defendants for an "aged store."  The store did not have any net sales, the partnership's credit card was charged $1,000.00 and then the store was shut down by Amazon due Defendants' failure to manage the store.  Defendants refused to refund the purchase price.

235.    By May 2022 and upon information and belief, Defendants had approximately two hundred active stores, down from more than approximately one thousand in 2021.

236.    Defendants' business model was essentially to induce individuals to invest and then allow the ecommerce stores to shut down, thereby ending NXT LVL's requirement to service the stores and allowing it to retain the full investment.

237.    Upon information and belief, the total losses incurred by Defendants' clients exceed $25,000,000.00.

## COUNT I – VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE PRACTICES ACT

238.    Plaintiffs repeat, re-allege and incorporate by reference the factual allegations of paragraphs one through 237 as if fully set forth herein.

239.    At all relevant times, there was in full force and effect a statute called the Illinois Consumer Fraud and Deceptive Business Practices Act ("the Act").

240.    The Act provides:

"Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act. 815 ILCS 505/2.

241.    As described more fully above, Defendants engaged in a scheme whereby through deception, fraud, false pretense, false promise, misrepresentation and concealment would induce prospective clients to pay large consulting fees for the purchase and management of ecommerce stores but either fail to purchase the stores or fail to manage the stores, leading to their removal from Amazon or Walmart's internet platform, but retain the consulting fees.

242.    As described more fully above, Defendants employed deception, fraud, false pretense, false promise, misrepresentation and concealment to induce Plaintiffs to rely thereupon and invest in Defendants' businesses.

243.    Plaintiffs in fact relied on Defendants' deception, fraud, false pretense, false promise representation as an inducement to invest in Defendants' businesses.

244. Plaintiffs lost in excess of $150,000.00 as a result of Defendants engaging in the aforementioned fraudulent and deceptive business practices.

WHEREFORE, H & B HOLDINGS, HANC HOLDINGS, ALGON, ECOM, ELEVATIONS, LEVEL SET, SRUNE, STELB, REDSTONE and PARKCAM demand judgment be entered in their favor and against NXT LVL, UGRADED, ONE UP and MICHAEL WALDING in an amount in excess of $150,000.00 in compensatory damages, punitive damages, attorney fees, costs of suit, and for any other relief the Court deems appropriate.

## COUNT II – FRAUDULENT MISREPRESENTATION

245. Plaintiffs repeat, re-allege and incorporate by reference the factual allegations of paragraphs one through 237 as if fully set forth herein.

246. As described more fully above, Defendants made statements of material fact that they knew or believed to be false.

247. Defendants' false statements and promises were part of an overall scheme to defraud Plaintiffs.

248. As described more fully above, Defendants intended to induce Plaintiffs to rely on those statements.

249. As described more fully above, Plaintiffs acted in reasonable reliance on the truth of those statements and were damaged as a result.

250. Plaintiffs lost in excess of $150,000.00 as a result of Defendants engaging in the aforementioned fraudulent and deceptive business practices.

WHEREFORE, H & B HOLDINGS, HANC HOLDINGS, ALGON, ECOM, ELEVATIONS, LEVEL SET, SRUNE, STELB, REDSTONE and PARKCAM demand judgment be entered in their favor and against NXT LVL, UGRADED, ONE UP and MICHAEL

WALDING in an amount in excess of $150,000.00 in compensatory, punitive damages, and for any other relief the Court deems appropriate.

**COUNT III – UNJUST ENRICHMENT**

251.     Plaintiffs repeat, re-allege, and incorporate by reference the factual allegations of paragraphs one through 237 as if fully set forth herein.

252.     As described more fully above, Defendants unjustly retained "consulting fees" to the Plaintiffs' detriment.

253.     Defendants' retention of those consulting fees violates the fundamental principles of justice, equity, and good conscience.

WHEREFORE, H & B HOLDINGS, HANC HOLDINGS, ALGON, ECOM, ELEVATIONS, LEVEL SET, SRUNE, STELB, REDSTONE and PARKCAM demand judgment be entered in their favor and against NXT LVL, UGRADED, ONE UP and MICHAEL WALDING in an amount in excess of $150,000.00 in compensatory damages and for any other relief the Court deems appropriate.

**COUNT IV – CONVERSION**

254.     Plaintiffs repeat, re-allege, and incorporate by reference the factual allegations of paragraphs one through 237 as if fully set forth herein.

255.     Plaintiffs have a right to reimbursement for the money tendered to Defendants to purchase ecommerce stores and the consulting fees paid to defendants to manage those stores.

256.     Plaintiffs have an absolute and unconditional right to the immediate reimbursement of the money tendered to Defendants to purchase ecommerce stores and the consulting fees paid to defendants to manage those stores.

257. In August 2021, Plaintiffs made a demand to Defendants for reimbursement of the money tendered to Defendants to purchase ecommerce stores and the consulting fees paid to defendants to manage those stores.

258. Defendants refused to reimburse the money tendered to Defendants to purchase ecommerce stores and the consulting fees paid to defendants to manage those stores and instead wrongfully and without authorization assumed control, dominion, or ownership over the property.

WHEREFORE, H & B HOLDINGS, HANC HOLDINGS, ALGON, ECOM, ELEVATIONS, LEVEL SET, SRUNE, STELB, REDSTONE and PARKCAM demand judgment be entered in their favor and against NXT LVL, UGRADED, ONE UP and MICHAEL WALDING in an amount in excess of $150,000.00 and for punitive damages, attorney fees, costs of suit, and for any other relief the Court deems appropriate.

## COUNT V – BREACH OF CONTRACT – H & B HOLDINGS AND ALGON V. NXT LVL AND MICHAEL WALDING

259. H & B HOLDINGS and ALGON repeat, re-allege and incorporate by reference the factual allegations of paragraphs one through 237 as if fully set forth herein.

260. H & B HOLDINGS and ALGON executed a valid and enforceable contract with NXT LVL and Mr. Walding. See Exhibit 3.

261. H & B HOLDINGS and ALGON performed all their obligations as required by the contract.

262. NXT LVL and Mr. Walding breached the contract as describe more fully above.

263. As a result of NXT LVL and Mr. Walding breaching the contract, H & B HOLDINGS and ALGON suffered compensatory damages in excess of $13,000.00.

WHEREFORE, H & B HOLDINGS and ALGON demand judgment be entered in their favor and against NXT LVL and Mr. Walding in an amount in excess of $13,000.00 plus attorney fees, cost of suit, and for any other relief the Court deems appropriate.

## COUNT VI – BREACH OF CONTRACT – H & B HOLDINGS AND ECOM V. NXT LVL AND MICHAEL WALDING

264.     H & B HOLDINGS and ECOM repeat, re-allege and incorporate by reference the factual allegations of paragraphs one through 237 as if fully set forth herein.

265.     H & B HOLDINGS and ECOM executed a valid and enforceable contract with NXT LVL and Mr. Walding.  See Exhibit 4.

266.     H & B HOLDINGS and ECOM performed all their obligations as required by the contract.

267.     NXT LVL and Mr. Walding breached the contract as describe more fully above.

268.     As a result of NXT LVL and Mr. Walding breaching the contract, H & B HOLDINGS and ECOM suffered compensatory damages in excess of $25,000.00.

WHEREFORE, H & B HOLDINGS and ECOM demand judgment be entered in their favor and against NXT LVL and Mr. Walding in an amount in excess of $25,000.00 plus attorney fees, cost of suit, and for any other relief the Court deems appropriate.

## COUNT VII – BREACH OF CONTRACT – HANC HOLDINGS AND ELEVATIONS V. NXT LVL, UPGRADED AND MICHAEL WALDING

269.     HANC HOLDINGS and ELEVATIONS repeat, re-allege and incorporate by reference the factual allegations of paragraphs one through 237 as if fully set forth herein.

270.     HANC HOLDINGS and ELEVATIONS executed a valid and enforceable contract with NXT LVL, UPGRADED and Mr. Walding.  See Exhibit 5.

271.    HANC HOLDINGS and ELEVATIONS performed all their obligations as required by the contract.

272.    NXT LVL, UPGRADED and Mr. Walding breached the contract as describe more fully above.

273.    As a result of NXT LVL, UPGRADED and Mr. Walding breaching the contract, HANC HOLDINGS and ELEVATIONS suffered compensatory damages in excess of $25,000.00.

WHEREFORE, H & B HOLDINGS and ELEVATIONS demand judgment be entered in their favor and against NXT LVL, UPGRADED and Mr. Walding in an amount in excess of $25,000.00 plus attorney fees, cost of suit, and for any other relief the Court deems appropriate.

## COUNT VIII – BREACH OF CONTRACT – H & B HOLDINGS AND LEVEL SET V. NXT LVL, UPGRADED AND MICHAEL WALDING

274.    H & B HOLDINGS and LEVEL SET repeat, re-allege and incorporate by reference the factual allegations of paragraphs one through 237 as if fully set forth herein.

275.    H & B HOLDINGS and LEVEL SET executed a valid and enforceable contract with NXT LVL, UPGRADED and Mr. Walding.  See Exhibit 6.

276.    H & B HOLDINGS and LEVEL SET performed all their obligations as required by the contract.

277.    NXT LVL, UPGRADED and Mr. Walding breached the contract as describe more fully above.

278.    As a result of NXT LVL, UPGRADED and Mr. Walding breaching the contract, H & B HOLDINGS and LEVEL SET suffered compensatory damages in excess of $25,000.00.

WHEREFORE, H & B HOLDINGS and LEVEL SET demand judgment be entered in their favor and against NXT LVL, UPGRADED and Mr. Walding in an amount in excess of $25,000.00 plus attorney fees, cost of suit, and for any other relief the Court deems appropriate.

## COUNT IX – BREACH OF CONTRACT – HANC HOLDINGS AND SRUNE V. ONE UP AND MICHAEL WALDING

279. HANC HOLDINGS and SRUNE repeat, re-allege and incorporate by reference the factual allegations of paragraphs one through 237 as if fully set forth herein.

280. HANC HOLDINGS and SRUNE executed a valid and enforceable contract with ONE UP and Mr. Walding. See Exhibit 7.

281. HANC HOLDINGS and SRUNE performed all their obligations as required by the contract.

282. ONE UP and Mr. Walding breached the contract as describe more fully above.

283. As a result of ONE UP and Mr. Walding breaching the contract, HANC HOLDINGS and SRUNE suffered compensatory damages in excess of $17,500.00.

WHEREFORE, HANC HOLDINGS and SRUNE demand judgment be entered in their favor and against ONE UP and Mr. Walding in an amount in excess of $17,500.00 plus attorney fees, cost of suit, and for any other relief the Court deems appropriate.

## COUNT X – BREACH OF CONTRACT – H & B HOLDINGS AND STELB V. ONE UP AND MICHAEL WALDING

284. H & B HOLDINGS and STELB repeat, re-allege and incorporate by reference the factual allegations of paragraphs one through 237 as if fully set forth herein.

285. H & B HOLDINGS and STELB executed a valid and enforceable contract with ONE UP and Mr. Walding. See Exhibit 8.

286. H & B HOLDINGS and STELB performed all their obligations as required by the contract.

287. ONE UP and Mr. Walding breached the contract as describe more fully above.

41

288.    As a result of ONE UP and Mr. Walding breaching the contract, H & B HOLDINGS and STELB suffered compensatory damages in excess of $17,500.00.

WHEREFORE, H & B HOLDINGS and STELB demand judgment be entered in their favor and against ONE UP and Mr. Walding in an amount in excess of $17,500.00 plus attorney fees, cost of suit, and for any other relief the Court deems appropriate.

### COUNT XI – BREACH OF CONTRACT – HANC HOLDINGS AND REDSTONE V. ONE UP AND MICHAEL WALDING

289.    HANC HOLDINGS and REDSTONE repeat, re-allege and incorporate by reference the factual allegations of paragraphs one through 237 as if fully set forth herein.

290.    HANC HOLDINGS and REDSTONE executed a valid and enforceable contract with ONE UP and Mr. Walding.  See Exhibit 9.

291.    HANC HOLDINGS and REDSTONE performed all their obligations as required by the contract.

292.    ONE UP and Mr. Walding breached the contract as describe more fully above.

293.    As a result of ONE UP and Mr. Walding breaching the contract, HANC HOLDINGS and REDSTONE suffered compensatory damages in excess of $17,500.00.

WHEREFORE, HANC HOLDINGS and REDSTONE demand judgment be entered in their favor and against ONE UP and Mr. Walding in an amount in excess of $17,500.00 plus attorney fees, cost of suit, and for any other relief the Court deems appropriate.

### COUNT XII – BREACH OF CONTRACT – HANC HOLDINGS AND PARKCAM V. ONE UP AND MICHAEL WALDING

294.    HANC HOLDINGS and PARKCAM repeat, re-allege and incorporate by reference the factual allegations of paragraphs one through 237 as if fully set forth herein.

295.     HANC HOLDINGS and PARKCAM executed a valid and enforceable oral contract with ONE UP and Mr. Walding.

296.     HANC HOLDINGS and PARKCAM performed all their obligations as required by the contract.

297.     ONE UP and Mr. Walding breached the contract as describe more fully above.

298.     As a result of ONE UP and Mr. Walding breaching the contract, HANC HOLDINGS and PARKCAM suffered compensatory damages in excess of $17,500.00.

WHEREFORE, HANC HOLDINGS and PARKCAM demand judgment be entered in their favor and against ONE UP and Mr. Walding in an amount in excess of $17,500.00 plus attorney fees, cost of suit, and for any other relief the Court deems appropriate.

## RULE 38 JURY DEMAND

The Plaintiffs demand trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

GRIFFIN WILLIAMS
MCMAHON & WALSH, LLP


By: /s/ Patrick J. Walsh
       Patrick J. Walsh, Esq.

Patrick J. Walsh, Esq.
GRIFFIN WILLIAMS
MCMAHON & WALSH, LLP
21 N. Fourth Street
Geneva, Illinois 60134
(630) 457-4242
ARDC No. 6287629
pwalsh@gwmwlaw.com

## Low Tier

| Month | Net Profit | Net After NXT Fees | Cuml Total |
|---|---|---|---|
| 1-Jan | -$1,500.00 | -$1,500.00 | -$1,500.00 |
| 1-Feb | -$500.00 | -$500.00 | -$2,000.00 |
| 1-Mar | $0.00 | $0.00 | -$2,000.00 |
| 1-Apr | $750.00 | $487.50 | -$1,512.50 |
| 1-May | $1,200.00 | $780.00 | -$732.50 |
| 1-Jun | $2,000.00 | $1,300.00 | $567.50 |
| 1-Jul | $2,500.00 | $1,625.00 | $2,192.50 |
| 1-Aug | $2,500.00 | $1,625.00 | $3,817.50 |
| 1-Sep | $2,500.00 | $1,625.00 | $5,442.50 |
| 1-Oct | $2,500.00 | $1,625.00 | $7,067.50 |
| 1-Nov | $2,500.00 | $1,625.00 | $8,692.50 |
| 1-Dec | $2,500.00 | $1,625.00 | $10,317.50 |

## Mid Tier

| Month | Net Profit | Net After NXT Fees | Cuml Total |
|---|---|---|---|
| 1-Jan | -$1,500.00 | -$1,500.00 | -$1,500.00 |
| 1-Feb | -$500.00 | -$500.00 | -$2,000.00 |
| 1-Mar | $0.00 | $0.00 | -$2,000.00 |
| 1-Apr | $1,500.00 | $975.00 | -$1,025.00 |
| 1-May | $2,000.00 | $1,300.00 | $275.00 |
| 1-Jun | $2,500.00 | $1,625.00 | $1,900.00 |
| 1-Jul | $3,000.00 | $1,950.00 | $3,850.00 |
| 1-Aug | $3,500.00 | $2,275.00 | $6,125.00 |
| 1-Sep | $4,000.00 | $2,600.00 | $8,725.00 |
| 1-Oct | $4,000.00 | $2,600.00 | $11,325.00 |
| 1-Nov | $4,500.00 | $2,925.00 | $14,250.00 |
| 1-Dec | $4,500.00 | $2,925.00 | $17,175.00 |

## High Tier

| Month | Net Profit | Net After NXT Fees |
|---|---|---|
| 1-Jan | -$1,500.00 | -$1,500.00 |
| 1-Feb | -$500.00 | -$500.00 |
| 1-Mar | $0.00 | $0.00 |
| 1-Apr | $1,000.00 | $650.00 |
| 1-May | $2,000.00 | $1,300.00 |
| 1-Jun | $3,000.00 | $1,950.00 |
| 1-Jul | $4,000.00 | $2,600.00 |
| 1-Aug | $5,000.00 | $3,250.00 |
| 1-Sep | $6,000.00 | $3,900.00 |
| 1-Oct | $7,000.00 | $4,550.00 |
| 1-Nov | $8,000.00 | $5,200.00 |
| 1-Dec | $8,000.00 | $5,200.00 |



tabbies®

PLAINTIFF'S
EXHIBIT

| Cuml Total |
|---|
| -$1,500.00 |
| -$2,000.00 |
| -$2,000.00 |
| -$1,350.00 |
| -$50.00 |
| $1,900.00 |
| $4,500.00 |
| $7,750.00 |
| $11,650.00 |
| $16,200.00 |
| $21,400.00 |
| $26,600.00 |
| $31,800.00 |
| $37,000.00 |
| $42,200.00 |
| $47,400.00 |
| $52,600.00 |
| $57,800.00 |
| $63,000.00 |
| $68,200.00 |
| $73,400.00 |
| $78,600.00 |
| $83,800.00 |
| $89,000.00 |

| | New Account | | | | Aged Account | | |
|---|---|---|---|---|---|---|---|
| Month | Net Profit | Net After NXT Fees | Cuml Total | Month | Net Profit | Net After NXT Fees | Cuml Total |
| 1-Jan | -$500.00 | -$500.00 | -$500.00 | 1-Jan | -$500.00 | -$500.00 | -$500.00 |
| 1-Feb | $0.00 | $0.00 | -$500.00 | 1-Feb | $5,000.00 | $3,250.00 | $2,750.00 |
| 1-Mar | $1,500.00 | $975.00 | $475.00 | 1-Mar | $6,500.00 | $4,225.00 | $6,975.00 |
| 1-Apr | $2,000.00 | $1,300.00 | $1,775.00 | 1-Apr | $5,000.00 | $3,250.00 | $10,225.00 |
| 1-May | $2,500.00 | $1,625.00 | $3,400.00 | 1-May | $7,500.00 | $4,875.00 | $15,100.00 |
| 1-Jun | $3,000.00 | $1,950.00 | $5,350.00 | 1-Jun | $9,000.00 | $5,850.00 | $20,950.00 |
| 1-Jul | $3,500.00 | $2,275.00 | $7,625.00 | 1-Jul | $6,500.00 | $4,225.00 | $25,175.00 |
| 1-Aug | $4,000.00 | $2,600.00 | $10,225.00 | 1-Aug | $7,500.00 | $4,875.00 | $30,050.00 |
| 1-Sep | $5,000.00 | $3,250.00 | $13,475.00 | 1-Sep | $12,000.00 | $7,800.00 | $37,850.00 |
| 1-Oct | $4,500.00 | $2,925.00 | $16,400.00 | 1-Oct | $7,500.00 | $4,875.00 | $42,725.00 |
| 1-Nov | $4,500.00 | $2,925.00 | $19,325.00 | 1-Nov | $8,500.00 | $5,525.00 | $48,250.00 |
| 1-Dec | $6,250.00 | $4,062.50 | $23,387.50 | 1-Dec | $13,000.00 | $8,450.00 | $56,700.00 |
| | Total Year 1 | | $23,387.50 | | Total Year 1 | | $56,700.00 |
| 1-Jan | $4,000.00 | $2,600.00 | $25,987.50 | 1-Jan | $8,000.00 | $5,200.00 | $61,900.00 |
| 1-Feb | $5,000.00 | $3,250.00 | $29,237.50 | 1-Feb | $9,000.00 | $5,850.00 | $67,750.00 |
| 1-Mar | $6,500.00 | $4,225.00 | $33,462.50 | 1-Mar | $6,500.00 | $4,225.00 | $71,975.00 |
| 1-Apr | $5,000.00 | $3,250.00 | $36,712.50 | 1-Apr | $7,500.00 | $4,875.00 | $76,850.00 |
| 1-May | $7,500.00 | $4,875.00 | $41,587.50 | 1-May | $12,000.00 | $7,800.00 | $84,650.00 |
| 1-Jun | $9,000.00 | $5,850.00 | $47,437.50 | 1-Jun | $13,000.00 | $8,450.00 | $93,100.00 |
| 1-Jul | $6,500.00 | $4,225.00 | $51,662.50 | 1-Jul | $8,500.00 | $5,525.00 | $98,625.00 |
| 1-Aug | $7,500.00 | $4,875.00 | $56,537.50 | 1-Aug | $10,000.00 | $6,500.00 | $105,125.00 |
| 1-Sep | $12,000.00 | $7,800.00 | $64,337.50 | 1-Sep | $14,000.00 | $9,100.00 | $114,225.00 |
| 1-Oct | $7,500.00 | $4,875.00 | $69,212.50 | 1-Oct | $8,000.00 | $5,200.00 | $119,425.00 |
| 1-Nov | $8,500.00 | $5,525.00 | $74,737.50 | 1-Nov | $8,000.00 | $5,200.00 | $124,625.00 |
| 1-Dec | $13,000.00 | $8,450.00 | $83,187.50 | 1-Dec | $15,000.00 | $9,750.00 | $134,375.00 |
| | Total Year 1 | | $83,187.50 | | | | |



PLAINTIFF'S EXHIBIT 2
tabbies

DocuSign Envelope ID: D928280B-ECF5-45E4-8E4B-5873E47D71D2

## E-COMMERCE CONSULTING AGREEMENT

This E-Commerce Consulting Agreement ("Agreement"), is dated as of ___December 10___, 2020, by and between NXTLVL SERVICES, LLC, a Florida limited liability company, whose address is 4300 Biscayne Blvd., Miami, Florida 33137 (hereinafter "Consultant"), and __Hanc&Brubaker Holdings, LLC (dba eComLLC)__ whose address is __100 24th Street West #1-2011, Billings MT 59102_____ (hereinafter "Client").

   WHEREAS, Client desires to engage Consultant's services, as an independent contractor, upon the terms and conditions herein set forth; and

   WHEREAS, Consultant desires to render consulting services to Client upon the terms and conditions herein set forth;

   NOW, THEREFORE, Consultant and Client (together, the "Parties"), for $10.00 and other good and valuable consideration, the receipt and sufficiency are hereby mutually acknowledged, agree to the following terms and conditions whereby Consultant shall consult Client in connection with an e-commerce store on the Amazon platform (the "Store"):

I. **CONSULTANT'S SERVICES** - Consultant agrees to perform the following services ("Services"):

  (A)  Maintain Client's Store, including configuring the Amazon storefront and configuring the front and back end systems necessary to manage the Store.

  (B)  Review, research, source, select, and list products for the Client's Store.

  (C)  Respond to customers' phone and email inquiries in support of Client's Store and shall exercise good faith efforts to resolve customer inquiries, handle product returns, and manage billing matters.

  (D)  Maintain oversight of Client's Store and its financial performance; however, Consultant shall have no obligation to, and does not intend to, provide financial advice to Client concerning the operation of Client's Store (Client shall confer with its professional financial advisors concerning all financial inquiries).

2. **CLIENT RESPONSIBILITIES.**

  (A)  Client understands there is a period that will delay the commencement and commercial operations of the Store, including, without limitation, a 1 to 4 month configuration period (and perhaps longer, depending on the circumstances specific to each proposed Store) where Client must complete certain obligations. Until Client satisfies all contractual and legal requirements for the creation and operation of Client's Store, Consultant cannot commence providing the Services as set forth in Section 1 of this Agreement.

  (B)  Within the first eight (8) months of this Agreement, Client will use best efforts to obtain, and maintain for the duration of this Agreement, a credit card issued through a United States federally insured banking institution with a *minimum* credit limit of thirty thousand ($30,000.00) dollars USD. In no event shall Consultant be responsible for payment of any kind and any other obligation under Client's credit card, all of which credit card obligations shall be solely that of Client. Furthermore, unless Consultant provides written consent: (i) at no time shall Client Pause its Store, allow for a Suspension, or place its Amazon account or Store in Vacation Mode, such terms being defined or referenced on the Amazon website or in other written materials made available to Client; and (ii) Client shall not allow its Store to remain shut down for more than ninety (90) days during the term of this Agreement.

  (B)  Within thirty (30) days from the commencement of this Agreement, Client shall provide Consultant with only necessary information for the purpose of Consultant carrying out its obligations under this Agreement. Client shall use its best efforts to assist Consultant in obtaining all information deemed necessary by Consultant to implement Consultant's Services.

3. **COMPENSATION.** In consideration of this Agreement, Client shall pay Consultant a one-time consulting fee of twenty-two thousand five-hundred dollars ($22,500.00) USD (the "Fee"), via wire transfer or ACH to Consultant's bank account split into two equal payments. The first payment within 72 hours of execution of this Agreement and the second payment within 72 hours of notice that the Clients Amazon account is established. **Except as expressly permitted under Section 10, the Fee is non-refundable.**

  (A)  Client shall also thereafter, beginning in the month following the month in which the Fee is paid, pay Consultant three hundred dollars ($300.00) USD per month (the "Maintenance Fee"), or thirty five percent (35%) of the Net Profit from Client's Store per month (the "Ongoing Commission"), whichever is greater.

   _BH/RB_

Client Initials_____ .

E-Commerce Consulting Agreement
Page 1 of 9

NXTLVL SERVICES, LLC © 2020



DocuSign Envelope ID: D928280B-ECF5-45E4-8E4B-5873E47D71D2

Client shall not be responsible for payment of the Ongoing Commission or the Maintenance Fee if, other than



**Client Initials**_____.

E-Commerce Consulting Agreement
Page 2 of 9

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: D928280B-ECF5-45E4-8E4B-5873E47D71D2

due to breach of this Agreement by Client, there is no activity in Client's Store for said month (or a portion thereof, where such portion exceeds 15 days).

(B) Consultant shall invoice Client monthly, and Client has seventy-two (72) hours to remit payment.

4. **TERM** – This Agreement shall commence on the last date of execution by both parties and shall continue in effect for a period of one (1) year (the "Initial Term") thereafter. Upon completion of the Initial Term, the Agreement shall automatically extend on a month-to-month basis (the "Option Term") until written notice is provided by either party, to the other party, in accordance with Section 5.

5. **TERMINATION** – Client may terminate this Agreement at any time by providing written notice to Consultant. Consultant may terminate this Agreement, at any time, for cause, with fourteen (14) days written notice to Client. Consultant may terminate the Option Term, without cause, at any time. For this Section, "cause" shall include, but not be limited to: (1) any act or omission by Client, which interferes with the operation of the Store or Consultant's ability to render Services, in Consultant's sole discretion; or (2) Client's breach or threatened breach of any term in this Agreement. If Client breaches any term under this Agreement, independent of any actions Amazon may take from time to time, Consultant may Pause Client's Store, which, Consultant may only reactivate, in Consultant's sole discretion.

6. **NON-DISPARAGEMENT** – During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement, shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true.

7. **SALES / USE TAX** – Consultant does not provide tax reporting or tax management services of any kind. Client is responsible for determining if Client is responsible for collecting and remitting sales or use tax under any applicable state or local law, regulation, or ordinance.

8. **INTELLECTUAL PROPERTY** – Client understands that Client's Store is a service hosted on the Amazon platform and not a distinct or severable product or service that can be ported, removed or installed in or on a different place or platform. Accordingly, Consultant does not hold itself out to have any rights, endorsements, relations, or affiliation with Amazon, or any of Amazon's copyright, trademark, trade dress, trade secret, or any other intellectual property right that Amazon may hold (the "Intellectual Property Rights"). Further, Consultant cannot, and does not, grant or convey to Client any Intellectual Property Rights, whatsoever, in Client's Store, or Amazon, and Consultant holds no legal or equitable rights in Client's Store.

9. **RESTRICTED ACTIVITIES** – Client acknowledges that during the Term of this Agreement Client will have access to Consultant's Confidential Information which, if disclosed, could assist in competition against Consultant by third parties. Client recognizes the highly competitive nature of Consultant's business, services, and its trade secrets, and that Client conducts its business electronically, through e-commerce, and throughout the United States. Therefore, Client agrees that *the following restrictions on Client's activities* are necessary to protect the good will, Confidential Information, and other legitimate business interests of Consultant, which restrictions are fair and supported by adequate consideration:

(A) Non-Competition. Client on behalf of itself and its directors, officers, members or shareholders, employees, agents, and representatives agrees and warrants that during the Term of this Agreement, and for two (2) years following the termination of this Agreement (the "Restricted Period"), Client shall not be involved, directly or indirectly, whether as owner, partner, investor, consultant (paid or unpaid), agent, employee, co-venturer or otherwise, with any business that manages, operates, or promotes e-commerce stores or e-commerce transactions on behalf of third parties anywhere in the United States, regardless of whether Client is physically located within the United States or outside of the United States.

(B) Non-Solicitation. During the Restricted Period, Client agrees that it will not, directly, or indirectly through another Person: (i) induce or attempt to induce any employee or contractor of Consultant to leave the employ or contract of Consultant, or in any way interfere with the relationship between Consultant and any of its employees or contractors, or (ii) induce or attempt to induce any customer, supplier, client,



**Client Initials_____.**

E-Commerce Consulting Agreement
Page 3 of 9

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: D928280B-ECF5-45E4-8E4B-5873E47D71D2

distributor, vendor, licensee, or other business relation of Consultant to cease doing business with Consultant, or in any way interfere with Consultant's relationship with any such party.

      (C)     Non-Disclosure. The Parties agree not to use, reveal, make available, nor disclose, whether directly or indirectly, to any third party, other than the Party's attorney and or tax accountant, any Confidential Information for any purpose except as approved in writing by Consultant. Further, the Parties shall (a) not assist nor enable anyone to access or use any of Confidential Information; and (b) not use nor exploit any of the Confidential Information for any purpose whatsoever except in accordance with the terms of this Agreement. For purposes of this Agreement, the Party disclosing the Confidential Information shall be referred to as "Disclosing Party," and the Party receiving the Confidential Information shall be referred to as "Receiving Party."

          (i)     Notwithstanding the foregoing, Receiving Party will: 1) promptly notify the Disclosing Party, to the extent legally permissible, if Receiving Party becomes required by court order to disclose any Confidential Information; 2) cooperate with Disclosing Party if Disclosing Party decides to oppose or to seek to restrain such disclosure; and 3) subject to the foregoing, only disclose that information which its counsel advises it is legally compelled to disclose.

          (ii)     If at Disclosing Party's request, Receiving Party is unable to obtain a protective order or other injunctive relief above with respect to the Confidential Information referred to therein and Receiving Party is thereafter required by court order to disclose such Confidential Information, Receiving Party may disclose only such Confidential Information as is expressly required by the court order.

      (D)     Maintenance of Confidential Information. The Receiving Party agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of Disclosing Party's Confidential Information. Without limiting the foregoing, Receiving Party shall take at least those measures that Receiving Party takes to protect its own confidential information. Receiving Party shall also immediately notify Disclosing Party, in writing, of any unauthorized use or disclosure of the Confidential Information.

      (E)     Confidentiality Term: Regardless of any termination of this Agreement, the parties expressly acknowledge and agree that their respective rights and obligation under this Section 9 shall last for a period of two (2) years following the expiration of this Agreement or permissible termination of this Agreement; *provided*, however, that Client's duties of confidentiality thereunder with respect to Consultant's trade secrets shall survive such expiration and such duties of confidentiality shall continue and not expire so long as such Confidential Information is deemed a trade secret as a matter of law.

      (F)     In signing this Agreement, Client acknowledges that he/she/it has carefully read, consulted with legal counsel, and considered all the terms and conditions of this Agreement, including the restraints imposed on Client, throughout the United States, under this Section 9. Client agrees that all such restraints are necessary for the reasonable and proper protection of Consultant, and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area (i.e., throughout the United States). Client further acknowledges that, were Client to breach any of the covenants contained in this Section 9, however caused, the damage to the Consultant would be irreparable. Client therefore agrees that Consultant, in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any such breach or threatened breach, without having to post bond, together with reasonable attorneys' fees incurred in enforcing Consultant's rights hereunder.

10. **REFUND POLICY –**

      *(A)*     Subject to Paragraph (B) below, from the date of the first sale of a product through Client's Store and for sixteen (16) months thereafter ("Refund Period"), if Consultant's services result in a Prohibited Action, Client has the option ("Refund Option") to request a refund during the Refund Period. Should Client elect to exercise the Refund Option, Client must so notify Consultant of that election no later than the last business day of the Refund Period. In that event, Consultant will refund a portion of the Fee, as defined in Paragraph (B) below (the "Refund Amount"). The Refund Amount shall be calculated by the following formula: (x) the Fee *less* (y) any Net Profit and Cash Back Client received during the Refund Period, *and less*

(z) any Net Profit and Cash Back Client received through the Cure Store; *provided*, however, that (1) Client

BH/RB

E-Commerce Consulting Agreement
Page 4 of 9

**Client Initials_____.**

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: D928280B-ECF5-45E4-8E4B-5873E47D71D2

has not engaged in any act that interferes with the operation of Client's Store or of Consultant's consulting services or which would be in breach of this Agreement, including, without limitation, a Suspension of Client's Store for any reason other than the occurrence of a Prohibited Action, and (2) this Agreement remains in full

┌─DS
│ *BH/RB*
Client Initials_____.

E-Commerce Consulting Agreement
Page 5 of 9

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: D928280B-ECF5-45E4-8E4B-5873E47D71D2

force and effect at the time Client exercises the Refund Option. The Parties further agree that under no circumstance shall the Refund Amount exceed the Fee.

(C) Client's right to exercise the Refund Option under Paragraph (A), and to request that Consultant pay Client the Refund Amount is expressly conditioned on Client notifying Consultant, in writing, of Client's intent to exercise the Refund Option (the "Refund Notice") no later than the last business day of the Refund Period. Further, upon Consultant receiving the Refund Notice, Consultant has the right thereafter at its election to manage a replacement store (the "Cure Store") for Client for a period of six (6) months ("Cure Store Period") before the Refund Amount is determined and is payable to Client. The Cure Store Period shall commence on the date of the first sale of product through the Cure Store. In such event, during the Cure Store Period, Consultant shall consult with Client consistent with the terms of this Agreement.

## 11. LIMITATION OF LIABILITY

(A) UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF LIABILTY SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO. SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S PRIOR WRITTEN APPROVAL.

(B) CONSULTANT ASSUMES NO LIABILITY FOR OR RELATING TO THE DELAY, INTERRUPTION, CORRUPTION OR FAILURE OF PRODUCT, DATA OR INFORMATION TRANSMITTED IN CONNECTION WITH THE STORE, INCLUDING WITHOUT LIMITATION ANY ACT OR FAILURE TO ACT BY AMAZON OR ANY FORCE MAJEURE CONDITION (INCLUDING BY WAY OF EXAMPLE ONLY, ANY PUBLIC HEALTH ISSUE).

(C) AS A LIQUIDATED DAMAGES REMEDY AND NOT AS A PENALTY, SINCE DAMAGES TO CLIENT RESULTING FROM BREACH OF THIS AGREEMENT BY CONSULTANT ARE DIFFICULT AND IMPRACTICAL, IF NOT IMPOSSIBLE TO CALCULATE, CONSULTANT SHALL ONLY BE LIABLE TO THE EXTENT OF ACTUAL DAMAGES INCURRED BY CLIENT, NOT TO EXCEED A TOTAL OF $5,000.00 USD. AGREEMENT TO THIS PROVISION IS A MATERIAL INDUCEMENT TO CONSULTANT AGREEING TO ENTER INTO THIS AGREEMENT WITH CLIENT. THIS PROVISION 11.(C) SHALL PREVAIL IN THE EVENT OF ANY CONFLICT OR INCONSISTENCY WITH ANY OTHER PROVISION IN THIS AGREEMENT. Client Initials .

## 12. DISCLAIMERS AND RELEASE

(A) CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-

Client Initials _____ .

BH/RB

E-Commerce Consulting Agreement
Page 6 of 9

DocuSign Envelope ID: D928280B-ECF5-45E4-8E4B-5873E47D71D2

INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT.

(B) Without limiting the foregoing, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability, or the completeness, of any matter within the scope of this Agreement, including but not limited to the Store, the products therein, or the data, information, content, software, technology, graphics, or communications provided on or through the Store; (2) the satisfaction of any regulation (government or otherwise) requiring disclosure of information on the products provided through or in connection with the Store or the approval or compliance of the Store or any software or information and content contained in the Store; or (3) that the Store will satisfy Client's economic needs and requirements or reach any particular level of sales, income, or net profits.

(C) Business Risk – Client hereby understands that the creation and potential growth of the Client's Store carries financial and other risks. Client hereby understands that e-commerce is an ever-changing industry that is subject to numerous business risks, including but not limited to: (i) a changing legal environment in which regulations can emerge or change that affects the commercial sale of products through Amazon and/or Client's Store; (ii) economic changes that affect consumer spending, the emergence of recessions due to economic and other issues (including public health issues) and the like; (iii) changes in the popular appeal of and demand for different types of Amazon products; (iv) changes in Amazon's terms and conditions, which can materially affect or even interfere with the marketability of Client's Store or its products; (v) changes in international politics or economies, which may affect, among other things, the ability to package, distribute and ship Amazon products, and the costs thereof; (vi) market forces, including increased and changing levels of competition for any given product from other sellers of such product; (vii) unforeseen events, force majeure, public health concerns, and other external events that could affect the performance of any Amazon Store. Client hereby understands that there are no guarantees made by Consultant or otherwise as to the Store's sales, income, or profitability at any time, and acknowledges that Client is at risk of a total loss of his, her or its investment. Client acknowledges the substantial risks generally involved with an e-commerce business. Client recognizes that there is a possibility that subsequent to the execution of this Agreement, Client may discover facts or incur or suffer claims which were unknown or unsuspected at the time this Agreement was executed, and which if known by Client at that time may have materially affected Client's decision to execute this Agreement. By operation of this Agreement, and in particular the disclaimers of Consultant contained in the preceding subsections, Client assumes any and all risks of such unknown facts and such unknown and unsuspected claims and expressly releases Consultant for any liability which Consultant could have had in connection therewith in the absence of the release herein provided by Client to Consultant. Consultant encourages Client to only invest funds that Client can afford to invest in an illiquid basis over a longer term and perhaps ultimately lose, and to consult Client's legal and/or business advisors prior to investing in the Store. Client Initials_____

(D) Amazon Terms and Conditions – Client hereby understands that Amazon, from time to time, with or without cause, can and does suspend accounts for various reasons, some of which may not be obvious or justified in Client's view. In the event of any such Suspension by Amazon of Client's Store, if available to Consultant, Consultant shall provide Client with independent third-party referral sources which can advise Client whether its Store can be returned to operating status and if so how Client can do so. Consultant makes no representations or warranties of any kind, however, that Amazon will in such cases return Client's Store to active status. Furthermore, Client agrees and understands that Consultant makes no guarantees or representations regarding the Store in relation to any Amazon policy, whether currently in effect or as may be amended by Amazon from time to time. Client understands that Consultant has no control over or input in when and whether Amazon elects to change any of its policies. However, the Services provided by Consultant to Client pursuant to this Agreement shall where practical be consistent with Amazon's current policies.

**13. GENERAL PROVISIONS**

(A)      Non-exclusivity - Each party is free to contract with others with respect to the subject matter of this Agreement subject to the limitations as to Client under Section 6 and Section 9 of this Agreement.

(B)      Relationship of the Parties – Nothing herein contained shall constitute a partnership or a joint venture between the Parties. Consultant is performing its services to Client as an independent contractor and not as Client's agent or employee. There is no third-party beneficiary to this Agreement.

*BH/RB*

E-Commerce Consulting Agreement
Page 7 of 9

**Client Initials**_____.

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: D928280B-ECF5-45E4-8E4B-5873E47D71D2

(C)    Notices - All notices to either party shall be sent electronically to the email address(es) provided by each Party to the other and as otherwise set forth below. All notices to Consultant shall be sent to help@nxtlvlservices.com with a copy sent to cs@nxtlvlservices.com. If to Client, notice shall be sent electronically to___hancandbrubakerholdings@gmail.com with a courtesy copy sent to_____.

Alternatively, such written notice will also be deemed given upon personal delivery, or on receipt or refusal if sent by U.S. first class certified or registered mail, postage prepaid, return receipt requested, or by a recognized private delivery service, to the addresses stated on Page 1 of this Agreement.

(D)    Severability, Headings - If any provision is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect. In such event, the Parties hereby acknowledge their intent to make such invalidated provision, or part of such provision, as to be deemed replaced with a valid provision or part of provision that most closely approximates and gives effect to the intent of the invalid provision. Any such modification shall revise the existing invalid provision, or part thereof, only as much as necessary to make the invalidly-held provision otherwise valid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or extent of any section of this Agreement.

(E)    Dispute Resolution - Except where otherwise expressly set forth in this Agreement, any dispute or claim arising out of or relating to this Agreement shall only be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Miami-Dade County, Florida. Any arbitration proceeding, determination, or award, shall be confidential, and neither Party may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses of such arbitration proceeding will be divided equally between the parties, though each Party will bear its own expense of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration (except where attorneys' fees and costs shall be awarded pursuant to Section 13.(L)). IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either Party more than one (1) year after the cause of action arose.

(F)    Amendment. This Agreement cannot be amended except in writing and signed by both Parties.

(G)    Electronic Signatures - This Agreement may be executed by electronic means and in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all such counterparts together will constitute one and the same instrument.

(H)    Governing Law; Jurisdiction - This Agreement, the negotiations thereunder, and performance thereof shall be interpreted, construed and enforced in all respects in accordance with the laws of the State of Florida without reference to principles of conflicts of laws. Client hereby irrevocably consents to the personal jurisdiction of and agrees that the sole venue for any dispute arising in connection to this Agreement shall be the courts of competent jurisdiction (State and federal) located within Miami-Dade County, Florida. Client agrees not to commence or prosecute any such action, claim or proceeding other than in such aforementioned courts. The parties hereto agree that Florida law shall apply regardless of any choice or conflicts of law principles. Client agrees that Miami-Dade County, Florida is a convenient forum, and waives any objection to same under *forum non conveniens* principles.

(I)    Waiver - The failure of any party to insist on or enforce strict performance of any provision of this Agreement, or to exercise any right or remedy under this Agreement or applicable law shall not be construed as a waiver or relinquishment of the right to assert or rely upon any such provision, right or remedy.

(J)    Force Majeure - Neither Party shall be responsible for any failure to perform beyond its reasonable control, including, without limitation acts of God, national health emergency, acts or omissions of civil or military authority, civil disturbances, wars, strikes or other labor disputes, fires, transportation contingencies, or interruptions in telecommunications, internet services, or third-party vendors.



E-Commerce Consulting Agreement
Page 8 of 9

Client Initials_____.

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: D928280B-ECF5-45E4-8E4B-5873E47D71D2

(K)     Entire Agreement - This Agreement constitutes the entire agreement between the parties and supersedes all prior and contemporaneous oral and written agreements relating to the subject matter herein.

(L)     Attorneys' Fees – If either party breaches this Agreement and one party brings any action (including appeal) against the breaching party in connection with this Agreement, the substantially prevailing party in such action shall be entitled to recover his/her/its cost of the action and reasonable attorneys' fees.

(M)     Injunctive Relief - In the event of a breach or threatened breach of Section 6 or Section 9, the aggrieved party shall immediately be entitled to pursue in any court of competent jurisdiction specific performance, injunctive relief, damages, or such other remedies and relief as may be available, regardless of any contrary provision of this Agreement. Additionally, due to the difficulty of measuring damages in the event of a breach of this Agreement by Client, the parties agree that, in the event of a breach of either Section 9(C) or 9(D) by Client, Client shall owe Consultant total liquidated damages in the amount of Fifty Thousand Dollars ($50,000.00) per breach. The Parties further agree that (i) the liquidated damage amount due from Client as above set forth is not a penalty but is an arms-length negotiated amount under the circumstances, and (ii) this Section shall not be construed as a waiver of prohibition of any other remedies of Consultant in the event of a breach of this Agreement by Client.

(N)     Independent Counsel - The Parties acknowledge that each has been advised to seek, and each has had sufficient opportunity to seek, independent legal counsel possessing industry experience in connection with this matter. The Parties have either sought such counsel or voluntarily waived such right to do so. Accordingly, in interpreting this Agreement, no weight shall be placed upon either party. Furthermore, the parties equally drafted this agreement; thus, the Agreement shall be construed neutrally, and no rule of construction shall apply to the disadvantage of any Party.

(O)     Assignment – Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party. Prior to any such assignment, said assignee shall execute an agreement identical to this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, and assigns. Any purported assignment or delegation by either party in violation of the foregoing shall be null and void ab initio and of no force and effect.

(P)     Cure - If at any time either Client believes the terms of this Agreement are not being fully performed, prior to seeking or commencing any relief expressly permitted under this Agreement, Client shall notify Consultant in writing of the specific nature of such claim, and Consultant receiving such notice shall have thirty (30) days from receipt of the notice to cure such claimed breach.

(Q)     Indemnification – Client agrees to indemnify, defend, and save and hold harmless Consultant, including its respective insurers, directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, in connection with or relating to the matters referred to in this Agreement, resulting from or relating directly or indirectly to Client's breach of this Agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to Client, and shall survive expiration or termination of this Agreement.

(R)     Survival – Any Section in this Agreement that requires survival shall survive the termination of this Agreement for the maximum period permitted by applicable law.

(S)     Client Data Management – Unless Consultant receives Client's prior written consent, Consultant shall not: (i) access, process, or otherwise use Client's Data other than as necessary to facilitate Consultant's Services; (ii) give any of its employees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performance of Consultant under this Agreement; or (iii) give any other third-party access to Client Data except as necessary for such third-party to facilitate performance under this Agreement. Consultant shall not erase Client Data, or any copy thereof, without Client's express written consent and shall follow Client's written instructions regarding retention and erasure of Client Data so long as it does not interfere with the performance of Consultant's Services and performance under this Agreement. Client possesses and retains all right, title, and interest in and to Client Data, and Consultant's use and possession thereof is solely in furtherance of Consultant's Services and on Client's behalf.



E-Commerce Consulting Agreement
Page 9 of 9

**Client Initials** _____.

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: D928280B-ECF5-45E4-8E4B-5873E47D71D2

Consultant shall comply with all applicable laws and regulations governing the handling of Client Data and shall not engage in any activity that would place Client in violation of any applicable law, regulation, or government request, or judicial process.

     (T)    Waiver of Jury Trial. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

     (U)    Ministerial Services – In furtherance of Client's obligations under Section 2, Consultant may offer Client guidance and referrals to third-party vendors. Additionally, Consultant may, in its discretion, and at no additional fee to Client, offer Client assistance in fulfilment of the obligations in Section 2 ("Ministerial Act"). Before Consultant commences any Ministerial Act, Consultant shall obtain Client's written consent. Client agrees to reimburse Consultant for expenses incurred in carrying out a Ministerial Act. In the event Consultant offers to engage in a Ministerial Act, Client hereby agrees to indemnify, defend and save and hold harmless Consultant from any cost, claim, damage or liability (including attorneys' fees and court costs) related to the Ministerial Act. Client also waives any claims against Consultant that may be related to the Ministerial Act. Client accepts that this indemnification and waiver of all liability related to the Ministerial Act is a material inducement for Consultant to make any offer to Client for such Ministerial Act, and without such indemnification and waiver from Client, Consultant would not make any such offer of assistance to Client to engage in the Ministerial Act. The foregoing indemnity of Client shall survive expiration of the Term of this Agreement or its earlier termination.

14. **DEFINITIONS** – Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

**IN WITNESS WHEREOF,** this Agreement is deemed executed as of the of the last execution date below.

**CLIENT:**
By: _Hanc and Brubaker Holdings llC_
*authorized representative and agent for service of process*
Date: _____ 12/10/2020

Principal of Client acknowledges and agrees to be bound by all of the provisions of this Agreement applicable to Client, as if expressly a party hereto. Accepted and Agreed to by Principal of Client:

By: _Hanc and Brubaker Holdings llC_
Print Name: _Brian Hanc_____, individually

**NXTLVL SERVICES, LLC**
By: _____ _Michael J. Walding Jr._
Michael J. Walding, Jr., CEO, *authorized representative and agent for service of process*
Date: _____ 12/10/2020

Client Initials _BH/RB_.

E-Commerce Consulting Agreement
Page 10 of 9

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: D928280B-ECF5-45E4-8E4B-5873E47D71D2

## EXHIBIT A

**Definitions:** Words or phrases which are initially capitalized or are within quotation marks in the e-commerce consulting agreement ("Agreement") shall have the meanings provided in this Exhibit A.

(A)     "Cash Back" means any revenue derived from cash back programs like BeFrugal.

(B)     "Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

(C)     "Confidential information" means any and all information of the Company that is not generally known to the public or those with whom the Company competes or does business, or with whom they plan to compete or do business, and any and all information, publicly known publicly known in whole or in part or not, which, if disclosed would assist in competition against them including without limitation: Consultant's proprietary business information and all information disclosed or made available by Consultant to Client, either directly or indirectly, in writing, orally, by demonstration, or by inspection of tangible or intangible objects, including without limitation documents, files, texts, emails, phone calls, zoom calls, links, source code, software, charts, graphs, and any other form of communication. Confidential Information also includes information disclosed by Client to Consultant. Confidential Information shall not include any information (a) which Client can establish was publicly known and made generally available in the public domain prior to the time of disclosure, other than as a result of an improper disclosure by a party hereto, or (b) was in Client's possession on a non-confidential basis prior to its disclosure.

(D)     "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store *after* deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Amazon fees related to Client's store.

(E)     "Pause" means the Store is considered in "Vacation Mode" due to a variety of reasons, including, but not limited to, insufficient credit available by Client to permit Consultant to render its services to Client as provided herein.

(F)     "Prohibited Action" means any affirmative action or inaction taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store.

(G)     The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Amazon transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

(H)     The term "Store" means the Client's wholly owned e-commerce location on the third-party Amazon.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon).

(I)     "Suspension" means an action or actions by Amazon which inactivates or freeze Client's Store, and which thereby results in an inability for Client to access Client's Store which results in no access or sales activity through the Store, other than where due to the occurrence of a Prohibited Action.

(J)     "Vacation Mode" means any action other than a breach of this Agreement by Client which results in a condition of Client's Store where all sales activity in the Store has been temporarily halted.

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: 7FBBDBD2-9B6A-41CA-921B-510FAD312287

## E-COMMERCE CONSULTING AGREEMENT

This E-Commerce Consulting Agreement ("Agreement"), is dated as of ___December 10___, 2020, by and between NXTLVL SERVICES, LLC, a Florida limited liability company, whose address is 4300 Biscayne Blvd., Miami, Florida 33137 (hereinafter "Consultant"), and ___Hanc&Brubaker Holdings___ whose address ___(acres Dynamics LLC)___ ___100 24th Street West #1-2011, Billings, MT 59102___ (hereinafter "Client").

       WHEREAS, Client desires to engage Consultant's services, as an independent contractor, upon the terms and conditions herein set forth; and

       WHEREAS, Consultant desires to render consulting services to Client upon the terms and conditions herein set forth;

       NOW, THEREFORE, Consultant and Client (together, the "Parties"), for $10.00 and other good and valuable consideration, the receipt and sufficiency are hereby mutually acknowledged, agree to the following terms and conditions whereby Consultant shall consult Client in connection with an e-commerce store on the Amazon platform (the "Store"):

1. **CONSULTANT'S SERVICES** - Consultant agrees to perform the following services ("Services"):

    (A)      Maintain Client's Store, including configuring the Amazon storefront and configuring the front and back end systems necessary to manage the Store.

    (B)      Review, research, source, select, and list products for the Client's Store.

    (C)      Respond to customers' phone and email inquiries in support of Client's Store and shall exercise good faith efforts to resolve customer inquiries, handle product returns, and manage billing matters.

    (D)      Maintain oversight of Client's Store and its financial performance; however, Consultant shall have no obligation to, and does not intend to, provide financial advice to Client concerning the operation of Client's Store (Client shall confer with its professional financial advisors concerning all financial inquiries).

2. **CLIENT RESPONSIBILITIES.**

    (A)      Client understands there is a period that will delay the commencement and commercial operations of the Store, including, without limitation, a 1 to 4 month configuration period (and perhaps longer, depending on the circumstances specific to each proposed Store) where Client must complete certain obligations. Until Client satisfies all contractual and legal requirements for the creation and operation of Client's Store, Consultant cannot commence providing the Services as set forth in Section I of this Agreement.

    (B)      Within the first eight (8) months of this Agreement, Client will use best efforts to obtain, and maintain for the duration of this Agreement, a credit card issued through a United States federally insured banking institution with a *minimum* credit limit of thirty thousand ($30,000.00) dollars USD. In no event shall Consultant be responsible for payment of any kind and any other obligation under Client's credit card, all of which credit card obligations shall be solely that of Client. Furthermore, unless Consultant provides written consent: (i) at no time shall Client Pause its Store, allow for a Suspension, or place its Amazon account or Store in Vacation Mode, such terms being defined or referenced on the Amazon website or in other written materials made available to Client; and (ii) Client shall not allow its Store to remain shut down for more than ninety (90) days during the term of this Agreement.

    (B) Within thirty (30) days from the commencement of this Agreement, Client shall provide Consultant with only necessary information for the purpose of Consultant carrying out its obligations under this Agreement. Client shall use its best efforts to assist Consultant in obtaining all information deemed necessary by Consultant to implement Consultant's Services.

3. **COMPENSATION**. In consideration for this Agreement, Client shall pay Consultant a one-time consulting fee of twenty-two thousand five-hundred dollars ($22,500.00) USD (the "Fee"), via wire transfer or ACH to Consultant's bank account split into two equal payments. The first payment within 72 hours of execution of this Agreement and the second payment within 72 hours of notice that the Clients Amazon account is established. **Except as expressly permitted under Section 10, the Fee is non-refundable.**

    (A) Client shall also thereafter, beginning in the month following the month in which the Fee is paid, pay Consultant three hundred dollars ($300.00) USD per month (the "Maintenance Fee"), or thirty five percent (35%) of the Net Profit from Client's Store per month (the "Ongoing Commission"), whichever is greater.

    *BH/RB*

E-Commerce Consulting Agreement
Page 1 of 9

**Client Initials_____.**

PLAINTIFF'S EXHIBIT 4

DocuSign Envelope ID: 7FBBDBD2-9B6A-41CA-921B-510FAD312287

Client shall not be responsible for payment of the Ongoing Commission or the Maintenance Fee if, other than

Client Initials_____.

BH/RB

E-Commerce Consulting Agreement
Page 2 of 9

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: 7FBBDBD2-9B6A-41CA-921B-510FAD312287

due to breach of this Agreement by Client, there is no activity in Client's Store for said month (or a portion thereof, where such portion exceeds 15 days).

  (B) Consultant shall invoice Client monthly, and Client has seventy-two (72) hours to remit payment.

4. **TERM** – This Agreement shall commence on the last date of execution by both parties and shall continue in effect for a period of one (1) year (the "Initial Term") thereafter. Upon completion of the Initial Term, the Agreement shall automatically extend on a month-to-month basis (the "Option Term") until written notice is provided by either party, to the other party, in accordance with Section 5.

5. **TERMINATION** – Client may terminate this Agreement at any time by providing written notice to Consultant. Consultant may terminate this Agreement, at any time, for cause, with fourteen (14) days written notice to Client. Consultant may terminate the Option Term, without cause, at any time. For this Section, "cause" shall include, but not be limited to: (1) any act or omission by Client, which interferes with the operation of the Store or Consultant's ability to render Services, in Consultant's sole discretion; or (2) Client's breach or threatened breach of any term in this Agreement. If Client breaches any term under this Agreement, independent of any actions Amazon may take from time to time, Consultant may Pause Client's Store, which, Consultant may only reactivate, in Consultant's sole discretion.

6. **NON-DISPARAGEMENT** – During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement, shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true.

7. **SALES / USE TAX** – Consultant does not provide tax reporting or tax management services of any kind. Client is responsible for determining if Client is responsible for collecting and remitting sales or use tax under any applicable state or local law, regulation, or ordinance.

8. **INTELLECTUAL PROPERTY** – Client understands that Client's Store is a service hosted on the Amazon platform and not a distinct or severable product or service that can be ported, removed or installed in or on a different place or platform. Accordingly, Consultant does not hold itself out to have any rights, endorsements, relations, or affiliation with Amazon, or any of Amazon's copyright, trademark, trade dress, trade secret, or any other intellectual property right that Amazon may hold (the "Intellectual Property Rights"). Further, Consultant cannot, and does not, grant or convey to Client any Intellectual Property Rights, whatsoever, in Client's Store, or Amazon, and Consultant holds no legal or equitable rights in Client's Store.

9. **RESTRICTED ACTIVITIES** – Client acknowledges that during the Term of this Agreement Client will have access to Consultant's Confidential Information which, if disclosed, could assist in competition against Consultant by third parties. Client recognizes the highly competitive nature of Consultant's business, services, and its trade secrets, and that Client conducts its business electronically, through e-commerce, and throughout the United States. Therefore, Client agrees that *the following restrictions on Client's activities* are necessary to protect the good will, Confidential Information, and other legitimate business interests of Consultant, which restrictions are fair and supported by adequate consideration:

  (A)   Non-Competition. Client on behalf of itself and its directors, officers, members or shareholders, employees, agents, and representatives agrees and warrants that during the Term of this Agreement, and for two (2) years following the termination of this Agreement (the "Restricted Period"), Client shall not be involved, directly or indirectly, whether as owner, partner, investor, consultant (paid or unpaid), agent, employee, co-venturer or otherwise, with any business that manages, operates, or promotes e-commerce stores or e-commerce transactions on behalf of third parties anywhere in the United States, regardless of whether Client is physically located within the United States or outside of the United States.

  (B)   Non-Solicitation. During the Restricted Period, Client agrees that it will not, directly, or indirectly through another Person: (i) induce or attempt to induce any employee or contractor of Consultant to leave the employ or contract of Consultant, or in any way interfere with the relationship between Consultant and any of its employees or contractors, or (ii) induce or attempt to induce any customer, supplier, client,



Client Initials_____.

     E-Commerce Consulting Agreement
     Page 3 of 9

DocuSign Envelope ID: 7FBBDBD2-9B6A-41CA-921B-510FAD312287

distributor, vendor, licensee, or other business relation of Consultant to cease doing business with Consultant, or in any way interfere with Consultant's relationship with any such party.

(C)     Non-Disclosure. The Parties agree not to use, reveal, make available, nor disclose, whether directly or indirectly, to any third party, other than the Party's attorney and or tax accountant, any Confidential Information for any purpose except as approved in writing by Consultant. Further, the Parties shall (a) not assist nor enable anyone to access or use any of Confidential Information; and (b) not use nor exploit any of the Confidential Information for any purpose whatsoever except in accordance with the terms of this Agreement. For purposes of this Agreement, the Party disclosing the Confidential Information shall be referred to as "Disclosing Party," and the Party receiving the Confidential Information shall be referred to as "Receiving Party."

(i)     Notwithstanding the foregoing, Receiving Party will: 1) promptly notify the Disclosing Party, to the extent legally permissible, if Receiving Party becomes required by court order to disclose any Confidential Information; 2) cooperate with Disclosing Party if Disclosing Party decides to oppose or to seek to restrain such disclosure; and 3) subject to the foregoing, only disclose that information which its counsel advises it is legally compelled to disclose.

(ii)     If at Disclosing Party's request, Receiving Party is unable to obtain a protective order or other injunctive relief above with respect to the Confidential Information referred to therein and Receiving Party is thereafter required by court order to disclose such Confidential Information, Receiving Party may disclose only such Confidential Information as is expressly required by the court order.

(D)     Maintenance of Confidential Information. The Receiving Party agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of Disclosing Party's Confidential Information. Without limiting the foregoing, Receiving Party shall take at least those measures that Receiving Party takes to protect its own confidential information. Receiving Party shall also immediately notify Disclosing Party, in writing, of any unauthorized use or disclosure of the Confidential Information.

(E)     Confidentiality Term: Regardless of any termination of this Agreement, the parties expressly acknowledge and agree that their respective rights and obligation under this Section 9 shall last for a period of two (2) years following the expiration of this Agreement or permissible termination of this Agreement; *provided*, however, that Client's duties of confidentiality thereunder with respect to Consultant's trade secrets shall survive such expiration and such duties of confidentiality shall continue and not expire so long as such Confidential Information is deemed a trade secret as a matter of law.

(F)     In signing this Agreement, Client acknowledges that he/she/it has carefully read, consulted with legal counsel, and considered all the terms and conditions of this Agreement, including the restraints imposed on Client, throughout the United States, under this Section 9. Client agrees that all such restraints are necessary for the reasonable and proper protection of Consultant, and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area (i.e., throughout the United States). Client further acknowledges that, were Client to breach any of the covenants contained in this Section 9, however caused, the damage to the Consultant would be irreparable. Client therefore agrees that Consultant, in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any such breach or threatened breach, without having to post bond, together with reasonable attorneys' fees incurred in enforcing Consultant's rights hereunder.

10. **REFUND POLICY –**

(A)     Subject to Paragraph (B) below, from the date of the first sale of a product through Client's Store and for sixteen (16) months thereafter ("Refund Period"), if Consultant's services result in a Prohibited Action, Client has the option ("Refund Option") to request a refund during the Refund Period. Should Client elect to exercise the Refund Option, Client must so notify Consultant of that election no later than the last business day of the Refund Period. In that event, Consultant will refund a portion of the Fee, as defined in Paragraph (B) below (the "Refund Amount"). The Refund Amount shall be calculated by the following formula: (x) the Fee *less* (y) any Net Profit and Cash Back Client received during the Refund Period, *and less*

(z) any Net Profit and Cash Back Client received through the Cure Store; *provided*, however, that (1) Client

BH/RB

Client Initials_____.

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: 7FBBDBD2-9B6A-41CA-9216-510FAD512287

has not engaged in any act that interferes with the operation of Client's Store or of Consultant's consulting services or which would be in breach of this Agreement, including, without limitation, a Suspension of Client's Store for any reason other than the occurrence of a Prohibited Action, and (2) this Agreement remains in full



**Client Initials**_____.

E-Commerce Consulting Agreement
Page 5 of 9

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: 7FBBDBD2-9B6A-41CA-921B-510FAD31228/

force and effect at the time Client exercises the Refund Option. The Parties further agree that under no circumstance shall the Refund Amount exceed the Fee.

(C) Client's right to exercise the Refund Option under Paragraph (A), and to request that Consultant pay Client the Refund Amount is expressly conditioned on Client notifying Consultant, in writing, of Client's intent to exercise the Refund Option (the "Refund Notice") no later than the last business day of the Refund Period. Further, upon Consultant receiving the Refund Notice, Consultant has the right thereafter at its election to manage a replacement store (the "Cure Store") for Client for a period of six (6) months ("Cure Store Period") before the Refund Amount is determined and is payable to Client. The Cure Store Period shall commence on the date of the first sale of product through the Cure Store. In such event, during the Cure Store Period, Consultant shall consult with Client consistent with the terms of this Agreement.

## 11. LIMITATION OF LIABILITY

(A) UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF LIABILTY SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO. SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S PRIOR WRITTEN APPROVAL.

(B) CONSULTANT ASSUMES NO LIABILITY FOR OR RELATING TO THE DELAY, INTERRUPTION, CORRUPTION OR FAILURE OF PRODUCT, DATA OR INFORMATION TRANSMITTED IN CONNECTION WITH THE STORE, INCLUDING WITHOUT LIMITATION ANY ACT OR FAILURE TO ACT BY AMAZON OR ANY FORCE MAJEURE CONDITION (INCLUDING BY WAY OF EXAMPLE ONLY, ANY PUBLIC HEALTH ISSUE).

(C) AS A LIQUIDATED DAMAGES REMEDY AND NOT AS A PENALTY, SINCE DAMAGES TO CLIENT RESULTING FROM BREACH OF THIS AGREEMENT BY CONSULTANT ARE DIFFICULT AND IMPRACTICAL, IF NOT IMPOSSIBLE TO CALCULATE, CONSULTANT SHALL ONLY BE LIABLE TO THE EXTENT OF ACTUAL DAMAGES INCURRED BY CLIENT, NOT TO EXCEED A TOTAL OF $5,000.00 USD. AGREEMENT TO THIS PROVISION IS A MATERIAL INDUCEMENT TO CONSULTANT AGREEING TO ENTER INTO THIS AGREEMENT WITH CLIENT. THIS PROVISION 11.(C) SHALL PREVAIL IN THE EVENT OF ANY CONFLICT OR INCONSISTENCY WITH ANY OTHER PROVISION IN THIS AGREEMENT. Client Initials .

## 12. DISCLAIMERS AND RELEASE

(A) CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-

BH/RB

Client Initials_____.

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: 7FBBDBD2-9B6A-41CA-921B-510FAD312287

INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT.

(B) Without limiting the foregoing, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability, or the completeness, of any matter within the scope of this Agreement, including but not limited to the Store, the products therein, or the data, information, content, software, technology, graphics, or communications provided on or through the Store; (2) the satisfaction of any regulation (government or otherwise) requiring disclosure of information on the products provided through or in connection with the Store or the approval or compliance of the Store or any software or information and content contained in the Store; or (3) that the Store will satisfy Client's economic needs and requirements or reach any particular level of sales, income, or net profits.

(C) Business Risk – Client hereby understands that the creation and potential growth of the Client's Store carries financial and other risks. Client hereby understands that e-commerce is an ever-changing industry that is subject to numerous business risks, including but not limited to: (i) a changing legal environment in which regulations can emerge or change that affects the commercial sale of products through Amazon and/or Client's Store; (ii) economic changes that affect consumer spending, the emergence of recessions due to economic and other issues (including public health issues) and the like; (iii) changes in the popular appeal of and demand for different types of Amazon products; (iv) changes in Amazon's terms and conditions, which can materially affect or even interfere with the marketability of Client's Store or its products; (v) changes in international politics or economies, which may affect, among other things, the ability to package, distribute and ship Amazon products, and the costs thereof; (vi) market forces, including increased and changing levels of competition for any given product from other sellers of such product; (vii) unforeseen events, force majeure, public health concerns, and other external events that could affect the performance of any Amazon Store. Client hereby understands that there are no guarantees made by Consultant or otherwise as to the Store's sales, income, or profitability at any time, and acknowledges that Client is at risk of a total loss of his, her or its investment. Client acknowledges the substantial risks generally involved with an e-commerce business. Client recognizes that there is a possibility that subsequent to the execution of this Agreement, Client may discover facts or incur or suffer claims which were unknown or unsuspected at the time this Agreement was executed, and which if known by Client at that time may have materially affected Client's decision to execute this Agreement. By operation of this Agreement, and in particular the disclaimers of Consultant contained in the preceding subsections, Client assumes any and all risks of such unknown facts and such unknown and unsuspected claims and expressly releases Consultant for any liability which Consultant could have had in connection therewith in the absence of the release herein provided by Client to Consultant. Consultant encourages Client to only invest funds that Client can afford to invest in an illiquid basis over a longer term and perhaps ultimately lose, and to consult Client's legal and/or business advisors prior to investing in the Store. Client Initials_____.

(D) Amazon Terms and Conditions – Client hereby understands that Amazon, from time to time, with or without cause, can and does suspend accounts for various reasons, some of which may not be obvious or justified in Client's view. In the event of any such Suspension by Amazon of Client's Store, if available to Consultant, Consultant shall provide Client with independent third-party referral sources which can advise Client whether its Store can be returned to operating status and if so how Client can do so. Consultant makes no representations or warranties of any kind, however, that Amazon will in such cases return Client's Store to active status. Furthermore, Client agrees and understands that Consultant makes no guarantees or representations regarding the Store in relation to any Amazon policy, whether currently in effect or as may be amended by Amazon from time to time. Client understands that Consultant has no control over or input in when and whether Amazon elects to change any of its policies. However, the Services provided by Consultant to Client pursuant to this Agreement shall where practical be consistent with Amazon's current policies.

## 13. GENERAL PROVISIONS

(A) Non-exclusivity - Each party is free to contract with others with respect to the subject matter of this Agreement subject to the limitations as to Client under Section 6 and Section 9 of this Agreement.

(B) Relationship of the Parties – Nothing herein contained shall constitute a partnership or a joint venture between the Parties. Consultant is performing its services to Client as an independent contractor and not as Client's agent or employee. There is no third-party beneficiary to this Agreement.

BH/RB

E-Commerce Consulting Agreement
Page 7 of 9

Client Initials_____.

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: 7FBBDBD2-9B6A-41CA-921B-510FAD312287

(C)     Notices - All notices to either party shall be sent electronically to the email address(es) provided by each Party to the other and as otherwise set forth below. All notices to Consultant shall be sent to help@nxtlvlservices.com with a copy sent to cs@nxtlvlservices.com. If to Client, notice shall be sent electronically to___Hancandbrubakerholdings with a courtesy copy sent to_____.

Alternatively, such written notice will also be deemed given upon personal delivery, or on receipt or refusal if sent by U.S. first class certified or registered mail, postage prepaid, return receipt requested, or by a recognized private delivery service, to the addresses stated on Page 1 of this Agreement.

(D)     Severability, Headings - If any provision is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect. In such event, the Parties hereby acknowledge their intent to make such invalidated provision, or part of such provision, as to be deemed replaced with a valid provision or part of provision that most closely approximates and gives effect to the intent of the invalid provision. Any such modification shall revise the existing invalid provision, or part thereof, only as much as necessary to make the invalidly-held provision otherwise valid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or extent of any section of this Agreement.

(E)     Dispute Resolution - Except where otherwise expressly set forth in this Agreement, any dispute or claim arising out of or relating to this Agreement shall only be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Miami-Dade County, Florida. Any arbitration proceeding, determination, or award, shall be confidential, and neither Party may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses of such arbitration proceeding will be divided equally between the parties, though each Party will bear its own expense of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration (except where attorneys' fees and costs shall be awarded pursuant to Section 13.(L)). IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either Party more than one (1) year after the cause of action arose.

(F)     Amendment. This Agreement cannot be amended except in writing and signed by both Parties.

(G)     Electronic Signatures - This Agreement may be executed by electronic means and in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all such counterparts together will constitute one and the same instrument.

(H)     Governing Law; Jurisdiction - This Agreement, the negotiations thereunder, and performance thereof shall be interpreted, construed and enforced in all respects in accordance with the laws of the State of Florida without reference to principles of conflicts of laws. Client hereby irrevocably consents to the personal jurisdiction of and agrees that the sole venue for any dispute arising in connection to this Agreement shall be the courts of competent jurisdiction (State and federal) located within Miami-Dade County, Florida. Client agrees not to commence or prosecute any such action, claim or proceeding other than in such aforementioned courts. The parties hereto agree that Florida law shall apply regardless of any choice or conflicts of law principles. Client agrees that Miami-Dade County, Florida is a convenient forum, and waives any objection to same under *forum non conveniens* principles.

(I)     Waiver - The failure of any party to insist on or enforce strict performance of any provision of this Agreement, or to exercise any right or remedy under this Agreement or applicable law shall not be construed as a waiver or relinquishment of the right to assert or rely upon any such provision, right or remedy.

(J)     Force Majeure - Neither Party shall be responsible for any failure to perform beyond its reasonable control, including, without limitation acts of God, national health emergency, acts or omissions of civil or military authority, civil disturbances, wars, strikes or other labor disputes, fires, transportation contingencies, or interruptions in telecommunications, internet services, or third-party vendors.



E-Commerce Consulting Agreement
Page 8 of 9

Client Initials_____.

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: 7FBBDBD2-9B6A-41CA-921B-510FAD312287

(K)     Entire Agreement - This Agreement constitutes the entire agreement between the parties and supersedes all prior and contemporaneous oral and written agreements relating to the subject matter herein.

(L)     Attorneys' Fees – If either party breaches this Agreement and one party brings any action (including appeal) against the breaching party in connection with this Agreement, the substantially prevailing party in such action shall be entitled to recover his/her/its cost of the action and reasonable attorneys' fees.

(M)     Injunctive Relief - In the event of a breach or threatened breach of Section 6 or Section 9, the aggrieved party shall immediately be entitled to pursue in any court of competent jurisdiction specific performance, injunctive relief, damages, or such other remedies and relief as may be available, regardless of any contrary provision of this Agreement. Additionally, due to the difficulty of measuring damages in the event of a breach of this Agreement by Client, the parties agree that, in the event of a breach of either Section 9(C) or 9(D) by Client, Client shall owe Consultant total liquidated damages in the amount of Fifty Thousand Dollars ($50,000.00) per breach. The Parties further agree that (i) the liquidated damage amount due from Client as above set forth is not a penalty but is an arms-length negotiated amount under the circumstances, and (ii) this Section shall not be construed as a waiver of prohibition of any other remedies of Consultant in the event of a breach of this Agreement by Client.

(N)     Independent Counsel - The Parties acknowledge that each has been advised to seek, and each has had sufficient opportunity to seek, independent legal counsel possessing industry experience in connection with this matter. The Parties have either sought such counsel or voluntarily waived such right to do so. Accordingly, in interpreting this Agreement, no weight shall be placed upon either party. Furthermore, the parties equally drafted this agreement; thus, the Agreement shall be construed neutrally, and no rule of construction shall apply to the disadvantage of any Party.

(O)     Assignment – Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party. Prior to any such assignment, said assignee shall execute an agreement identical to this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, and assigns. Any purported assignment or delegation by either party in violation of the foregoing shall be null and void ab initio and of no force and effect.

(P)     Cure - If at any time either Client believes the terms of this Agreement are not being fully performed, prior to seeking or commencing any relief expressly permitted under this Agreement, Client shall notify Consultant in writing of the specific nature of such claim, and Consultant receiving such notice shall have thirty (30) days from receipt of the notice to cure such claimed breach.

(Q)     Indemnification – Client agrees to indemnify, defend, and save and hold harmless Consultant, including its respective insurers, directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, in connection with or relating to the matters referred to in this Agreement, resulting from or relating directly or indirectly to Client's breach of this Agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to Client, and shall survive expiration or termination of this Agreement.

(R)     Survival – Any Section in this Agreement that requires survival shall survive the termination of this Agreement for the maximum period permitted by applicable law.

(S)     Client Data Management – Unless Consultant receives Client's prior written consent, Consultant shall not: (i) access, process, or otherwise use Client's Data other than as necessary to facilitate Consultant's Services; (ii) give any of its employees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performance of Consultant under this Agreement; or (iii) give any other third-party access to Client Data except as necessary for such third-party to facilitate performance under this Agreement. Consultant shall not erase Client Data, or any copy thereof, without Client's express written consent and shall follow Client's instructions regarding retention and erasure of Client Data so long as it does not interfere with the performance of Consultant's Services and performance under this Agreement. Client possesses and retains all right, title, and interest in and to Client Data, and Consultant's use and possession thereof is solely in furtherance of Consultant's Services and on Client's behalf.



Client Initials

E-Commerce Consulting Agreement
Page 9 of 9

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: 7FBBDBD2-9B6A-41CA-921B-510FAD312287

Consultant shall comply with all applicable laws and regulations governing the handling of Client Data and shall not engage in any activity that would place Client in violation of any applicable law, regulation, or government request, or judicial process.

(T)     Waiver of Jury Trial. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

(U)     Ministerial Services – In furtherance of Client's obligations under Section 2, Consultant may offer Client guidance and referrals to third-party vendors. Additionally, Consultant may, in its discretion, and at no additional fee to Client, offer Client assistance in fulfilment of the obligations in Section 2 ("Ministerial Act"). Before Consultant commences any Ministerial Act, Consultant shall obtain Client's written consent. Client agrees to reimburse Consultant for expenses incurred in carrying out a Ministerial Act. In the event Consultant offers to engage in a Ministerial Act, Client hereby agrees to indemnify, defend and save and hold harmless Consultant from any cost, claim, damage or liability (including attorneys' fees and court costs) related to the Ministerial Act. Client also waives any claims against Consultant that may be related to the Ministerial Act. Client accepts that this indemnification and waiver of all liability related to the Ministerial Act is a material inducement for Consultant to make any offer to Client for such Ministerial Act, and without such indemnification and waiver from Client, Consultant would not make any such offer of assistance to Client to engage in the Ministerial Act. The foregoing indemnity of Client shall survive expiration of the Term of this Agreement or its earlier termination.

14. **DEFINITIONS** – Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

**IN WITNESS WHEREOF,** this Agreement is deemed executed as of the of the last execution date below.

**CLIENT:**
By: _Hanc and Brubaker Holdings LLC_
authorized representative and agent for service of process
Date: _12/10/2020_

Principal of Client acknowledges and agrees to be bound by all of the provisions of this Agreement applicable to Client, as if expressly a party hereto. Accepted and Agreed to by Principal of Client:

By: _Hanc and Brubaker Holdings LLC_

Print Name: _Brian Hanc (managing partner_, individually

**NXTLVL SERVICES, LLC**

By: _____
Michael J. Walding, Jr., CEO, _authorized representative and agent for service of process_
Date: _____

Client Initials _BH/RB_.

E-Commerce Consulting Agreement
Page 10 of 9

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: 7FBBDBD2-9B6A-41CA-921B-510FAD312287

# EXHIBIT A

**Definitions:** Words or phrases which are initially capitalized or are within quotation marks in the e-commerce consulting agreement ("Agreement") shall have the meanings provided in this Exhibit A.

(A)    "Cash Back" means any revenue derived from cash back programs like BeFrugal.

(B)    "Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

(C)    "Confidential information" means any and all information of the Company that is not generally known to the public or those with whom the Company competes or does business, or with whom they plan to compete or do business, and any and all information, publicly known information in whole or in part or not, which, if disclosed would assist in competition against them including without limitation: Consultant's proprietary business information and all information disclosed or made available by Consultant to Client, either directly or indirectly, in writing, orally, by demonstration, or by inspection of tangible or intangible objects, including without limitation documents, files, texts, emails, phone calls, zoom calls, links, source code, software, charts, graphs, and any other form of communication. Confidential Information also includes information disclosed by Client to Consultant. Confidential Information shall not include any information (a) which Client can establish was publicly known and made generally available in the public domain prior to the time of disclosure, other than as a result of an improper disclosure by a party hereto, or (b) was in Client's possession on a non-confidential basis prior to its disclosure.

(D)    "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store *after* deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Amazon fees related to Client's store.

(E)    "Pause" means the Store is considered in "Vacation Mode" due to a variety of reasons, including, but not limited to, insufficient credit available by Client to permit Consultant to render its services to Client as provided herein.

(F)    "Prohibited Action" means any affirmative action or inaction taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store.

(G)    The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Amazon transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

(H)    The term "Store" means the Client's wholly owned e-commerce location on the third-party Amazon.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon).

(I)    "Suspension" means an action or actions by Amazon which inactivates or freeze Client's Store, and which thereby results in an inability for Client to access Client's Store which results in no access or sales activity through the Store, other than where due to the occurrence of a Prohibited Action.

(J)    "Vacation Mode" means any action other than a breach of this Agreement by Client which results in a condition of Client's Store where all sales activity in the Store has been temporarily halted.

Client Initials _____BH/RB_____.

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: F835DD6B-E6CF-4FD7-95D6-DDF3AEFCBDB2

## E-COMMERCE CONSULTING AGREEMENT

This E-Commerce Consulting Agreement ("Agreement"), is dated as of ___December 10___, 2020, by and between NXTLVL SERVICES, LLC, a Florida limited liability company, whose address is 4300 Biscayne Blvd., Miami, Florida 33137 (hereinafter "Consultant"), and ___HancHoldings (Elevation whose address is)___ ___100 24th Street West #1-2013 Billings MT 59102_____(hereinafter "Client").

      WHEREAS, Client desires to engage Consultant's services, as an independent contractor, upon the terms and conditions herein set forth; and

      WHEREAS, Consultant desires to render consulting services to Client upon the terms and conditions herein set forth;

      NOW, THEREFORE, Consultant and Client (together, the "Parties"), for $10.00 and other good and valuable consideration, the receipt and sufficiency are hereby mutually acknowledged, agree to the following terms and conditions whereby Consultant shall consult Client in connection with an e-commerce store on the Amazon platform (the "Store"):

1.  **CONSULTANT'S SERVICES** - Consultant agrees to perform the following services ("Services"):

    (A)      Maintain Client's Store, including configuring the Amazon storefront and configuring the front and back end systems necessary to manage the Store.

    (B)      Review, research, source, select, and list products for the Client's Store.

    (C)      Respond to customers' phone and email inquiries in support of Client's Store and shall exercise good faith efforts to resolve customer inquiries, handle product returns, and manage billing matters.

    (D)      Maintain oversight of Client's Store and its financial performance; however, Consultant shall have no obligation to, and does not intend to, provide financial advice to Client concerning the operation of Client's Store (Client shall confer with its professional financial advisors concerning all financial inquiries).

2.  **CLIENT RESPONSIBILITIES.**

    (A)      Client understands there is a period that will delay the commencement and commercial operations of the Store, including, without limitation, a 1 to 4 month configuration period (and perhaps longer, depending on the circumstances specific to each proposed Store) where Client must complete certain obligations. Until Client satisfies all contractual and legal requirements for the creation and operation of Client's Store, Consultant cannot commence providing the Services as set forth in Section 1 of this Agreement.

    (B)      Within the first eight (8) months of this Agreement, Client will use best efforts to obtain, and maintain for the duration of this Agreement, a credit card issued through a United States federally insured banking institution with a *minimum* credit limit of thirty thousand ($30,000.00) dollars USD. In no event shall Consultant be responsible for payment of any kind and any other obligation under Client's credit card, all of which credit card obligations shall be solely that of Client. Furthermore, unless Consultant provides written consent: (i) at no time shall Client Pause its Store, allow for a Suspension, or place its Amazon account or Store in Vacation Mode, such terms being defined or referenced on the Amazon website or in other written materials made available to Client; and (ii) Client shall not allow its Store to remain shut down for more than ninety (90) days during the term of this Agreement.

    (B)  Within thirty (30) days from the commencement of this Agreement, Client shall provide Consultant with only necessary information for the purpose of Consultant carrying out its obligations under this Agreement. Client shall use its best efforts to assist Consultant in obtaining all information deemed necessary by Consultant to implement Consultant's Services.

3.  **COMPENSATION.** In consideration for this Agreement, Client shall pay Consultant a one-time consulting fee of twenty-two thousand five-hundred dollars ($22,500.00) USD (the "Fee"), via wire transfer or ACH to Consultant's bank account split into two equal payments. The first payment within 72 hours of execution of this Agreement and the second payment within 72 hours of notice that the Clients Amazon account is established. **Except as expressly permitted under Section 10, the Fee is non-refundable.**

    (A) Client shall also thereafter, beginning in the month following the month in which the Fee is paid, pay Consultant three hundred dollars ($300.00) USD per month (the "Maintenance Fee"), or thirty five percent (35%) of the Net Profit from Client's Store per month (the "Ongoing Commission"), whichever is greater.

Client Initials __*BH*_____.

E-Commerce Consulting Agreement
Page 1 of 9

NXTLVL SERVICES, LLC © 2020



PLAINTIFF'S EXHIBIT 3

DocuSign Envelope ID: F835DD6B-E6CF-4FD7-95D6-DDF3AEFCBDB2

Client shall not be responsible for payment of the Ongoing Commission or the Maintenance Fee if, other than



**Client Initials**_____.

E-Commerce Consulting Agreement
Page 2 of 9

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: F835DD6B-E6CF-4FD7-95D6-DDF3AEFCBDB2

due to breach of this Agreement by Client, there is no activity in Client's Store for said month (or a portion thereof, where such portion exceeds 15 days).

 (B) Consultant shall invoice Client monthly, and Client has seventy-two (72) hours to remit payment.

4. **TERM** – This Agreement shall commence on the last date of execution by both parties and shall continue in effect for a period of one (1) year (the "Initial Term") thereafter. Upon completion of the Initial Term, the Agreement shall automatically extend on a month-to-month basis (the "Option Term") until written notice is provided by either party, to the other party, in accordance with Section 5.

5. **TERMINATION** – Client may terminate this Agreement at any time by providing written notice to Consultant. Consultant may terminate this Agreement, at any time, for cause, with fourteen (14) days written notice to Client. Consultant may terminate the Option Term, without cause, at any time. For this Section, "cause" shall include, but not be limited to: (1) any act or omission by Client, which interferes with the operation of the Store or Consultant's ability to render Services, in Consultant's sole discretion; or (2) Client's breach or threatened breach of any term in this Agreement. If Client breaches any term under this Agreement, independent of any actions Amazon may take from time to time, Consultant may Pause Client's Store, which, Consultant may only reactivate, in Consultant's sole discretion.

6. **NON-DISPARAGEMENT** – During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement, shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true.

7. **SALES / USE TAX** – Consultant does not provide tax reporting or tax management services of any kind. Client is responsible for determining if Client is responsible for collecting and remitting sales or use tax under any applicable state or local law, regulation, or ordinance.

8. **INTELLECTUAL PROPERTY** – Client understands that Client's Store is a service hosted on the Amazon platform and not a distinct or severable product or service that can be ported, removed or installed in or on a different place or platform. Accordingly, Consultant does not hold itself out to have any rights, endorsements, relations, or affiliation with Amazon, or any of Amazon's copyright, trademark, trade dress, trade secret, or any other intellectual property right that Amazon may hold (the "Intellectual Property Rights"). Further, Consultant cannot, and does not, grant or convey to Client any Intellectual Property Rights, whatsoever, in Client's Store, or Amazon, and Consultant holds no legal or equitable rights in Client's Store.

9. **RESTRICTED ACTIVITIES** – Client acknowledges that during the Term of this Agreement Client will have access to Consultant's Confidential Information which, if disclosed, could assist in competition against Consultant by third parties. Client recognizes the highly competitive nature of Consultant's business, services, and its trade secrets, and that Client conducts its business electronically, through e-commerce, and throughout the United States. Therefore, Client agrees that *the following restrictions on Client's activities* are necessary to protect the good will, Confidential Information, and other legitimate business interests of Consultant, which restrictions are fair and supported by adequate consideration:

 (A) Non-Competition. Client on behalf of itself and its directors, officers, members or shareholders, employees, agents, and representatives agrees and warrants that during the Term of this Agreement, and for two (2) years following the termination of this Agreement (the "Restricted Period"), Client shall not be involved, directly or indirectly, whether as owner, partner, investor, consultant (paid or unpaid), agent, employee, co-venturer or otherwise, with any business that manages, operates, or promotes e-commerce stores or e-commerce transactions on behalf of third parties anywhere in the United States, regardless of whether Client is physically located within the United States or outside of the United States.

 (B) Non-Solicitation. During the Restricted Period, Client agrees that it will not, directly, or indirectly through another Person: (i) induce or attempt to induce any employee or contractor of Consultant to leave the employ or contract of Consultant, or in any way interfere with the relationship between Consultant and any of its employees or contractors, or (ii) induce or attempt to induce any customer, supplier, client,



Client Initials_____.

E-Commerce Consulting Agreement
Page 3 of 9

DocuSign Envelope ID: F835DD6B-E6CF-4FD7-95D6-DDF3AEFCBDB2

distributor, vendor, licensee, or other business relation of Consultant to cease doing business with Consultant, or in any way interfere with Consultant's relationship with any such party.

(C) Non-Disclosure. The Parties agree not to use, reveal, make available, nor disclose, whether directly or indirectly, to any third party, other than the Party's attorney and or tax accountant, any Confidential Information for any purpose except as approved in writing by Consultant. Further, the Parties shall (a) not assist nor enable anyone to access or use any of Confidential Information; and (b) not use nor exploit any of the Confidential Information for any purpose whatsoever except in accordance with the terms of this Agreement. For purposes of this Agreement, the Party disclosing the Confidential Information shall be referred to as "Disclosing Party," and the Party receiving the Confidential Information shall be referred to as "Receiving Party."

(i) Notwithstanding the foregoing, Receiving Party will: 1) promptly notify the Disclosing Party, to the extent legally permissible, if Receiving Party becomes required by court order to disclose any Confidential Information; 2) cooperate with Disclosing Party if Disclosing Party decides to oppose or to seek to restrain such disclosure; and 3) subject to the foregoing, only disclose that information which its counsel advises it is legally compelled to disclose.

(ii) If at Disclosing Party's request, Receiving Party is unable to obtain a protective order or other injunctive relief above with respect to the Confidential Information referred to therein and Receiving Party is thereafter required by court order to disclose such Confidential Information, Receiving Party may disclose only such Confidential Information as is expressly required by the court order.

(D) Maintenance of Confidential Information. The Receiving Party agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of Disclosing Party's Confidential Information. Without limiting the foregoing, Receiving Party shall take at least those measures that Receiving Party takes to protect its own confidential information. Receiving Party shall also immediately notify Disclosing Party, in writing, of any unauthorized use or disclosure of the Confidential Information.

(E) Confidentiality Term: Regardless of any termination of this Agreement, the parties expressly acknowledge and agree that their respective rights and obligation under this Section 9 shall last for a period of two (2) years following the expiration of this Agreement or permissible termination of this Agreement; *provided*, however, that Client's duties of confidentiality thereunder with respect to Consultant's trade secrets shall survive such expiration and such duties of confidentiality shall continue and not expire so long as such Confidential Information is deemed a trade secret as a matter of law.

(F) In signing this Agreement, Client acknowledges that he/she/it has carefully read, consulted with legal counsel, and considered all the terms and conditions of this Agreement, including the restraints imposed on Client, throughout the United States, under this Section 9. Client agrees that all such restraints are necessary for the reasonable and proper protection of Consultant, and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area (i.e., throughout the United States). Client further acknowledges that, were Client to breach any of the covenants contained in this Section 9, however caused, the damage to the Consultant would be irreparable. Client therefore agrees that Consultant, in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any such breach or threatened breach, without having to post bond, together with reasonable attorneys' fees incurred in enforcing Consultant's rights hereunder.

**10. REFUND POLICY –**

(A) Subject to Paragraph (B) below, from the date of the first sale of a product through Client's Store and for sixteen (16) months thereafter ("Refund Period"), if Consultant's services result in a Prohibited Action, Client has the option ("Refund Option") to request a refund during the Refund Period. Should Client elect to exercise the Refund Option, Client must so notify Consultant of that election no later than the last business day of the Refund Period. In that event, Consultant will refund a portion of the Fee, as defined in Paragraph (B) below (the "Refund Amount"). The Refund Amount shall be calculated by the following formula: (x) the Fee *less* (y) any Net Profit and Cash Back Client received during the Refund Period, *and less*

(z) any Net Profit and Cash Back Client received through the Cure Store; *provided*, however, that (1) Client

Client Initials _____ *BH* .

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: F835DD6B-E6CF-4FD7-95D6-DDF3AEFCBDB2

has not engaged in any act that interferes with the operation of Client's Store or of Consultant's consulting services or which would be in breach of this Agreement, including, without limitation, a Suspension of Client's Store for any reason other than the occurrence of a Prohibited Action, and (2) this Agreement remains in full

**Client Initials**_____.

E-Commerce Consulting Agreement
Page 5 of 9

DocuSign Envelope ID: F835DD6B-E6CF-4FD7-95D6-DDF3AEFCBDB2

force and effect at the time Client exercises the Refund Option. The Parties further agree that under no circumstance shall the Refund Amount exceed the Fee.

    (C) Client's right to exercise the Refund Option under Paragraph (A), and to request that Consultant pay Client the Refund Amount is expressly conditioned on Client notifying Consultant, in writing, of Client's intent to exercise the Refund Option (the "Refund Notice") no later than the last business day of the Refund Period. Further, upon Consultant receiving the Refund Notice, Consultant has the right thereafter at its election to manage a replacement store (the "Cure Store") for Client for a period of six (6) months ("Cure Store Period") before the Refund Amount is determined and is payable to Client. The Cure Store Period shall commence on the date of the first sale of product through the Cure Store. In such event, during the Cure Store Period, Consultant shall consult with Client consistent with the terms of this Agreement.

## 11. LIMITATION OF LIABILITY

    (A) UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF LIABILTY SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO. SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S PRIOR WRITTEN APPROVAL.

    (B) CONSULTANT ASSUMES NO LIABILITY FOR OR RELATING TO THE DELAY, INTERRUPTION, CORRUPTION OR FAILURE OF PRODUCT, DATA OR INFORMATION TRANSMITTED IN CONNECTION WITH THE STORE, INCLUDING WITHOUT LIMITATION ANY ACT OR FAILURE TO ACT BY AMAZON OR ANY FORCE MAJEURE CONDITION (INCLUDING BY WAY OF EXAMPLE ONLY, ANY PUBLIC HEALTH ISSUE).

    (C) AS A LIQUIDATED DAMAGES REMEDY AND NOT AS A PENALTY, SINCE DAMAGES TO CLIENT RESULTING FROM BREACH OF THIS AGREEMENT BY CONSULTANT ARE DIFFICULT AND IMPRACTICAL, IF NOT IMPOSSIBLE TO CALCULATE, CONSULTANT SHALL ONLY BE LIABLE TO THE EXTENT OF ACTUAL DAMAGES INCURRED BY CLIENT, NOT TO EXCEED A TOTAL OF $5,000.00 USD. AGREEMENT TO THIS PROVISION IS A MATERIAL INDUCEMENT TO CONSULTANT AGREEING TO ENTER INTO THIS AGREEMENT WITH CLIENT. THIS PROVISION 11.(C) SHALL PREVAIL IN THE EVENT OF ANY CONFLICT OR INCONSISTENCY WITH ANY OTHER PROVISION IN THIS AGREEMENT. Client Initials .

## 12. DISCLAIMERS AND RELEASE

    (A) CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-



**Client Initials**_____.

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: F835DD6B-E6CF-4FD7-95D6-DDF3AEFCBDB2

INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT.

(B) Without limiting the foregoing, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability, or the completeness, of any matter within the scope of this Agreement, including but not limited to the Store, the products therein, or the data, information, content, software, technology, graphics, or communications provided on or through the Store; (2) the satisfaction of any regulation (government or otherwise) requiring disclosure of information on the products provided through or in connection with the Store or the approval or compliance of the Store or any software or information and content contained in the Store; or (3) that the Store will satisfy Client's economic needs and requirements or reach any particular level of sales, income, or net profits.

(C) Business Risk – Client hereby understands that the creation and potential growth of the Client's Store carries financial and other risks. Client hereby understands that e-commerce is an ever-changing industry that is subject to numerous business risks, including but not limited to: (i) a changing legal environment in which regulations can emerge or change that affects the commercial sale of products through Amazon and/or Client's Store; (ii) economic changes that affect consumer spending, the emergence of recessions due to economic and other issues (including public health issues) and the like; (iii) changes in the popular appeal of and demand for different types of Amazon products; (iv) changes in Amazon's terms and conditions, which can materially affect or even interfere with the marketability of Client's Store or its products; (v) changes in international politics or economies, which may affect, among other things, the ability to package, distribute and ship Amazon products, and the costs thereof; (vi) market forces, including increased and changing levels of competition for any given product from other sellers of such product; (vii) unforeseen events, force majeure, public health concerns, and other external events that could affect the performance of any Amazon Store. Client hereby understands that there are no guarantees made by Consultant or otherwise as to the Store's sales, income, or profitability at any time, and acknowledges that Client is at risk of a total loss of his, her or its investment. Client acknowledges the substantial risks generally involved with an e-commerce business. Client recognizes that there is a possibility that subsequent to the execution of this Agreement, Client may discover facts or incur or suffer claims which were unknown or unsuspected at the time this Agreement was executed, and which if known by Client at that time may have materially affected Client's decision to execute this Agreement. By operation of this Agreement, and in particular the disclaimers of Consultant contained in the preceding subsections, Client assumes any and all risks of such unknown facts and such unknown and unsuspected claims and expressly releases Consultant for any liability which Consultant could have had in connection therewith in the absence of the release herein provided by Client to Consultant. Consultant encourages Client to only invest funds that Client can afford to invest in an illiquid basis over a longer term and perhaps ultimately lose, and to consult Client's legal and/or business advisors prior to investing in the Store. Client Initials_____.

(D) Amazon Terms and Conditions – Client hereby understands that Amazon, from time to time, with or without cause, can and does suspend accounts for various reasons, some of which may not be obvious or justified in Client's view. In the event of any such Suspension by Amazon of Client's Store, if available to Consultant, Consultant shall provide Client with independent third-party referral sources which can advise Client whether its Store can be returned to operating status and if so how Client can do so. Consultant makes no representations or warranties of any kind, however, that Amazon will in such cases return Client's Store to active status. Furthermore, Client agrees and understands that Consultant makes no guarantees or representations regarding the Store in relation to any Amazon policy, whether currently in effect or as may be amended by Amazon from time to time. Client understands that Consultant has no control over or input in when and whether Amazon elects to change any of its policies. However, the Services provided by Consultant to Client pursuant to this Agreement shall where practical be consistent with Amazon's current policies.

13. **GENERAL PROVISIONS**

(A)     Non-exclusivity - Each party is free to contract with others with respect to the subject matter of this Agreement subject to the limitations as to Client under Section 6 and Section 9 of this Agreement.

(B)     Relationship of the Parties – Nothing herein contained shall constitute a partnership or a joint venture between the Parties. Consultant is performing its services to Client as an independent contractor and not as Client's agent or employee. There is no third-party beneficiary to this Agreement.

E-Commerce Consulting Agreement
Page 7 of 9

**Client Initials**_____.

DocuSign Envelope ID: F835DD6B-E6CF-4FD7-95D6-DDF3AEFCBDB2

(C)    Notices - All notices to either party shall be sent electronically to the email address(es) provided by each Party to the other and as otherwise set forth below. All notices to Consultant shall be sent to help@nxtlvlservices.com with a copy sent to cs@nxtlvlservices.com. If to Client, notice shall be sent electronically to__hancholdings@gmail.com, with a courtesy copy sent to_____.

Alternatively, such written notice will also be deemed given upon personal delivery, or on receipt or refusal if sent by U.S. first class certified or registered mail, postage prepaid, return receipt requested, or by a recognized private delivery service, to the addresses stated on Page 1 of this Agreement.

(D)    Severability, Headings - If any provision is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect. In such event, the Parties hereby acknowledge their intent to make such invalidated provision, or part of such provision, as to be deemed replaced with a valid provision or part of provision that most closely approximates and gives effect to the intent of the invalid provision. Any such modification shall revise the existing invalid provision, or part thereof, only as much as necessary to make the invalidly-held provision otherwise valid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or extent of any section of this Agreement.

(E)    Dispute Resolution - Except where otherwise expressly set forth in this Agreement, any dispute or claim arising out of or relating to this Agreement shall only be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Miami-Dade County, Florida. Any arbitration proceeding, determination, or award, shall be confidential, and neither Party may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses of such arbitration proceeding will be divided equally between the parties, though each Party will bear its own expense of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration (except where attorneys' fees and costs shall be awarded pursuant to Section 13.(L)). IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either Party more than one (1) year after the cause of action arose.

(F)    Amendment. This Agreement cannot be amended except in writing and signed by both Parties.

(G)    Electronic Signatures - This Agreement may be executed by electronic means and in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all such counterparts together will constitute one and the same instrument.

(H)    Governing Law; Jurisdiction - This Agreement, the negotiations thereunder, and performance thereof shall be interpreted, construed and enforced in all respects in accordance with the laws of the State of Florida without reference to principles of conflicts of laws. Client hereby irrevocably consents to the personal jurisdiction of and agrees that the sole venue for any dispute arising in connection to this Agreement shall be the courts of competent jurisdiction (State and federal) located within Miami-Dade County, Florida. Client agrees not to commence or prosecute any such action, claim or proceeding other than in such aforementioned courts. The parties hereto agree that Florida law shall apply regardless of any choice or conflicts of law principles. Client agrees that Miami-Dade County, Florida is a convenient forum, and waives any objection to same under *forum non conveniens* principles.

(I)    Waiver - The failure of any party to insist on or enforce strict performance of any provision of this Agreement, or to exercise any right or remedy under this Agreement or applicable law shall not be construed as a waiver or relinquishment of the right to assert or rely upon any such provision, right or remedy.

(J)    Force Majeure - Neither Party shall be responsible for any failure to perform beyond its reasonable control, including, without limitation acts of God, national health emergency, acts or omissions of civil or military authority, civil disturbances, wars, strikes or other labor disputes, fires, transportation contingencies, or interruptions in telecommunications, internet services, or third-party vendors.



E-Commerce Consulting Agreement
Page 8 of 9

Client Initials_____.

DocuSign Envelope ID: F835DD6B-E6CF-4FD7-95D6-DDF3AEFCBDB2

(K)     Entire Agreement - This Agreement constitutes the entire agreement between the parties and supersedes all prior and contemporaneous oral and written agreements relating to the subject matter herein.

(L)     Attorneys' Fees – If either party breaches this Agreement and one party brings any action (including appeal) against the breaching party in connection with this Agreement, the substantially prevailing party in such action shall be entitled to recover his/her/its cost of the action and reasonable attorneys' fees.

(M)     Injunctive Relief - In the event of a breach or threatened breach of Section 6 or Section 9, the aggrieved party shall immediately be entitled to pursue in any court of competent jurisdiction specific performance, injunctive relief, damages, or such other remedies and relief as may be available, regardless of any contrary provision of this Agreement. Additionally, due to the difficulty of measuring damages in the event of a breach of this Agreement by Client, the parties agree that, in the event of a breach of either Section 9(C) or 9(D) by Client, Client shall owe Consultant total liquidated damages in the amount of Fifty Thousand Dollars ($50,000.00) per breach. The Parties further agree that (i) the liquidated damage amount due from Client as above set forth is not a penalty but is an arms-length negotiated amount under the circumstances, and (ii) this Section shall not be construed as a waiver of prohibition of any other remedies of Consultant in the event of a breach of this Agreement by Client.

(N)     Independent Counsel - The Parties acknowledge that each has been advised to seek, and each has had sufficient opportunity to seek, independent legal counsel possessing industry experience in connection with this matter. The Parties have either sought such counsel or voluntarily waived such right to do so. Accordingly, in interpreting this Agreement, no weight shall be placed upon either party. Furthermore, the parties equally drafted this agreement; thus, the Agreement shall be construed neutrally, and no rule of construction shall apply to the disadvantage of any Party.

(O)     Assignment – Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party. Prior to any such assignment, said assignee shall execute an agreement identical to this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, and assigns. Any purported assignment or delegation by either party in violation of the foregoing shall be null and void ab initio and of no force and effect.

(P)     Cure - If at any time either Client believes the terms of this Agreement are not being fully performed, prior to seeking or commencing any relief expressly permitted under this Agreement, Client shall notify Consultant in writing of the specific nature of such claim, and Consultant receiving such notice shall have thirty (30) days from receipt of the notice to cure such claimed breach.

(Q)     Indemnification – Client agrees to indemnify, defend, and save and hold harmless Consultant, including its respective insurers, directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, in connection with or relating to the matters referred to in this Agreement, resulting from or relating directly or indirectly to Client's breach of this Agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to Client, and shall survive expiration or termination of this Agreement.

(R)     Survival – Any Section in this Agreement that requires survival shall survive the termination of this Agreement for the maximum period permitted by applicable law.

(S)     Client Data Management – Unless Consultant receives Client's prior written consent, Consultant shall not: (i) access, process, or otherwise use Client's Data other than as necessary to facilitate Consultant's Services; (ii) give any of its employees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performance of Consultant under this Agreement; or (iii) give any other third-party access to Client Data except as necessary for such third-party to facilitate performance under this Agreement. Consultant shall not erase Client Data, or any copy thereof, without Client's express written consent and shall follow Client's written instructions regarding retention and erasure of Client Data so long as it does not interfere with the performance of Consultant's Services and performance under this Agreement. Client possesses and retains all right, title, and interest in and to Client Data, and Consultant's use and possession thereof is solely in furtherance of Consultant's Services and on Client's behalf.



E-Commerce Consulting Agreement
Page 9 of 9

**Client Initials** _____.

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: F835DD6B-E6CF-4FD7-95D6-DDF3AEFCBDB2

Consultant shall comply with all applicable laws and regulations governing the handling of Client Data and shall not engage in any activity that would place Client in violation of any applicable law, regulation, or government request, or judicial process.

(T)     Waiver of Jury Trial. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

(U)     Ministerial Services – In furtherance of Client's obligations under Section 2, Consultant may offer Client guidance and referrals to third-party vendors. Additionally, Consultant may, in its discretion, and at no additional fee to Client, offer Client assistance in fulfilment of the obligations in Section 2 ("Ministerial Act"). Before Consultant commences any Ministerial Act, Consultant shall obtain Client's written consent. Client agrees to reimburse Consultant for expenses incurred in carrying out a Ministerial Act. In the event Consultant offers to engage in a Ministerial Act, Client hereby agrees to indemnify, defend and save and hold harmless Consultant from any cost, claim, damage or liability (including attorneys' fees and court costs) related to the Ministerial Act. Client also waives any claims against Consultant that may be related to the Ministerial Act. Client accepts that this indemnification and waiver of all liability related to the Ministerial Act is a material inducement for Consultant to make any offer to Client for such Ministerial Act, and without such indemnification and waiver from Client, Consultant would not make any such offer of assistance to Client to engage in the Ministerial Act. The foregoing indemnity of Client shall survive expiration of the Term of this Agreement or its earlier termination.

14. **DEFINITIONS** – Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

**IN WITNESS WHEREOF,** this Agreement is deemed executed as of the of the last execution date below.

**CLIENT:**
By: _Elevations in Ecom_
CAC634AEB9A04B4...
*authorized representative and agent for service of process*
Date: _12/10/2020_

Principal of Client acknowledges and agrees to be bound by all of the provisions of this Agreement applicable to Client, as if expressly a party hereto. Accepted and Agreed to by Principal of Client:

By: _Elevations in Ecom_
CAC634AEB9A04B4...
Print Name: _Brian Hanc (manager)_ , individually

**NXTLVL SERVICES, LLC**
By: _Michael J. Walding Jr._
E79FF9CDD1424SA...
Michael J. Walding, Jr., CEO, *authorized representative and agent for service of process*
Date: _12/10/2020_

Client Initials _BH_ .

E-Commerce Consulting Agreement
Page 10 of 9

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: F835DD6B-E6CF-4FD7-95D6-DDF3AEFCBDB2

## EXHIBIT A

**Definitions:** Words or phrases which are initially capitalized or are within quotation marks in the e-commerce consulting agreement ("Agreement") shall have the meanings provided in this Exhibit A.

(A)        "Cash Back" means any revenue derived from cash back programs like BeFrugal.

(B)        "Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

(C)        "Confidential information" means any and all information of the Company that is not generally known to the public or those with whom the Company competes or does business, or with whom they plan to compete or do business, and any and all information, publicly known publicly known in whole or in part or not, which, if disclosed would assist in competition against them including without limitation: Consultant's proprietary business information and all information disclosed or made available by Consultant to Client, either directly or indirectly, in writing, orally, by demonstration, or by inspection of tangible or intangible objects, including without limitation documents, files, texts, emails, phone calls, zoom calls, links, source code, software, charts, graphs, and any other form of communication. Confidential Information also includes information disclosed by Client to Consultant. Confidential Information shall not include any information (a) which Client can establish was publicly known and made generally available in the public domain prior to the time of disclosure, other than as a result of an improper disclosure by a party hereto, or (b) was in Client's possession on a non-confidential basis prior to its disclosure.

(D)        "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store *after* deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Amazon fees related to Client's store.

(E)        "Pause" means the Store is considered in "Vacation Mode" due to a variety of reasons, including, but not limited to, insufficient credit available by Client to permit Consultant to render its services to Client as provided herein.

(F)        "Prohibited Action" means any affirmative action or inaction taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store.

(G)        The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Amazon transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

(H)        The term "Store" means the Client's wholly owned e-commerce location on the third-party Amazon.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon).

(I)        "Suspension" means an action or actions by Amazon which inactivates or freeze Client's Store, and which thereby results in an inability for Client to access Client's Store which results in no access or sales activity through the Store, other than where due to the occurrence of a Prohibited Action.

(J)        "Vacation Mode" means any action other than a breach of this Agreement by Client which results in a condition of Client's Store where all sales activity in the Store has been temporarily halted.



**Client Initials** _____.

E-Commerce Consulting Agreement
Page 11 of 9

DocuSign Envelope ID: C926CE13-D752-4667-9635-DC568933ABE0

## E-COMMERCE CONSULTING AGREEMENT

This E-Commerce Consulting Agreement ("Agreement"), is dated as of _December 10_, 2020, by and between NXTLVL SERVICES, LLC, a Florida limited liability company, whose address is 4300 Biscayne Blvd., Miami, Florida 33137 (hereinafter "Consultant"), and _Hanc&Brubaker Holdings LLC (whose address is eCom LLC)_ _100 24th Street West #1-2011 Billings MT 59102_ (hereinafter "Client").

 WHEREAS, Client desires to engage Consultant's services, as an independent contractor, upon the terms and conditions herein set forth; and

 WHEREAS, Consultant desires to render consulting services to Client upon the terms and conditions herein set forth;

 NOW, THEREFORE, Consultant and Client (together, the "Parties"), for $10.00 and other good and valuable consideration, the receipt and sufficiency are hereby mutually acknowledged, agree to the following terms and conditions whereby Consultant shall consult Client in connection with an e-commerce store on the Amazon platform (the "Store"):

1. **CONSULTANT'S SERVICES** - Consultant agrees to perform the following services ("Services"):
 (A) Maintain Client's Store, including configuring the Amazon storefront and configuring the front and back end systems necessary to manage the Store.
 (B) Review, research, source, select, and list products for the Client's Store.
 (C) Respond to customers' phone and email inquiries in support of Client's Store and shall exercise good faith efforts to resolve customer inquiries, handle product returns, and manage billing matters.
 (D) Maintain oversight of Client's Store and its financial performance; however, Consultant shall have no obligation to, and does not intend to, provide financial advice to Client concerning the operation of Client's Store (Client shall confer with its professional financial advisors concerning all financial inquiries).

2. **CLIENT RESPONSIBILITIES.**
 (A) Client understands there is a period that will delay the commencement and commercial operations of the Store, including, without limitation, a 1 to 4 month configuration period (and perhaps longer, depending on the circumstances specific to each proposed Store) where Client must complete certain obligations. Until Client satisfies all contractual and legal requirements for the creation and operation of Client's Store, Consultant cannot commence providing the Services as set forth in Section 1 of this Agreement.
 (B) Within the first eight (8) months of this Agreement, Client will use best efforts to obtain, and maintain for the duration of this Agreement, a credit card issued through a United States federally insured banking institution with a *minimum* credit limit of thirty thousand ($30,000.00) dollars USD. In no event shall Consultant be responsible for payment of any kind and any other obligation under Client's credit card, all of which credit card obligations shall be solely that of Client. Furthermore, unless Consultant provides written consent: (i) at no time shall Client Pause its Store, allow for a Suspension, or place its Amazon account or Store in Vacation Mode, such terms being defined or referenced on the Amazon website or in other written materials made available to Client; and (ii) Client shall not allow its Store to remain shut down for more than ninety (90) days during the term of this Agreement.
 (B) Within thirty (30) days from the commencement of this Agreement, Client shall provide Consultant with only necessary information for the purpose of Consultant carrying out its obligations under this Agreement. Client shall use its best efforts to assist Consultant in obtaining all information deemed necessary by Consultant to implement Consultant's Services.

3. **COMPENSATION.** In consideration for this Agreement, Client shall pay Consultant a one-time consulting fee of twenty-two thousand five-hundred dollars ($22,500.00) USD (the "Fee"), via wire transfer or ACH to Consultant's bank account split into two equal payments. The first payment within 72 hours of execution of this Agreement and the second payment within 72 hours of notice that the Clients Amazon account is established. **Except as expressly permitted under Section 10, the Fee is non-refundable.**
 (A) Client shall also thereafter, beginning in the month following the month in which the Fee is paid, pay Consultant three hundred dollars ($300.00) USD per month (the "Maintenance Fee"), or thirty five percent (35%) of the Net Profit from Client's Store per month (the "Ongoing Commission"), whichever is greater.

_BH_

Client Initials_____.

NXTLVL SERVICES, LLC © 2020



DocuSign Envelope ID: C926CE13-D752-4667-9635-DC568933ABE0

Client shall not be responsible for payment of the Ongoing Commission or the Maintenance Fee if, other than



Client Initials_____.

E-Commerce Consulting Agreement
Page 2 of 9

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: C926CE13-D752-4667-9635-DC568933ABE0

due to breach of this Agreement by Client, there is no activity in Client's Store for said month (or a portion thereof, where such portion exceeds 15 days).

      (B) Consultant shall invoice Client monthly, and Client has seventy-two (72) hours to remit payment.

4. **TERM** – This Agreement shall commence on the last date of execution by both parties and shall continue in effect for a period of one (1) year (the "Initial Term") thereafter. Upon completion of the Initial Term, the Agreement shall automatically extend on a month-to-month basis (the "Option Term") until written notice is provided by either party, to the other party, in accordance with Section 5.

5. **TERMINATION** – Client may terminate this Agreement at any time by providing written notice to Consultant. Consultant may terminate this Agreement, at any time, for cause, with fourteen (14) days written notice to Client. Consultant may terminate the Option Term, without cause, at any time. For this Section, "cause" shall include, but not be limited to: (1) any act or omission by Client, which interferes with the operation of the Store or Consultant's ability to render Services, in Consultant's sole discretion; or (2) Client's breach or threatened breach of any term in this Agreement. If Client breaches any term under this Agreement, independent of any actions Amazon may take from time to time, Consultant may Pause Client's Store, which, Consultant may only reactivate, in Consultant's sole discretion.

6. **NON-DISPARAGEMENT** – During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement, shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true.

7. **SALES / USE TAX** – Consultant does not provide tax reporting or tax management services of any kind. Client is responsible for determining if Client is responsible for collecting and remitting sales or use tax under any applicable state or local law, regulation, or ordinance.

8. **INTELLECTUAL PROPERTY** – Client understands that Client's Store is a service hosted on the Amazon platform and not a distinct or severable product or service that can be ported, removed or installed in or on a different place or platform. Accordingly, Consultant does not hold itself out to have any rights, endorsements, relations, or affiliation with Amazon, or any of Amazon's copyright, trademark, trade dress, trade secret, or any other intellectual property right that Amazon may hold (the "Intellectual Property Rights"). Further, Consultant cannot, and does not, grant or convey to Client any Intellectual Property Rights, whatsoever, in Client's Store, or Amazon, and Consultant holds no legal or equitable rights in Client's Store.

9. **RESTRICTED ACTIVITIES** – Client acknowledges that during the Term of this Agreement Client will have access to Consultant's Confidential Information which, if disclosed, could assist in competition against Consultant by third parties. Client recognizes the highly competitive nature of Consultant's business, services, and its trade secrets, and that Client conducts its business electronically, through e-commerce, and throughout the United States. Therefore, Client agrees that *the following restrictions on Client's activities* are necessary to protect the good will, Confidential Information, and other legitimate business interests of Consultant, which restrictions are fair and supported by adequate consideration:

      (A)      Non-Competition. Client on behalf of itself and its directors, officers, members or shareholders, employees, agents, and representatives agrees and warrants that during the Term of this Agreement, and for two (2) years following the termination of this Agreement (the "Restricted Period"), Client shall not be involved, directly or indirectly, whether as owner, partner, investor, consultant (paid or unpaid), agent, employee, co-venturer or otherwise, with any business that manages, operates, or promotes e-commerce stores or e-commerce transactions on behalf of third parties anywhere in the United States, regardless of whether Client is physically located within the United States or outside of the United States.

      (B)      Non-Solicitation. During the Restricted Period, Client agrees that it will not, directly, or indirectly through another Person: (i) induce or attempt to induce any employee or contractor of Consultant to leave the employ or contract of Consultant, or in any way interfere with the relationship between Consultant and any of its employees or contractors, or (ii) induce or attempt to induce any customer, supplier, client,



Client Initials_____.

E-Commerce Consulting Agreement
Page 3 of 9

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: C926CE13-D752-4667-9635-DC568933ABE0

distributor, vendor, licensee, or other business relation of Consultant to cease doing business with Consultant, or in any way interfere with Consultant's relationship with any such party.

(C)     Non-Disclosure. The Parties agree not to use, reveal, make available, nor disclose, whether directly or indirectly, to any third party, other than the Party's attorney and or tax accountant, any Confidential Information for any purpose except as approved in writing by Consultant. Further, the Parties shall (a) not assist nor enable anyone to access or use any of Confidential Information; and (b) not use nor exploit any of the Confidential Information for any purpose whatsoever except in accordance with the terms of this Agreement. For purposes of this Agreement, the Party disclosing the Confidential Information shall be referred to as "Disclosing Party," and the Party receiving the Confidential Information shall be referred to as "Receiving Party."

(i)     Notwithstanding the foregoing, Receiving Party will: 1) promptly notify the Disclosing Party, to the extent legally permissible, if Receiving Party becomes required by court order to disclose any Confidential Information; 2) cooperate with Disclosing Party if Disclosing Party decides to oppose or to seek to restrain such disclosure; and 3) subject to the foregoing, only disclose that information which its counsel advises it is legally compelled to disclose.

(ii)    If at Disclosing Party's request, Receiving Party is unable to obtain a protective order or other injunctive relief above with respect to the Confidential Information referred to therein and Receiving Party is thereafter required by court order to disclose such Confidential Information, Receiving Party may disclose only such Confidential Information as is expressly required by the court order.

(D)     Maintenance of Confidential Information. The Receiving Party agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of Disclosing Party's Confidential Information. Without limiting the foregoing, Receiving Party shall take at least those measures that Receiving Party takes to protect its own confidential information. Receiving Party shall also immediately notify Disclosing Party, in writing, of any unauthorized use or disclosure of the Confidential Information.

(E)     Confidentiality Term: Regardless of any termination of this Agreement, the parties expressly acknowledge and agree that their respective rights and obligation under this Section 9 shall last for a period of two (2) years following the expiration of this Agreement or permissible termination of this Agreement; *provided*, however, that Client's duties of confidentiality thereunder with respect to Consultant's trade secrets shall survive such expiration and such duties of confidentiality shall continue and not expire so long as such Confidential Information is deemed a trade secret as a matter of law.

(F)     In signing this Agreement, Client acknowledges that he/she/it has carefully read, consulted with legal counsel, and considered all the terms and conditions of this Agreement, including the restraints imposed on Client, throughout the United States, under this Section 9. Client agrees that all such restraints are necessary for the reasonable and proper protection of Consultant, and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area (i.e., throughout the United States). Client further acknowledges that, were Client to breach any of the covenants contained in this Section 9, however caused, the damage to the Consultant would be irreparable. Client therefore agrees that Consultant, in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any such breach or threatened breach, without having to post bond, together with reasonable attorneys' fees incurred in enforcing Consultant's rights hereunder.

10. **REFUND POLICY** –

(A)     Subject to Paragraph (B) below, from the date of the first sale of a product through Client's Store and for sixteen (16) months thereafter ("Refund Period"), if Consultant's services result in a Prohibited Action, Client has the option ("Refund Option") to request a refund during the Refund Period. Should Client elect to exercise the Refund Option, Client must so notify Consultant of that election no later than the last business day of the Refund Period. In that event, Consultant will refund a portion of the Fee, as defined in Paragraph (B) below (the "Refund Amount"). The Refund Amount shall be calculated by the following formula: (x) the Fee *less* (y) any Net Profit and Cash Back Client received during the Refund Period, *and less*

(z) any Net Profit and Cash Back Client received through the Cure Store; *provided*, however, that (1) Client

Client Initials_____.

E-Commerce Consulting Agreement
Page 4 of 9

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: C926CE13-D752-4667-9635-DC568933ABE0

has not engaged in any act that interferes with the operation of Client's Store or of Consultant's consulting services or which would be in breach of this Agreement, including, without limitation, a Suspension of Client's Store for any reason other than the occurrence of a Prohibited Action, and (2) this Agreement remains in full

**Client Initials**_____.

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: C926CE13-D752-4667-9635-DC568933ABE0

force and effect at the time Client exercises the Refund Option. The Parties further agree that under no circumstance shall the Refund Amount exceed the Fee.

(C) Client's right to exercise the Refund Option under Paragraph (A), and to request that Consultant pay Client the Refund Amount is expressly conditioned on Client notifying Consultant, in writing, of Client's intent to exercise the Refund Option (the "Refund Notice") no later than the last business day of the Refund Period. Further, upon Consultant receiving the Refund Notice, Consultant has the right thereafter at its election to manage a replacement store (the "Cure Store") for Client for a period of six (6) months ("Cure Store Period") before the Refund Amount is determined and is payable to Client. The Cure Store Period shall commence on the date of the first sale of product through the Cure Store. In such event, during the Cure Store Period, Consultant shall consult with Client consistent with the terms of this Agreement.

## 11. LIMITATION OF LIABILITY

(A) UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF LIABILTY SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO. SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S PRIOR WRITTEN APPROVAL.

(B) CONSULTANT ASSUMES NO LIABILITY FOR OR RELATING TO THE DELAY, INTERRUPTION, CORRUPTION OR FAILURE OF PRODUCT, DATA OR INFORMATION TRANSMITTED IN CONNECTION WITH THE STORE, INCLUDING WITHOUT LIMITATION ANY ACT OR FAILURE TO ACT BY AMAZON OR ANY FORCE MAJEURE CONDITION (INCLUDING BY WAY OF EXAMPLE ONLY, ANY PUBLIC HEALTH ISSUE).

(C) AS A LIQUIDATED DAMAGES REMEDY AND NOT AS A PENALTY, SINCE DAMAGES TO CLIENT RESULTING FROM BREACH OF THIS AGREEMENT BY CONSULTANT ARE DIFFICULT AND IMPRACTICAL, IF NOT IMPOSSIBLE TO CALCULATE, CONSULTANT SHALL ONLY BE LIABLE TO THE EXTENT OF ACTUAL DAMAGES INCURRED BY CLIENT, NOT TO EXCEED A TOTAL OF $5,000.00 USD. AGREEMENT TO THIS PROVISION IS A MATERIAL INDUCEMENT TO CONSULTANT AGREEING TO ENTER INTO THIS AGREEMENT WITH CLIENT. THIS PROVISION 11.(C) SHALL PREVAIL IN THE EVENT OF ANY CONFLICT OR INCONSISTENCY WITH ANY OTHER PROVISION IN THIS AGREEMENT. Client Initials .

## 12. DISCLAIMERS AND RELEASE

(A) CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-



Client Initials_____.

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: C926CE13-D752-4667-9635-DC568933ABE0

INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT.

(B) Without limiting the foregoing, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability, or the completeness, of any matter within the scope of this Agreement, including but not limited to the Store, the products therein, or the data, information, content, software, technology, graphics, or communications provided on or through the Store; (2) the satisfaction of any regulation (government or otherwise) requiring disclosure of information on the products provided through or in connection with the Store or the approval or compliance of the Store or any software or information and content contained in the Store; or (3) that the Store will satisfy Client's economic needs and requirements or reach any particular level of sales, income, or net profits.

(C) Business Risk – Client hereby understands that the creation and potential growth of the Client's Store carries financial and other risks. Client hereby understands that e-commerce is an ever-changing industry that is subject to numerous business risks, including but not limited to: (i) a changing legal environment in which regulations can emerge or change that affects the commercial sale of products through Amazon and/or Client's Store; (ii) economic changes that affect consumer spending, the emergence of recessions due to economic and other issues (including public health issues) and the like; (iii) changes in the popular appeal of and demand for different types of Amazon products; (iv) changes in Amazon's terms and conditions, which can materially affect or even interfere with the marketability of Client's Store or its products; (v) changes in international politics or economies, which may affect, among other things, the ability to package, distribute and ship Amazon products, and the costs thereof; (vi) market forces, including increased and changing levels of competition for any given product from other sellers of such product; (vii) unforeseen events, force majeure, public health concerns, and other external events that could affect the performance of any Amazon Store. Client hereby understands that there are no guarantees made by Consultant or otherwise as to the Store's sales, income, or profitability at any time, and acknowledges that Client is at risk of a total loss of his, her or its investment. Client acknowledges the substantial risks generally involved with an e-commerce business. Client recognizes that there is a possibility that subsequent to the execution of this Agreement, Client may discover facts or incur or suffer claims which were unknown or unsuspected at the time this Agreement was executed, and which if known by Client at that time may have materially affected Client's decision to execute this Agreement. By operation of this Agreement, and in particular the disclaimers of Consultant contained in the preceding subsections, Client assumes any and all risks of such unknown facts and such unknown and unsuspected claims and expressly releases Consultant for any liability which Consultant could have had in connection therewith in the absence of the release herein provided by Client to Consultant. Consultant encourages Client to only invest funds that Client can afford to invest in an illiquid basis over a longer term and perhaps ultimately lose, and to consult Client's legal and/or business advisors prior to investing in the Store. Client Initials_____.

(D) Amazon Terms and Conditions – Client hereby understands that Amazon, from time to time, with or without cause, can and does suspend accounts for various reasons, some of which may not be obvious or justified in Client's view. In the event of any such Suspension by Amazon of Client's Store, if available to Consultant, Consultant shall provide Client with independent third-party referral sources which can advise Client whether its Store can be returned to operating status and if so how Client can do so. Consultant makes no representations or warranties of any kind, however, that Amazon will in such cases return Client's Store to active status. Furthermore, Client agrees and understands that Consultant makes no guarantees or representations regarding the Store in relation to any Amazon policy, whether currently in effect or as may be amended by Amazon from time to time. Client understands that Consultant has no control over or input in when and whether Amazon elects to change any of its policies. However, the Services provided by Consultant to Client pursuant to this Agreement shall where practical be consistent with Amazon's current policies.

**13. GENERAL PROVISIONS**

(A)     Non-exclusivity - Each party is free to contract with others with respect to the subject matter of this Agreement subject to the limitations as to Client under Section 6 and Section 9 of this Agreement.

(B)     Relationship of the Parties – Nothing herein contained shall constitute a partnership or a joint venture between the Parties. Consultant is performing its services to Client as an independent contractor and not as Client's agent or employee. There is no third-party beneficiary to this Agreement.

*BH*

E-Commerce Consulting Agreement
Page 7 of 9

Client Initials_____.

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: C926CE13-D752-4667-9635-DC568933ABE0

(C)     Notices - All notices to either party shall be sent electronically to the email address(es) provided by each Party to the other and as otherwise set forth below. All notices to Consultant shall be sent to help@nxtlvlservices.com with a copy sent to cs@nxtlvlservices.com. If to Client, notice shall be sent electronically to___hancandbrubakerholdings@gmail.coourtesy copy sent to_____.

Alternatively, such written notice will also be deemed given upon personal delivery, or on receipt or refusal if sent by U.S. first class certified or registered mail, postage prepaid, return receipt requested, or by a recognized private delivery service, to the addresses stated on Page 1 of this Agreement.

(D)     Severability, Headings - If any provision is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect. In such event, the Parties hereby acknowledge their intent to make such invalidated provision, or part of such provision, as to be deemed replaced with a valid provision or part of provision that most closely approximates and gives effect to the intent of the invalid provision. Any such modification shall revise the existing invalid provision, or part thereof, only as much as necessary to make the invalidly-held provision otherwise valid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or extent of any section of this Agreement.

(E)     Dispute Resolution - Except where otherwise expressly set forth in this Agreement, any dispute or claim arising out of or relating to this Agreement shall only be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Miami-Dade County, Florida. Any arbitration proceeding, determination, or award, shall be confidential, and neither Party may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses of such arbitration proceeding will be divided equally between the parties, though each Party will bear its own expense of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration (except where attorneys' fees and costs shall be awarded pursuant to Section 13.(L)). IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either Party more than one (1) year after the cause of action arose.

(F)     Amendment. This Agreement cannot be amended except in writing and signed by both Parties.

(G)     Electronic Signatures - This Agreement may be executed by electronic means and in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all such counterparts together will constitute one and the same instrument.

(H)     Governing Law; Jurisdiction - This Agreement, the negotiations thereunder, and performance thereof shall be interpreted, construed and enforced in all respects in accordance with the laws of the State of Florida without reference to principles of conflicts of laws. Client hereby irrevocably consents to the personal jurisdiction of and agrees that the sole venue for any dispute arising in connection to this Agreement shall be the courts of competent jurisdiction (State and federal) located within Miami-Dade County, Florida. Client agrees not to commence or prosecute any such action, claim or proceeding other than in such aforementioned courts. The parties hereto agree that Florida law shall apply regardless of any choice or conflicts of law principles. Client agrees that Miami-Dade County, Florida is a convenient forum, and waives any objection to same under *forum non conveniens* principles.

(I)     Waiver - The failure of any party to insist on or enforce strict performance of any provision of this Agreement, or to exercise any right or remedy under this Agreement or applicable law shall not be construed as a waiver or relinquishment of the right to assert or rely upon any such provision, right or remedy.

(J)     Force Majeure - Neither Party shall be responsible for any failure to perform beyond its reasonable control, including, without limitation acts of God, national health emergency, acts or omissions of civil or military authority, civil disturbances, wars, strikes or other labor disputes, fires, transportation contingencies, or interruptions in telecommunications, internet services, or third-party vendors.



E-Commerce Consulting Agreement
Page 8 of 9

**Client Initials**_____.

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: C926CE13-D752-4667-9635-DC568933ABE0

(K)    Entire Agreement - This Agreement constitutes the entire agreement between the parties and supersedes all prior and contemporaneous oral and written agreements relating to the subject matter herein.

(L)    Attorneys' Fees – If either party breaches this Agreement and one party brings any action (including appeal) against the breaching party in connection with this Agreement, the substantially prevailing party in such action shall be entitled to recover his/her/its cost of the action and reasonable attorneys' fees.

(M)    Injunctive Relief - In the event of a breach or threatened breach of Section 6 or Section 9, the aggrieved party shall immediately be entitled to pursue in any court of competent jurisdiction specific performance, injunctive relief, damages, or such other remedies and relief as may be available, regardless of any contrary provision of this Agreement. Additionally, due to the difficulty of measuring damages in the event of a breach of this Agreement by Client, the parties agree that, in the event of a breach of either Section 9(C) or 9(D) by Client, Client shall owe Consultant total liquidated damages in the amount of Fifty Thousand Dollars ($50,000.00) per breach. The Parties further agree that (i) the liquidated damage amount due from Client as above set forth is not a penalty but is an arms-length negotiated amount under the circumstances, and (ii) this Section shall not be construed as a waiver of prohibition of any other remedies of Consultant in the event of a breach of this Agreement by Client.

(N)    Independent Counsel - The Parties acknowledge that each has been advised to seek, and each has had sufficient opportunity to seek, independent legal counsel possessing industry experience in connection with this matter. The Parties have either sought such counsel or voluntarily waived such right to do so. Accordingly, in interpreting this Agreement, no weight shall be placed upon either party. Furthermore, the parties equally drafted this agreement; thus, the Agreement shall be construed neutrally, and no rule of construction shall apply to the disadvantage of any Party.

(O)    Assignment – Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party. Prior to any such assignment, said assignee shall execute an agreement identical to this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, and assigns. Any purported assignment or delegation by either party in violation of the foregoing shall be null and void ab initio and of no force and effect.

(P)    Cure - If at any time either Client believes the terms of this Agreement are not being fully performed, prior to seeking or commencing any relief expressly permitted under this Agreement, Client shall notify Consultant in writing of the specific nature of such claim, and Consultant receiving such notice shall have thirty (30) days from receipt of the notice to cure such claimed breach.

(Q)    Indemnification – Client agrees to indemnify, defend, and save and hold harmless Consultant, including its respective insurers, directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, in connection with or relating to the matters referred to in this Agreement, resulting from or relating directly or indirectly to Client's breach of this Agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to Client, and shall survive expiration or termination of this Agreement.

(R)    Survival – Any Section in this Agreement that requires survival shall survive the termination of this Agreement for the maximum period permitted by applicable law.

(S)    Client Data Management – Unless Consultant receives Client's prior written consent, Consultant shall not: (i) access, process, or otherwise use Client's Data other than as necessary to facilitate Consultant's Services; (ii) give any of its employees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performance of Consultant under this Agreement; or (iii) give any other third-party access to Client Data except as necessary for such third-party to facilitate performance under this Agreement. Consultant shall not erase Client Data, or any copy thereof, without Client's express written consent and shall follow Client's written instructions regarding retention and erasure of Client Data so long as it does not interfere with the performance of Consultant's Services and performance under this Agreement. Client possesses and retains all right, title, and interest in and to Client Data, and Consultant's use and possession thereof is solely in furtherance of Consultant's Services and on Client's behalf.



E-Commerce Consulting Agreement
Page 9 of 9

Client Initials_____.

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: C926CE13-D752-4667-9635-DC568933ABE0

Consultant shall comply with all applicable laws and regulations governing the handling of Client Data and shall not engage in any activity that would place Client in violation of any applicable law, regulation, or government request, or judicial process.

(T)     Waiver of Jury Trial. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

(U)     Ministerial Services – In furtherance of Client's obligations under Section 2, Consultant may offer Client guidance and referrals to third-party vendors. Additionally, Consultant may, in its discretion, and at no additional fee to Client, offer Client assistance in fulfilment of the obligations in Section 2 ("Ministerial Act"). Before Consultant commences any Ministerial Act, Consultant shall obtain Client's written consent. Client agrees to reimburse Consultant for expenses incurred in carrying out a Ministerial Act. In the event Consultant offers to engage in a Ministerial Act, Client hereby agrees to indemnify, defend and save and hold harmless Consultant from any cost, claim, damage or liability (including attorneys' fees and court costs) related to the Ministerial Act. Client also waives any claims against Consultant that may be related to the Ministerial Act. Client accepts that this indemnification and waiver of all liability related to the Ministerial Act is a material inducement for Consultant to make any offer to Client for such Ministerial Act, and without such indemnification and waiver from Client, Consultant would not make any such offer of assistance to Client to engage in the Ministerial Act. The foregoing indemnity of Client shall survive expiration of the Term of this Agreement or its earlier termination.

14. **DEFINITIONS** – Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

**IN WITNESS WHEREOF,** this Agreement is deemed executed as of the of the last execution date below.

**CLIENT:**
By: _Hanc & Brubaker Holdings LLC_
authorized representative and agent for service of process
Date: _12/10/2020_

Principal of Client acknowledges and agrees to be bound by all of the provisions of this Agreement applicable to Client, as if expressly a party hereto. Accepted and Agreed to by Principal of Client:

By: _Hanc & Brubaker Holdings LLC_
Print Name: _Brian Hanc_ , individually

**NXTLVL SERVICES, LLC**

By: _____
Michael J. Walding, Jr., CEO, *authorized representative and agent for service of process*
Date: _____

Client Initials _BH_ .

E-Commerce Consulting Agreement
Page 10 of 9

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: C926CE13-D752-4667-9635-DC568933ABE0

## EXHIBIT A

**Definitions:** Words or phrases which are initially capitalized or are within quotation marks in the e-commerce consulting agreement ("Agreement") shall have the meanings provided in this Exhibit A.

(A)  "Cash Back" means any revenue derived from cash back programs like BeFrugal.

(B)  "Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

(C)  "Confidential information" means any and all information of the Company that is not generally known to the public or those with whom the Company competes or does business, or with whom they plan to compete or do business, and any and all information, publicly known publicly known in whole or in part or not, which, if disclosed would assist in competition against them including without limitation: Consultant's proprietary business information and all information disclosed or made available by Consultant to Client, either directly or indirectly, in writing, orally, by demonstration, or by inspection of tangible or intangible objects, including without limitation documents, files, texts, emails, phone calls, zoom calls, links, source code, software, charts, graphs, and any other form of communication. Confidential Information also includes information disclosed by Client to Consultant. Confidential Information shall not include any information (a) which Client can establish was publicly known and made generally available in the public domain prior to the time of disclosure, other than as a result of an improper disclosure by a party hereto, or (b) was in Client's possession on a non-confidential basis prior to its disclosure.

(D)  "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store *after* deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Amazon fees related to Client's store.

(E)  "Pause" means the Store is considered in "Vacation Mode" due to a variety of reasons, including, but not limited to, insufficient credit available by Client to permit Consultant to render its services to Client as provided herein.

(F)  "Prohibited Action" means any affirmative action or inaction taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store.

(G)  The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Amazon transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

(H)  The term "Store" means the Client's wholly owned e-commerce location on the third-party Amazon.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon).

(I)  "Suspension" means an action or actions by Amazon which inactivates or freeze Client's Store, and which thereby results in an inability for Client to access Client's Store which results in no access or sales activity through the Store, other than where due to the occurrence of a Prohibited Action.

(J)  "Vacation Mode" means any action other than a breach of this Agreement by Client which results in a condition of Client's Store where all sales activity in the Store has been temporarily halted.



**Client Initials**_____.

NXTLVL SERVICES, LLC © 2020

DocuSign Envelope ID: 9DDC8D18-AB82-42D2-9CB1-3568142E05E4

## E-COMMERCE CONSULTING AGREEMENT

This E-Commerce Consulting Agreement ("Agreement"), is dated as of _____ March ____ 16 , 2021, by and between One Up, LLC, a Florida limited liability company, whose address is 4300 Biscayne Blvd., Miami, Florida, 33137 (hereinafter "Consultant"), and OneUpComm LLC _____, whose address is 3422 OLD CAPITOL TRAIL, Suite 83, WILMINGTON DE 19808 (hereinafter "Client").

        **WHEREAS**, Client desires to engage Consultant's services, as an independent contractor, upon the terms and conditions herein set forth; and

        **WHEREAS**, Consultant desires to render consulting services to Client upon the terms and conditions herein set forth;

        **NOW, THEREFORE**, Consultant and Client (together, the "Parties"), for $10.00 and other good and valuable consideration, the receipt and sufficiency are hereby mutually acknowledged, agree to the following terms and conditions whereby Consultant shall consult Client in connection with an e-commerce store on the Walmart platform (the "Store"):

1. **CONSULTANT'S SERVICES** - Consultant agrees to perform the following services ("Services"):

    (A)      Perform all acts and do all things necessary to apply for a Store on Client's behalf. In the event Walmart denies Consultant's application to open a Store, Consultant shall reapply for a Store on Client's behalf until such time as Walmart grants Consultant's application to open a Store;

    (B)      Maintain Client's Store, including configuring the Walmart storefront and configuring the front and back end systems necessary to manage the Store.

    (C)      Review, research, source, select, and list products for the Client's Store.

    (D)      Respond to customers' phone and email inquiries in support of Client's Store and shall exercise good faith efforts to resolve customer inquiries, handle product returns, and manage billing matters.

    (E)      Maintain oversight of Client's Store and its financial performance; however, Consultant shall have no obligation to, and does not intend to, provide financial advice to Client concerning the operation of Client's Store (Client shall confer with its professional financial advisors concerning all financial inquiries).

    (F)      If Client's Store is closed due to no fault of Client, Consultant agrees to manage a replacement store for Client for the remainder of the Agreement. In such event, Consultant shall continue to consult with Client consistent with the terms of this Agreement.

2. **CLIENT RESPONSIBILITIES.**

    (A)      Client understands there is a period that will delay the commencement and commercial operations of the Store, including, without limitation, a 1 to 4 month configuration period (and perhaps longer, depending on the circumstances specific to each proposed Store) where Client must complete certain obligations. Until Client satisfies all contractual and legal requirements for the creation and operation of Client's Store, Consultant cannot commence providing the Services as set forth in Section 1 of this Agreement.

    (B)      Within the first eight (8) months of this Agreement, Client will use best efforts to obtain, and maintain for the duration of this Agreement, a credit card issued through a United States federally insured banking institution with a *minimum* credit limit of thirty thousand ($30,000.00) dollars USD. In no event shall Consultant be responsible for payment of any kind and any other obligation under Client's credit card, all of which credit card obligations shall be solely that of Client. Furthermore, unless Consultant provides written consent: (i) at no time shall Client Pause its Store or allow for a Suspension, such terms being defined or referenced on the Walmart website or in other written materials made available to Client; and (ii) Client shall not allow its Store to remain shut down for more than ninety (90) days during the term of this Agreement.

    (C)      Within thirty (30) days from the commencement of this Agreement, Client shall provide Consultant with only necessary information for the purpose of Consultant carrying out its obligations under this Agreement. Client shall use its best efforts to assist Consultant in obtaining all information deemed necessary by Consultant to implement Consultant's Services.

3. **COMPENSATION.** In consideration for this Agreement, Client shall pay Consultant a one-time consulting fee of fifteen thousand dollars ($15,000.00) USD (the "Fee"), via wire transfer or ACH to Consultant's bank



Client Initials _____.

E-Commerce Consulting Agreement
Page 1 of 9

ONE UP, LLC © 2021



PLAINTIFF'S EXHIBIT

DocuSign Envelope ID: 9DDC8D18-AB82-42D2-9CB1-3568142E05E4

account. One-half of the Fee ($7,500.00) is due within 72 hours of execution of this Agreement and the second half of the Fee ($7,500.00) is due at the time of applying for the store. **Except as expressly permitted under Section 10, the Fee is non-refundable.**

    (A) Client shall also thereafter, beginning in the month following the month in which the Fee is paid, pay Consultant two hundred and forty nine dollars ($249.00) USD per month (the "Maintenance Fee"), and fifty percent (50%) of the Net Profit from Client's Store per month (the "Ongoing Commission"). Client shall not be responsible for payment of the Ongoing Commission or the Maintenance Fee if, other than due to breach of this Agreement by Client, there is no activity in Client's Store for said month (or a portion thereof, where such portion exceeds 15 days).

    (B) Consultant shall invoice Client monthly, and Client has seventy-two (72) hours to remit payment.

4. **TERM** – This Agreement shall commence on the last date of execution by both parties and shall continue in effect for a period of one (1) year (the "Initial Term") thereafter. Upon completion of the Initial Term, the Agreement shall automatically extend on a month-to-month basis (the "Option Term") until written notice is provided by either party, to the other party, in accordance with Section 5.

5. **TERMINATION** – Client may terminate this Agreement at any time by providing written notice to Consultant. Consultant may terminate this Agreement, at any time, for cause, with fourteen (14) days written notice to Client. Consultant may terminate the Option Term, without cause, at any time. For this Section, "cause" shall include, but not be limited to: (1) any act or omission by Client, which interferes with the operation of the Store or Consultant's ability to render Services, in Consultant's sole discretion; or (2) Client's breach or threatened breach of any term in this Agreement. If Client breaches any term under this Agreement, independent of any actions Walmart may take from time to time, Consultant may Pause Client's Store, which, Consultant may only reactivate, in Consultant's sole discretion.

6. **NON-DISPARAGEMENT** – During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement, shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true.

7. **SALES / USE TAX** – Consultant does not provide tax reporting or tax management services of any kind. Client is responsible for determining if Client is responsible for collecting and remitting sales or use tax under any applicable state or local law, regulation, or ordinance.

8. **INTELLECTUAL PROPERTY** – Client understands that Client's Store is a service hosted on the Walmart platform and not a distinct or severable product or service that can be ported, removed or installed in or on a different place or platform. Accordingly, Consultant does not hold itself out to have any rights, endorsements, relations, or affiliation with Walmart, or any of Walmart's copyright, trademark, trade dress, trade secret, or any other intellectual property right that Walmart may hold (the "Intellectual Property Rights"). Further, Consultant cannot, and does not, grant or convey to Client any Intellectual Property Rights, whatsoever, in Client's Store, or Walmart, and Consultant holds no legal or equitable rights in Client's Store.

9. **RESTRICTED ACTIVITIES** – Client acknowledges that during the Term of this Agreement Client will have access to Consultant's Confidential Information which, if disclosed, could assist in competition against Consultant by third parties. Client recognizes the highly competitive nature of Consultant's business, services, and its trade secrets, and that Consultant conducts its business electronically, through e-commerce, and throughout the United States. Therefore, Client agrees that *the following restrictions on Client's activities* are necessary to protect the good will, Confidential Information, and other legitimate business interests of Consultant, which restrictions are fair and supported by adequate consideration:

    (A)    Non-Competition. Client on behalf of itself and its directors, officers, members or shareholders, employees, agents, and representatives agrees and warrants that during the Term of this Agreement, and for two (2) years following the termination of this Agreement (the "Restricted Period"), Client shall not be involved, directly or indirectly, whether as owner, partner, investor, consultant (paid or unpaid), agent, employee, co-venturer or otherwise, with any business that manages, operates, or promotes e-commerce



Client Initials _____.

ONE UP, LLC © 2021

DocuSign Envelope ID: 9DDC8D18-AB82-42D2-9CB1-3568142E05E4

stores or e-commerce transactions on behalf of third parties anywhere in the United States, regardless of whether Client is physically located within the United States or outside of the United States.

(B)   Non-Solicitation. During the Restricted Period, Client agrees that it will not, directly, or indirectly through another Person: (i) induce or attempt to induce any employee or contractor of Consultant to leave the employ or contract of Consultant, or in any way interfere with the relationship between Consultant and any of its employees or contractors, or (ii) induce or attempt to induce any customer, supplier, client, distributor, vendor, licensee, or other business relation of Consultant to cease doing business with Consultant, or in any way interfere with Consultant's relationship with any such party.

(C)   Non-Disclosure. The Parties agree not to use, reveal, make available, nor disclose, whether directly or indirectly, to any third party, other than the Party's attorney or tax accountant, any Confidential Information for any purpose except as approved in writing by Consultant. Further, the Parties shall (a) not assist nor enable anyone to access or use any of Confidential Information; and (b) not use nor exploit any of the Confidential Information for any purpose whatsoever except in accordance with the terms of this Agreement. For purposes of this Agreement, the Party disclosing the Confidential Information shall be referred to as "Disclosing Party," and the Party receiving the Confidential Information shall be referred to as "Receiving Party."

(i)   Notwithstanding the foregoing, Receiving Party will: 1) promptly   notify   the Disclosing Party, to the extent legally permissible, if Receiving Party becomes required by court order to disclose any Confidential Information; 2) cooperate with Disclosing Party if Disclosing Party decides to oppose or to seek to restrain such disclosure; and 3) subject to the foregoing, only disclose that information which its counsel advises it is legally compelled to disclose.

(ii)   If at Disclosing Party's request, Receiving Party is unable to obtain a protective order or other injunctive relief above with respect to the Confidential Information referred to therein and Receiving Party is thereafter required by court order to disclose such Confidential Information, Receiving Party may disclose only such Confidential Information as is expressly required by the court order.

(D)   Maintenance of Confidential Information. The Receiving Party agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of Disclosing Party's Confidential Information. Without limiting the foregoing, Receiving Party shall take at least those measures that Receiving Party takes to protect its own confidential information. Receiving Party shall also immediately notify Disclosing Party, in writing, of any unauthorized use or disclosure of the Confidential Information.

(E)   Confidentiality Term: Regardless of any termination of this Agreement, the parties expressly acknowledge and agree that their respective rights and obligation under this Section 9 shall last for a period of two (2) years following the expiration of this Agreement or permissible termination of this Agreement; *provided*, however, that Client's duties of confidentiality thereunder with respect to Consultant's trade secrets shall survive such expiration and such duties of confidentiality shall continue and not expire so long as such Confidential Information is deemed a trade secret as a matter of law.

(F)   In signing this Agreement, Client acknowledges that he/she/it has carefully read, consulted with legal counsel, and considered all the terms and conditions of this Agreement, including the restraints imposed on Client, throughout the United States, under this Section 9. Client agrees that all such restraints are necessary for the reasonable and proper protection of Consultant, and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area (i.e., throughout the United States). Client further acknowledges that, were Client to breach any of the covenants contained in this Section 9, however caused, the damage to the Consultant would be irreparable. Client therefore agrees that Consultant, in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any such breach or threatened breach, without having to post bond, together with reasonable attorneys' fees incurred in enforcing Consultant's rights hereunder.

10. **REPLACEMENT STORE.** If Client's Store is closed due to no fault of Client, Consultant agrees to manage a replacement store for Client for the remainder of the Agreement. In such event, Consultant shall continue to consult with Client consistent with the terms of this Agreement.

11. **LIMITATION OF LIABILITY**



E-Commerce Consulting Agreement
Page 3 of 9

Client Initials _____.

ONE UP, LLC © 2021

DocuSign Envelope ID: 9DDC8D18-AB82-42D2-9CB1-3568142E05E4

(A) UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF LIABILTY SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO. SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S PRIOR WRITTEN APPROVAL.

(B) CONSULTANT ASSUMES NO LIABILITY FOR OR RELATING TO THE DELAY, INTERRUPTION, CORRUPTION OR FAILURE OF PRODUCT, DATA OR INFORMATION TRANSMITTED IN CONNECTION WITH THE STORE, INCLUDING WITHOUT LIMITATION ANY ACT OR FAILURE TO ACT BY WALMART OR ANY FORCE MAJEURE CONDITION (INCLUDING BY WAY OF EXAMPLE ONLY, ANY PUBLIC HEALTH ISSUE).

(C) AS A LIQUIDATED DAMAGES REMEDY AND NOT AS A PENALTY, SINCE DAMAGES TO CLIENT RESULTING FROM BREACH OF THIS AGREEMENT BY CONSULTANT ARE DIFFICULT AND IMPRACTICAL, IF NOT IMPOSSIBLE TO CALCULATE, CONSULTANT SHALL ONLY BE LIABLE TO THE EXTENT OF ACTUAL DAMAGES INCURRED BY CLIENT, NOT TO EXCEED A TOTAL OF $5,000.00 USD. AGREEMENT TO THIS PROVISION IS A MATERIAL INDUCEMENT TO CONSULTANT AGREEING TO ENTER INTO THIS AGREEMENT WITH CLIENT. THIS PROVISION 11.(C) SHALL PREVAIL IN THE EVENT OF ANY CONFLICT OR INCONSISTENCY WITH ANY OTHER PROVISION IN THIS AGREEMENT.

12. **DISCLAIMERS AND RELEASE**

(A) CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT.

(B) Without limiting the foregoing, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability, or the completeness, of any matter within the scope of this Agreement, including but not limited to the Store, the products therein, or the data, information, content, software, technology, graphics, or communications provided on or through the Store; (2) the satisfaction of any regulation (government or otherwise) requiring disclosure of information on the products provided through or in connection with the Store or the approval or compliance of the Store or any software or information and content contained in the Store; or (3) that the Store will satisfy Client's economic needs and requirements or reach any particular level of sales, income, or net profits.

(C) Business Risk – Client hereby understands that the creation and potential growth of the Client's Store carries financial and other risks. Client hereby understands that e-commerce is an ever-changing industry that



**Client Initials** _____.

E-Commerce Consulting Agreement
Page 4 of 9

ONE UP, LLC © 2021

DocuSign Envelope ID: 9DDC8D18-AB82-42D2-9CB1-3568142E05E4

is subject to numerous business risks, including but not limited to: (i) a changing legal environment in which regulations can emerge or change that affects the commercial sale of products through Walmart and/or Client's Store; (ii) economic changes that affect consumer spending, the emergence of recessions due to economic and other issues (including public health issues) and the like; (iii) changes in the popular appeal of and demand for different types of Walmart products; (iv) changes in Walmart's terms and conditions, which can materially affect or even interfere with  the marketability of Client's Store or its products; (v) changes in international politics or economies, which may affect, among other things, the ability to package, distribute and ship Walmart products, and the costs thereof; (vi) market forces, including increased and changing levels of competition for any given product from other sellers of such product; (vii) unforeseen events, force majeure, public health concerns, and other external events that could affect the performance of any Walmart Store. Client hereby understands that there are no guarantees made by Consultant or otherwise as to the Store's sales, income, or profitability at any time, and acknowledges that Client is at risk of a total loss of his, her or its investment. Client acknowledges the substantial risks generally involved with an e-commerce business. Client recognizes that there is a possibility that subsequent to the execution of this Agreement, Client may discover facts or incur or suffer claims which were unknown or unsuspected at the time this Agreement was executed, and which if known by Client at that time may have materially affected Client's decision to execute this Agreement. By operation of this Agreement, and in particular the disclaimers of Consultant contained in the preceding subsections, Client assumes any and all risks of such unknown facts and such unknown and unsuspected claims and expressly releases Consultant for any liability which Consultant could have had in connection therewith in the absence of the release herein provided by Client to Consultant. Consultant encourages Client to only invest funds that Client can afford to invest in an illiquid basis over a longer term and perhaps ultimately lose, and to consult Client's legal and/or business advisors prior to investing in the Store.

(D) Walmart Terms and Conditions – Client hereby understands that Walmart, from time to time, with or without cause, can and does suspend accounts for various reasons, some of which may not be obvious or justified in Client's view. In the event Client's Store is suspended, Company will assist in sending an appeal on behalf of the Client and working with Walmart to remedy the situation at no extra cost. Consultant makes no representations or warranties of any kind, however, that Walmart will in such cases return Client's Store to active status.  Furthermore, Client agrees and understands that Consultant makes no guarantees or representations regarding the Store in relation to any Walmart policy, whether currently in effect or as may be amended by Walmart from time to time.  Client understands that Consultant has no control over or input in when and whether Walmart elects to change any of its policies. However, the Services provided by Consultant to Client pursuant to this Agreement shall where practical be consistent with Walmart's current policies.

13. **GENERAL PROVISIONS**

(A) Non-exclusivity - Each party is free to contract with others with respect to the subject matter of this Agreement subject to the limitations as to Client under Section 6 and Section 9 of this Agreement.

(B) Relationship of the Parties – Nothing herein contained shall constitute a partnership or a joint venture between the Parties. Consultant is performing its services to Client as an independent contractor and not as Client's agent or employee.  There is no third-party beneficiary to this Agreement.(C)

(C) Notices - All notices to either party shall be sent electronically to the email address(es) provided by each Party to the other and as otherwise set forth below. All notices to Consultant shall be sent to help@oneup.services.  If to Client, notice shall be sent electronically to sruneecom1@gmail.com ,

Alternatively, such written notice will also be deemed given upon personal delivery, or on receipt or refusal if sent by U.S. first class certified or registered mail, postage prepaid, return receipt requested, or by a recognized private delivery service, to the addresses stated on Page 1 of this Agreement.

(D) Severability, Headings - If any provision is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect. In such event, the Parties hereby acknowledge their intent to make such invalidated provision, or part of such provision, as to be deemed replaced with a valid provision or part of provision that most closely approximates and gives effect to the intent of the invalid provision. Any such modification shall revise the existing invalid provision, or part thereof, only as much as



Client Initials

E-Commerce Consulting Agreement
Page 5 of 9

ONE UP, LLC © 2021

DocuSign Envelope ID: 9DDC8D18-AB82-42D2-9CB1-3568142E05E4

necessary to make the invalidly-held provision otherwise valid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or extent of any section of this Agreement.

(E)     Dispute Resolution - Except where otherwise expressly set forth in this Agreement, any dispute or claim arising out of or relating to this Agreement shall only be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Miami-Dade County, Florida. Any arbitration proceeding, determination, or award, shall be confidential, and neither Party may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses of such arbitration proceeding will be divided equally between the parties, though each Party will bear its own expense of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration (except where attorneys' fees and costs shall be awarded pursuant to Section 13.(L)). IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either Party more than one (1) year after the cause of action arose.

(F)     Amendment. This Agreement cannot be amended except in writing and signed by both Parties.

(G)     Electronic Signatures - This Agreement may be executed by electronic means and in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all such counterparts together will constitute one and the same instrument.

(H)     Governing Law; Jurisdiction - This Agreement, the negotiations thereunder, and performance thereof shall be interpreted, construed and enforced in all respects in accordance with the laws of the State of Florida without reference to principles of conflicts of laws. Client hereby irrevocably consents to the personal jurisdiction of and agrees that the sole venue for any dispute arising in connection to this Agreement shall be the courts of competent jurisdiction (State and federal) located within Miami-Dade County, Florida. Client agrees not to commence or prosecute any such action, claim or proceeding other than in such aforementioned courts. The parties hereto agree that Florida law shall apply regardless of any choice or conflicts of law principles. Client agrees that Miami-Dade County, Florida is a convenient forum, and waives any objection to same under *forum non conveniens* principles.

(I)     Waiver - The failure of any party to insist on or enforce strict performance of any provision of this Agreement, or to exercise any right or remedy under this Agreement or applicable law shall not be construed as a waiver or relinquishment of the right to assert or rely upon any such provision, right or remedy.

(J)     Force Majeure - Neither Party shall be responsible for any failure to perform beyond its reasonable control, including, without limitation acts of God, national health emergency, acts or omissions of civil or military authority, civil disturbances, wars, strikes or other labor disputes, fires, transportation contingencies, or interruptions in telecommunications, internet services, or third-party vendors.

(K)     Entire Agreement - This Agreement constitutes the entire agreement between the parties and supersedes all prior and contemporaneous oral and written agreements relating to the subject matter herein.

(L)     Attorneys' Fees – If either party breaches this Agreement and one party brings any action (including appeal) against the breaching party in connection with this Agreement, the substantially prevailing party in such action shall be entitled to recover his/her/its cost of the action and reasonable attorneys' fees.

(M)     Injunctive Relief - In the event of a breach or threatened breach of Sections 9(C) or 9(D), the aggrieved party shall immediately be entitled to pursue in any court of competent jurisdiction specific performance, injunctive relief, damages, or such other remedies and relief as may be available, regardless of any contrary provision of this Agreement. Additionally, due to the difficulty of measuring damages in the event of a breach of this Agreement by Client, the parties agree that, in the event of a breach of either Section 6 or Section 9 by Client, Client shall owe Consultant total liquidated damages in the amount of Fifty Thousand Dollars ($50,000.00) per breach. The Parties further agree that (i) the liquidated damage amount due from Client as above set forth is not a penalty but is an arms-length negotiated amount under the circumstances, and



Client Initials _____.

E-Commerce Consulting Agreement
Page 6 of 9

ONE UP, LLC © 2021

DocuSign Envelope ID: 9DDC8D18-AB82-42D2-9CB1-3568142E05E4

(ii) this Section shall not be construed as a waiver of prohibition of any other remedies of Consultant in the event of a breach of this Agreement by Client.

(N)     Independent Counsel - The Parties acknowledge that each has been advised to seek, and each has had sufficient opportunity to seek, independent legal counsel possessing industry experience in connection with this matter.  The Parties have either sought such counsel or voluntarily waived such right to do so. Accordingly, in interpreting this Agreement, no weight shall be placed upon either party. Furthermore, the parties equally drafted this agreement; thus, the Agreement shall be construed neutrally, and no rule of construction shall apply to the disadvantage of any Party.

(O)     Assignment – Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party. Prior to any such assignment, said assignee shall execute an agreement identical to this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, and assigns. Any purported assignment or delegation by either party in violation of the foregoing shall be null and void ab initio and of no force and effect.

(P)     Cure - If at any time either Client believes the terms of this Agreement are not being fully performed, prior to seeking or commencing any relief expressly permitted under this Agreement, Client shall notify Consultant in writing of the specific nature of such claim, and Consultant receiving such notice shall have thirty (30) days from receipt of the notice to cure such claimed breach.

(Q)     Indemnification – Client agrees to indemnify, defend, and save and hold harmless Consultant, including its respective insurers, directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, in connection with or relating to the matters referred to in this Agreement, resulting from or relating directly or indirectly to Client's breach of this Agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to Client, and shall survive expiration or termination of this Agreement.

(R)     Survival – Any Section in this Agreement that requires survival shall survive the termination of this Agreement for the maximum period permitted by applicable law.

(S)     Client Data Management – Unless Consultant receives Client's prior written consent, Consultant shall not: (i) access, process, or otherwise use Client's Data other than as necessary to facilitate Consultant's Services; (ii) give any of its employees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performance of Consultant under this Agreement; or (iii) give any other third-party access to Client Data except as necessary for  such third-party  to facilitate performance under this Agreement. Consultant shall not erase Client Data, or any copy thereof, without Client's express written consent and shall follow Client's written instructions regarding retention and erasure of Client Data so long as it does not interfere with the performance of Consultant's Services and performance under this Agreement. Client possesses and retains all right, title, and interest in and to Client Data, and Consultant's use and possession thereof is solely in furtherance of Consultant's Services and on Client's behalf. Consultant shall comply with all applicable laws and regulations governing the handling of Client Data and shall not engage in any activity that would place Client in violation of any applicable law, regulation, or government request, or judicial process.

(T)     Waiver of Jury Trial. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS



Client Initials

E-Commerce Consulting Agreement
Page 7 of 9

ONE UP, LLC © 2021

DocuSign Envelope ID: 9DDC8D18-AB82-42D2-9CB1-3568142E05E4

AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

(U)     Ministerial Services – In furtherance of Client's obligations under Section 2, Consultant may offer Client guidance and referrals to third-party vendors. Additionally, Consultant may, in its discretion, and at no additional fee to Client, offer Client assistance in fulfilment of the obligations in Section 2 ("Ministerial Act"). Before Consultant commences any Ministerial Act, Consultant shall obtain Client's written consent. Client agrees to reimburse Consultant for expenses incurred in carrying out a Ministerial Act.  In the event Consultant offers to engage in a Ministerial Act, Client hereby agrees to indemnify, defend and save and hold harmless Consultant from any cost, claim, damage or liability (including attorneys' fees and court costs) related to the Ministerial Act. Client also waives any claims against Consultant that may be related to the Ministerial Act. Client accepts that this indemnification and waiver of all liability related to the Ministerial Act is a material inducement for Consultant to make any offer to Client for such Ministerial Act, and without such indemnification and waiver from Client, Consultant would not make any such offer of assistance to Client to engage in the Ministerial Act.  The foregoing indemnity of Client shall survive expiration of the Term of this Agreement or its earlier termination.

14. **DEFINITIONS** – Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

**IN WITNESS WHEREOF,** this Agreement is deemed executed as of the of the last execution date below.

**CLIENT:** Brian Hanc
By: _____
5D1EE5336980480...
authorized representative and agent for service of process
Date: 3/16/2021 _____

Principal of Client acknowledges and agrees to be bound by all of the provisions of this Agreement applicable to Client, as if expressly a party hereto. Accepted and Agreed to by Principal of Client:

By: Brian Hanc _____
5D1EE5336980480...
Print Name: Brian Hanc _____, individually

**ONE UP, LLC**
By: Michael J. Walding Jr. _____
8B70BCBE4FF04FD...
Michael J. Walding, Jr., CEO, *authorized representative and agent for service of process*
Date: 3/16/2021 _____

Client Initials [BH] _____.

E-Commerce Consulting Agreement
Page 8 of 9

ONE UP, LLC © 2021

DocuSign Envelope ID: 9DDC8D18-AB82-42D2-9CB1-3568142E05E4

## EXHIBIT A

**Definitions:** Words or phrases which are initially capitalized or are within quotation marks in the e-commerce consulting agreement ("Agreement") shall have the meanings provided in this Exhibit A.

(A)    "Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

(B)    "Confidential information" means any and all information of the Company that is not generally known to the public or those with whom the Company competes or does business, or with whom they plan to compete or do business, and any and all information, publicly known publicly known in whole or in part or not, which, if disclosed would assist in competition against them including without limitation: Consultant's proprietary business information and all information disclosed or made available by Consultant to Client, either directly or indirectly, in writing, orally, by demonstration, or by inspection of tangible or intangible objects, including without limitation documents, files, texts, emails, phone calls, zoom calls, links, source code, software, charts, graphs, and any other form of communication. Confidential Information also includes information disclosed by Client to Consultant. Confidential Information shall not include any information (a) which Client can establish was publicly known and made generally available in the public domain prior to the time of disclosure, other than as a result of an improper disclosure by a party hereto, or (b) was in Client's possession on a non-confidential basis prior to its disclosure.

(C)    "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store *after* deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Walmart fees related to Client's store.

(D)    "Pause" means the Store is inactive, and Consultant is unable to render its services to Client as provided under the Agreement.

(E)    "Prohibited Action" means any affirmative action or inaction taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store.

(F)    The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Walmart transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

(G)    The term "Store" means the Client's wholly owned e-commerce location on the Walmart online platform where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Walmart).

(H)    "Suspension" means an action or actions by Walmart which inactivates or freeze Client's Store, and which thereby results in an inability for Client to access Client's Store which results in no access or sales activity through the Store, other than where due to the occurrence of a Prohibited Action.



**Client Initials** _____.

E-Commerce Consulting Agreement
Page 9 of 9

ONE UP, LLC © 2021

DocuSign Envelope ID: 5DA680AD-23C3-41A2-9E4F-F9F90E2D0D5C

## E-COMMERCE CONSULTING AGREEMENT

This E-Commerce Consulting Agreement ("Agreement"), is dated as of ___March 4th___ ___2021___, 2020, by and between One Up, LLC, a Florida limited liability company, whose address is 4300 Biscayne Blvd., Miami, Florida, 33137 (hereinafter "Consultant"), and ~~See To eCom LLC~~ ~~1201 N. Orange Street Suite 7145, Wilmington DE 19801~~, whose address is _____ (hereinafter "Client").

WHEREAS, Client desires to engage Consultant's services, as an independent contractor, upon the terms and conditions herein set forth; and

WHEREAS, Consultant desires to render consulting services to Client upon the terms and conditions herein set forth;

NOW, THEREFORE, Consultant and Client (together, the "Parties"), for $10.00 and other good and valuable consideration, the receipt and sufficiency are hereby mutually acknowledged, agree to the following terms and conditions whereby Consultant shall consult Client in connection with an e-commerce store on the Walmart platform (the "Store"):

1.  **CONSULTANT'S SERVICES** - Consultant agrees to perform the following services ("Services"):
    (A)      Perform all acts and do all things necessary to apply for a Store on Client's behalf.  In the event Walmart denies Consultant's application to open a Store, Consultant shall reapply for a Store on Client's behalf until such time as Walmart grants Consultant's application to open a Store;
    (B)      Maintain Client's Store, including configuring the Walmart storefront and configuring the front and back end systems necessary to manage the Store.
    (C)      Review, research, source, select, and list products for the Client's Store.
    (D)      Respond to customers' phone and email inquiries in support of Client's Store and shall exercise good faith efforts to resolve customer inquiries, handle product returns, and manage billing matters.
    (E)      Maintain oversight of Client's Store and its financial performance; however, Consultant shall have no obligation to, and does not intend to, provide financial advice to Client concerning the operation of Client's Store (Client shall confer with its professional financial advisors concerning all financial inquiries).
    (F)      If Client's Store is closed due to no fault of Client, Consultant agrees to manage a replacement store for Client for the remainder of the Agreement.  In such event, Consultant shall continue to consult with Client consistent with the terms of this Agreement.
2.  **CLIENT RESPONSIBILITIES.**
    (A)      Client understands there is a period that will delay the commencement and commercial operations of the Store, including, without limitation, a 1 to 4 month configuration period (and perhaps longer, depending on the circumstances specific to each proposed Store) where Client must complete certain obligations. Until Client satisfies all contractual and legal requirements for the creation and operation of Client's Store, Consultant cannot commence providing the Services as set forth in Section 1 of this Agreement.
    (B)      Within the first eight (8) months of this Agreement, Client will use best efforts to obtain, and maintain for the duration of this Agreement, a credit card issued through a United States federally insured banking institution with a *minimum* credit limit of thirty thousand ($30,000.00) dollars USD. In no event shall Consultant be responsible for payment of any kind and any other obligation under Client's credit card, all of which credit card obligations shall be solely that of Client.  Furthermore, unless Consultant provides written consent: (i) at no time shall Client Pause its Store or allow for a Suspension, such terms being defined or referenced on the Walmart website or in other written materials made available to Client; and (ii) Client shall not allow its Store to remain shut down for more than ninety (90) days during the term of this Agreement.
    (B)      Within thirty (30) days from the commencement of this Agreement, Client shall provide Consultant with only necessary information for the purpose of Consultant carrying out its obligations under this Agreement. Client shall use its best efforts to assist Consultant in obtaining all information deemed necessary by Consultant to implement Consultant's Services.
3.  **COMPENSATION**. In consideration for this Agreement, Client shall pay Consultant a one-time consulting fee of fifteen thousand dollars ($15,000.00) USD (the "Fee"), via wire transfer or ACH to Consultant's bank account.  One-half of the Fee ($7,500.00) is due within 72 hours of execution of this Agreement and the second

Client Initials  .

E-Commerce Consulting Agreement
Page 1 of 9



ONE UP, LLC © 2020

DocuSign Envelope ID: 5DA680AD-23C3-41A2-9E4F-F9F90E2D0D5C

half of the Fee ($7,500.00) is due at the time of applying for the store. **Except as expressly permitted under Section 10, the Fee is non-refundable.**

(A) Client shall also thereafter, beginning in the month following the month in which the Fee is paid, pay Consultant two hundred and forty nine dollars ($249.00) USD per month (the "Maintenance Fee"), and fifty percent (50%) of the Net Profit from Client's Store per month (the "Ongoing Commission"). Client shall not be responsible for payment of the Ongoing Commission or the Maintenance Fee if, other than due to breach of this Agreement by Client, there is no activity in Client's Store for said month (or a portion thereof, where such portion exceeds 15 days).

(B) Consultant shall invoice Client monthly, and Client has seventy-two (72) hours to remit payment.

4. **TERM** – This Agreement shall commence on the last date of execution by both parties and shall continue in effect for a period of one (1) year (the "Initial Term") thereafter. Upon completion of the Initial Term, the Agreement shall automatically extend on a month-to-month basis (the "Option Term") until written notice is provided by either party, to the other party, in accordance with Section 5.

5. **TERMINATION** – Client may terminate this Agreement at any time by providing written notice to Consultant. Consultant may terminate this Agreement, at any time, for cause, with fourteen (14) days written notice to Client. Consultant may terminate the Option Term, without cause, at any time. For this Section, "cause" shall include, but not be limited to: (1) any act or omission by Client, which interferes with the operation of the Store or Consultant's ability to render Services, in Consultant's sole discretion; or (2) Client's breach or threatened breach of any term in this Agreement. If Client breaches any term under this Agreement, independent of any actions Walmart may take from time to time, Consultant may Pause Client's Store, which, Consultant may only reactivate, in Consultant's sole discretion.

6. **NON-DISPARAGEMENT** – During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement, shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true.

7. **SALES / USE TAX** – Consultant does not provide tax reporting or tax management services of any kind. Client is responsible for determining if Client is responsible for collecting and remitting sales or use tax under any applicable state or local law, regulation, or ordinance.

8. **INTELLECTUAL PROPERTY** – Client understands that Client's Store is a service hosted on the Walmart platform and not a distinct or severable product or service that can be ported, removed or installed in or on a different place or platform. Accordingly, Consultant does not hold itself out to have any rights, endorsements, relations, or affiliation with Walmart, or any of Walmart's copyright, trademark, trade dress, trade secret, or any other intellectual property right that Walmart may hold (the "Intellectual Property Rights"). Further, Consultant cannot, and does not, grant or convey to Client any Intellectual Property Rights, whatsoever, in Client's Store, or Walmart, and Consultant holds no legal or equitable rights in Client's Store.

9. **RESTRICTED ACTIVITIES** – Client acknowledges that during the Term of this Agreement Client will have access to Consultant's Confidential Information which, if disclosed, could assist in competition against Consultant by third parties. Client recognizes the highly competitive nature of Consultant's business, services, and its trade secrets, and that Consultant conducts its business electronically, through e-commerce, and throughout the United States. Therefore, Client agrees that *the following restrictions on Client's activities* are necessary to protect the good will, Confidential Information, and other legitimate business interests of Consultant, which restrictions are fair and supported by adequate consideration:

(A) Non-Competition. Client on behalf of itself and its directors, officers, members or shareholders, employees, agents, and representatives agrees and warrants that during the Term of this Agreement, and for two (2) years following the termination of this Agreement (the "Restricted Period"), Client shall not be involved, directly or indirectly, whether as owner, partner, investor, consultant (paid or unpaid), agent, employee, co-venturer or otherwise, with any business that manages, operates, or promotes e-commerce



Client Initials

E-Commerce Consulting Agreement
Page 2 of 9

ONE UP, LLC © 2020

DocuSign Envelope ID: 5DA680AD-23C3-41A2-9E4F-F9F90E2D0D5C

stores or e-commerce transactions on behalf of third parties anywhere in the United States, regardless of whether Client is physically located within the United States or outside of the United States.

(B)    Non-Solicitation. During the Restricted Period, Client agrees that it will not, directly, or indirectly through another Person: (i) induce or attempt to induce any employee or contractor of Consultant to leave the employ or contract of Consultant, or in any way interfere with the relationship between Consultant and any of its employees or contractors, or (ii) induce or attempt to induce any customer, supplier, client, distributor, vendor, licensee, or other business relation of Consultant to cease doing business with Consultant, or in any way interfere with Consultant's relationship with any such party.

(C)    Non-Disclosure. The Parties agree not to use, reveal, make available, nor disclose, whether directly or indirectly, to any third party, other than the Party's attorney or tax accountant, any Confidential Information for any purpose except as approved in writing by Consultant. Further, the Parties shall (a) not assist nor enable anyone to access or use any of Confidential Information; and (b) not use nor exploit any of the Confidential Information for any purpose whatsoever except in accordance with the terms of this Agreement. For purposes of this Agreement, the Party disclosing the Confidential Information shall be referred to as "Disclosing Party," and the Party receiving the Confidential Information shall be referred to as "Receiving Party."

(i)    Notwithstanding the foregoing, Receiving Party will: 1) promptly notify the Disclosing Party, to the extent legally permissible, if Receiving Party becomes required by court order to disclose any Confidential Information; 2) cooperate with Disclosing Party if Disclosing Party decides to oppose or to seek to restrain such disclosure; and 3) subject to the foregoing, only disclose that information which its counsel advises it is legally compelled to disclose.

(ii)    If at Disclosing Party's request, Receiving Party is unable to obtain a protective order or other injunctive relief above with respect to the Confidential Information referred to therein and Receiving Party is thereafter required by court order to disclose such Confidential Information, Receiving Party may disclose only such Confidential Information as is expressly required by the court order.

(D)    Maintenance of Confidential Information. The Receiving Party agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of Disclosing Party's Confidential Information. Without limiting the foregoing, Receiving Party shall take at least those measures that Receiving Party takes to protect its own confidential information. Receiving Party shall also immediately notify Disclosing Party, in writing, of any unauthorized use or disclosure of the Confidential Information.

(E)    Confidentiality Term: Regardless of any termination of this Agreement, the parties expressly acknowledge and agree that their respective rights and obligation under this Section 9 shall last for a period of two (2) years following the expiration of this Agreement or permissible termination of this Agreement; *provided*, however, that Client's duties of confidentiality thereunder with respect to Consultant's trade secrets shall survive such expiration and such duties of confidentiality shall continue and not expire so long as such Confidential Information is deemed a trade secret as a matter of law.

(F)    In signing this Agreement, Client acknowledges that he/she/it has carefully read, consulted with legal counsel, and considered all the terms and conditions of this Agreement, including the restraints imposed on Client, throughout the United States, under this Section 9. Client agrees that all such restraints are necessary for the reasonable and proper protection of Consultant, and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area (i.e., throughout the United States). Client further acknowledges that, were Client to breach any of the covenants contained in this Section 9, however caused, the damage to the Consultant would be irreparable. Client therefore agrees that Consultant, in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any such breach or threatened breach, without having to post bond, together with reasonable attorneys' fees incurred in enforcing Consultant's rights hereunder.

10. **REPLACEMENT STORE.** If Client's Store is closed due to no fault of Client, Consultant agrees to manage a replacement store for Client for the remainder of the Agreement. In such event, Consultant shall continue to consult with Client consistent with the terms of this Agreement.

11. **LIMITATION OF LIABILITY**



Client Initials _____.

E-Commerce Consulting Agreement
Page 3 of 9

ONE UP, LLC © 2020

DocuSign Envelope ID: 5DA680AD-23C3-41A2-9E4F-F9F90E2D0D5C

(A) UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF LIABILTY SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO. SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S PRIOR WRITTEN APPROVAL.

(B) CONSULTANT ASSUMES NO LIABILITY FOR OR RELATING TO THE DELAY, INTERRUPTION, CORRUPTION OR FAILURE OF PRODUCT, DATA OR INFORMATION TRANSMITTED IN CONNECTION WITH THE STORE, INCLUDING WITHOUT LIMITATION ANY ACT OR FAILURE TO ACT BY WALMART OR ANY FORCE MAJEURE CONDITION (INCLUDING BY WAY OF EXAMPLE ONLY, ANY PUBLIC HEALTH ISSUE).

(C) AS A LIQUIDATED DAMAGES REMEDY AND NOT AS A PENALTY, SINCE DAMAGES TO CLIENT RESULTING FROM BREACH OF THIS AGREEMENT BY CONSULTANT ARE DIFFICULT AND IMPRACTICAL, IF NOT IMPOSSIBLE TO CALCULATE, CONSULTANT SHALL ONLY BE LIABLE TO THE EXTENT OF ACTUAL DAMAGES INCURRED BY CLIENT, NOT TO EXCEED A TOTAL OF $5,000.00 USD. AGREEMENT TO THIS PROVISION IS A MATERIAL INDUCEMENT TO CONSULTANT AGREEING TO ENTER INTO THIS AGREEMENT WITH CLIENT. THIS PROVISION 11.(C) SHALL PREVAIL IN THE EVENT OF ANY CONFLICT OR INCONSISTENCY WITH ANY OTHER PROVISION IN THIS AGREEMENT.

12. **DISCLAIMERS AND RELEASE**

(A) CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT.

(B) Without limiting the foregoing, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability, or the completeness, of any matter within the scope of this Agreement, including but not limited to the Store, the products therein, or the data, information, content, software, technology, graphics, or communications provided on or through the Store; (2) the satisfaction of any regulation (government or otherwise) requiring disclosure of information on the products provided through or in connection with the Store or the approval or compliance of the Store or any software or information and content contained in the Store; or (3) that the Store will satisfy Client's economic needs and requirements or reach any particular level of sales, income, or net profits.

(C) Business Risk – Client hereby understands that the creation and potential growth of the Client's Store carries financial and other risks. Client hereby understands that e-commerce is an ever-changing industry that



Client Initials _____.

E-Commerce Consulting Agreement
Page 4 of 9

ONE UP, LLC © 2020

DocuSign Envelope ID: 5DA680AD-23C3-41A2-9E4F-F9F90E2D0D5C

is subject to numerous business risks, including but not limited to: (i) a changing legal environment in which regulations can emerge or change that affects the commercial sale of products through Walmart and/or Client's Store; (ii) economic changes that affect consumer spending, the emergence of recessions due to economic and other issues (including public health issues) and the like; (iii) changes in the popular appeal of and demand for different types of Walmart products; (iv) changes in Walmart's terms and conditions, which can materially affect or even interfere with the marketability of Client's Store or its products; (v) changes in international politics or economies, which may affect, among other things, the ability to package, distribute and ship Walmart products, and the costs thereof; (vi) market forces, including increased and changing levels of competition for any given product from other sellers of such product; (vii) unforeseen events, force majeure, public health concerns, and other external events that could affect the performance of any Walmart Store. Client hereby understands that there are no guarantees made by Consultant or otherwise as to the Store's sales, income, or profitability at any time, and acknowledges that Client is at risk of a total loss of his, her or its investment. Client acknowledges the substantial risks generally involved with an e-commerce business. Client recognizes that there is a possibility that subsequent to the execution of this Agreement, Client may discover facts or incur or suffer claims which were unknown or unsuspected at the time this Agreement was executed, and which if known by Client at that time may have materially affected Client's decision to execute this Agreement. By operation of this Agreement, and in particular the disclaimers of Consultant contained in the preceding subsections, Client assumes any and all risks of such unknown facts and such unknown and unsuspected claims and expressly releases Consultant for any liability which Consultant could have had in connection therewith in the absence of the release herein provided by Client to Consultant. Consultant encourages Client to only invest funds that Client can afford to invest in an illiquid basis over a longer term and perhaps ultimately lose, and to consult Client's legal and/or business advisors prior to investing in the Store.

(D) Walmart Terms and Conditions – Client hereby understands that Walmart, from time to time, with or without cause, can and does suspend accounts for various reasons, some of which may not be obvious or justified in Client's view. In the event Client's Store is suspended, Company will assist in sending an appeal on behalf of the Client and working with Walmart to remedy the situation at no extra cost. Consultant makes no representations or warranties of any kind, however, that Walmart will in such cases return Client's Store to active status. Furthermore, Client agrees and understands that Consultant makes no guarantees or representations regarding the Store in relation to any Walmart policy, whether currently in effect or as may be amended by Walmart from time to time. Client understands that Consultant has no control over or input in when and whether Walmart elects to change any of its policies. However, the Services provided by Consultant to Client pursuant to this Agreement shall where practical be consistent with Walmart's current policies.

13. **GENERAL PROVISIONS**

(A)     Non-exclusivity - Each party is free to contract with others with respect to the subject matter of this Agreement subject to the limitations as to Client under Section 6 and Section 9 of this Agreement.

(B)     Relationship of the Parties – Nothing herein contained shall constitute a partnership or a joint venture between the Parties. Consultant is performing its services to Client as an independent contractor and not as Client's agent or employee. There is no third-party beneficiary to this Agreement.

(C)     Notices - All notices to either party shall be sent electronically to the email address(es) provided by each Party to the other and as otherwise set forth below. All notices to Consultant shall be sent to help@oneup.services If to Client, notice shall be sent electronically to  ste1becom1@gma1l.com .

Alternatively, such written notice will also be deemed given upon personal delivery, or on receipt or refusal if sent by U.S. first class certified or registered mail, postage prepaid, return receipt requested, or by a recognized private delivery service, to the addresses stated on Page 1 of this Agreement.

(D)     Severability, Headings - If any provision is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect. In such event, the Parties hereby acknowledge their intent to make such invalidated provision, or part of such provision, as to be deemed replaced with a valid provision or part of provision that most closely approximates and gives effect to the intent of the invalid provision. Any such modification shall revise the existing invalid provision, or part thereof, only as much as

DocuSign Envelope ID: 5DA680AD-23C3-41A2-9E4F-F9F90E2D0D5C

necessary to make the invalidly-held provision otherwise valid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or extent of any section of this Agreement.

      (E)     Dispute Resolution - Except where otherwise expressly set forth in this Agreement, any dispute or claim arising out of or relating to this Agreement shall only be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Miami-Dade County, Florida. Any arbitration proceeding, determination, or award, shall be confidential, and neither Party may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses of such arbitration proceeding will be divided equally between the parties, though each Party will bear its own expense of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration (except where attorneys' fees and costs shall be awarded pursuant to Section 13.(L)). IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either Party more than one (1) year after the cause of action arose.

      (F)     Amendment. This Agreement cannot be amended except in writing and signed by both Parties.

      (G)     Electronic Signatures - This Agreement may be executed by electronic means and in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all such counterparts together will constitute one and the same instrument.

      (H)     Governing Law; Jurisdiction - This Agreement, the negotiations thereunder, and performance thereof shall be interpreted, construed and enforced in all respects in accordance with the laws of the State of Florida without reference to principles of conflicts of laws. Client hereby irrevocably consents to the personal jurisdiction of and agrees that the sole venue for any dispute arising in connection with this Agreement shall be the courts of competent jurisdiction (State and federal) located within Miami-Dade County, Florida. Client agrees not to commence or prosecute any such action, claim or proceeding other than in such aforementioned courts. The parties hereto agree that Florida law shall apply regardless of any choice or conflicts of law principles. Client agrees that Miami-Dade County, Florida is a convenient forum, and waives any objection to same under *forum non conveniens* principles.

      (I)     Waiver - The failure of any party to insist on or enforce strict performance of any provision of this Agreement, or to exercise any right or remedy under this Agreement or applicable law shall not be construed as a waiver or relinquishment of the right to assert or rely upon any such provision, right or remedy.

      (J)     Force Majeure - Neither Party shall be responsible for any failure to perform beyond its reasonable control, including, without limitation acts of God, national health emergency, acts or omissions of civil or military authority, civil disturbances, wars, strikes or other labor disputes, fires, transportation contingencies, or interruptions in telecommunications, internet services, or third-party vendors.

      (K)     Entire Agreement - This Agreement constitutes the entire agreement between the parties and supersedes all prior and contemporaneous oral and written agreements relating to the subject matter herein.

      (L)     Attorneys' Fees – If either party breaches this Agreement and one party brings any action (including appeal) against the breaching party in connection with this Agreement, the substantially prevailing party in such action shall be entitled to recover his/her/its cost of the action and reasonable attorneys' fees.

      (M)     Injunctive Relief - In the event of a breach or threatened breach of Sections 9(C) or 9(D), the aggrieved party shall immediately be entitled to pursue in any court of competent jurisdiction specific performance, injunctive relief, damages, or such other remedies and relief as may be available, regardless of any contrary provision of this Agreement. Additionally, due to the difficulty of measuring damages in the event of a breach of this Agreement by Client, the parties agree that, in the event of a breach of either Section 6 or Section 9 by Client, Client shall owe Consultant total liquidated damages in the amount of Fifty Thousand Dollars ($50,000.00) per breach. The Parties further agree that (i) the liquidated damage amount due from Client as above set forth is not a penalty but is an arms-length negotiated amount under the circumstances, and

Client Initials _BH_

E-Commerce Consulting Agreement
Page 6 of 9

ONE UP, LLC © 2020

DocuSign Envelope ID: 5DA680AD-23C3-41A2-9E4F-F9F90E2D0D5C

(ii) this Section shall not be construed as a waiver of prohibition of any other remedies of Consultant in the event of a breach of this Agreement by Client.

(N)     Independent Counsel - The Parties acknowledge that each has been advised to seek, and each has had sufficient opportunity to seek, independent legal counsel possessing industry experience in connection with this matter. The Parties have either sought such counsel or voluntarily waived such right to do so. Accordingly, in interpreting this Agreement, no weight shall be placed upon either party. Furthermore, the parties equally drafted this agreement; thus, the Agreement shall be construed neutrally, and no rule of construction shall apply to the disadvantage of any Party.

(O)     Assignment – Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party. Prior to any such assignment, said assignee shall execute an agreement identical to this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, and assigns. Any purported assignment or delegation by either party in violation of the foregoing shall be null and void ab initio and of no force and effect.

(P)     Cure - If at any time either Client believes the terms of this Agreement are not being fully performed, prior to seeking or commencing any relief expressly permitted under this Agreement, Client shall notify Consultant in writing of the specific nature of such claim, and Consultant receiving such notice shall have thirty (30) days from receipt of the notice to cure such claimed breach.

(Q)     Indemnification – Client agrees to indemnify, defend, and save and hold harmless Consultant, including its respective insurers, directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, in connection with or relating to the matters referred to in this Agreement, resulting from or relating directly or indirectly to Client's breach of this Agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to Client, and shall survive expiration or termination of this Agreement.

(R)     Survival – Any Section in this Agreement that requires survival shall survive the termination of this Agreement for the maximum period permitted by applicable law.

(S)     Client Data Management – Unless Consultant receives Client's prior written consent, Consultant shall not: (i) access, process, or otherwise use Client's Data other than as necessary to facilitate Consultant's Services; (ii) give any of its employees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performance of Consultant under this Agreement; or (iii) give any other third-party access to Client Data except as necessary for  such third-party  to facilitate performance under this Agreement. Consultant shall not erase Client Data, or any copy thereof, without Client's express written consent and shall follow Client's written instructions regarding retention and erasure of Client Data so long as it does not interfere with the performance of Consultant's Services and performance under this Agreement. Client possesses and retains all right, title, and interest in and to Client Data, and Consultant's use and possession thereof is solely in furtherance of Consultant's Services and on Client's behalf. Consultant shall comply with all applicable laws and regulations governing the handling of Client Data and shall not engage in any activity that would place Client in violation of any applicable law, regulation, or government request, or judicial process.

(T)     Waiver of Jury Trial. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS



**Client Initials** _____.

E-Commerce Consulting Agreement
Page 7 of 9

ONE UP, LLC © 2020

DocuSign Envelope ID: 5DA680AD-23C3-41A2-9E4F-F9F90E2D0D5C

AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

    (U)    Ministerial Services – In furtherance of Client's obligations under Section 2, Consultant may offer Client guidance and referrals to third-party vendors. Additionally, Consultant may, in its discretion, and at no additional fee to Client, offer Client assistance in fulfilment of the obligations in Section 2 ("Ministerial Act"). Before Consultant commences any Ministerial Act, Consultant shall obtain Client's written consent. Client agrees to reimburse Consultant for expenses incurred in carrying out a Ministerial Act. In the event Consultant offers to engage in a Ministerial Act, Client hereby agrees to indemnify, defend and save and hold harmless Consultant from any cost, claim, damage or liability (including attorneys' fees and court costs) related to the Ministerial Act. Client also waives any claims against Consultant that may be related to the Ministerial Act. Client accepts that this indemnification and waiver of all liability related to the Ministerial Act is a material inducement for Consultant to make any offer to Client for such Ministerial Act, and without such indemnification and waiver from Client, Consultant would not make any such offer of assistance to Client to engage in the Ministerial Act. The foregoing indemnity of Client shall survive expiration of the Term of this Agreement or its earlier termination.

14. **DEFINITIONS** – Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

**IN WITNESS WHEREOF,** this Agreement is deemed executed as of the of the last execution date below.

**CLIENT:** *Brian Hanc*
By: _____
*authorized representative and agent for service of process*
Date: 3/4/2021 _____

Principal of Client acknowledges and agrees to be bound by all of the provisions of this Agreement applicable to Client, as if expressly a party hereto. Accepted and Agreed to by Principal of Client:

By: *Brian Hanc* _____
Print Name: Brian Hanc _____, individually

**ONE UP, LLC** *Michael J. Walding Jr.*
By: _____
Michael J. Walding, Jr., CEO, *authorized representative and agent for service of process*
Date: 3/4/2021 _____

Client Initials [ BH ] _____.

E-Commerce Consulting Agreement
Page 8 of 9

ONE UP, LLC © 2020

DocuSign Envelope ID: 5DA680AD-23C3-41A2-9E4F-F9F90E2D0D5C

## EXHIBIT A

**Definitions:** Words or phrases which are initially capitalized or are within quotation marks in the e-commerce consulting agreement ("Agreement") shall have the meanings provided in this Exhibit A.

    (A)    "Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

    (B)    "Confidential information" means any and all information of the Company that is not generally known to the public or those with whom the Company competes or does business, or with whom they plan to compete or do business, and any and all information, publicly known publicly known in whole or in part or not, which, if disclosed would assist in competition against them including without limitation: Consultant's proprietary business information and all information disclosed or made available by Consultant to Client, either directly or indirectly, in writing, orally, by demonstration, or by inspection of tangible or intangible objects, including without limitation documents, files, texts, emails, phone calls, zoom calls, links, source code, software, charts, graphs, and any other form of communication. Confidential Information also includes information disclosed by Client to Consultant. Confidential Information shall not include any information (a) which Client can establish was publicly known and made generally available in the public domain prior to the time of disclosure, other than as a result of an improper disclosure by a party hereto, or (b) was in Client's possession on a non-confidential basis prior to its disclosure.

    (C)    "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store *after* deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Walmart fees related to Client's store.

    (D)    "Pause" means the Store is inactive, and Consultant is unable to render its services to Client as provided under the Agreement.

    (E)    "Prohibited Action" means any affirmative action or inaction taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store.

    (F)    The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Walmart transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

    (G)    The term "Store" means the Client's wholly owned e-commerce location on the Walmart online platform where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Walmart).

    (H)    "Suspension" means an action or actions by Walmart which inactivates or freeze Client's Store, and which thereby results in an inability for Client to access Client's Store which results in no access or sales activity through the Store, other than where due to the occurrence of a Prohibited Action.



E-Commerce Consulting Agreement
Page 9 of 9

**Client Initials** _____.

ONE UP, LLC © 2020

DocuSign Envelope ID: 43E6572C-338A-4488-B5F3-7D7253175174

## E-COMMERCE CONSULTING AGREEMENT

This E-Commerce Consulting Agreement ("Agreement"), is dated as of __March__ __16__, 2021, by and between One Up, LLC, a Florida limited liability company, whose address is 4300 Biscayne Blvd., Miami, Florida 33137 (hereinafter "Consultant"), and ___Redstone ecom LLC___, whose address is ___8 The Green Suite 10620, Dover DE 19901___ (hereinafter "Client").

WHEREAS, Client desires to engage Consultant's services, as an independent contractor, upon the terms and conditions herein set forth; and

WHEREAS, Consultant desires to render consulting services to Client upon the terms and conditions herein set forth;

NOW, THEREFORE, Consultant and Client (together, the "Parties"), for $10.00 and other good and valuable consideration, the receipt and sufficiency are hereby mutually acknowledged, agree to the following terms and conditions whereby Consultant shall consult Client in connection with an e-commerce store on the Walmart platform (the "Store"):

1. **CONSULTANT'S SERVICES** - Consultant agrees to perform the following services ("Services"):
    (A)     Perform all acts and do all things necessary to apply for a Store on Client's behalf. In the event Walmart denies Consultant's application to open a Store, Consultant shall reapply for a Store on Client's behalf until such time as Walmart grants Consultant's application to open a Store;
    (B)     Maintain Client's Store, including configuring the Walmart storefront and configuring the front and back end systems necessary to manage the Store.
    (C)     Review, research, source, select, and list products for the Client's Store.
    (D)     Respond to customers' phone and email inquiries in support of Client's Store and shall exercise good faith efforts to resolve customer inquiries, handle product returns, and manage billing matters.
    (E)     Maintain oversight of Client's Store and its financial performance; however, Consultant shall have no obligation to, and does not intend to, provide financial advice to Client concerning the operation of Client's Store (Client shall confer with its professional financial advisors concerning all financial inquiries).
    (F)     If Client's Store is closed due to no fault of Client, Consultant agrees to manage a replacement store for Client for the remainder of the Agreement. In such event, Consultant shall continue to consult with Client consistent with the terms of this Agreement.

2. **CLIENT RESPONSIBILITIES.**
    (A)     Client understands there is a period that will delay the commencement and commercial operations of the Store, including, without limitation, a 1 to 4 month configuration period (and perhaps longer, depending on the circumstances specific to each proposed Store) where Client must complete certain obligations. Until Client satisfies all contractual and legal requirements for the creation and operation of Client's Store, Consultant cannot commence providing the Services as set forth in Section 1 of this Agreement.
    (B)     Within the first eight (8) months of this Agreement, Client will use best efforts to obtain, and maintain for the duration of this Agreement, a credit card issued through a United States federally insured banking institution with a *minimum* credit limit of thirty thousand ($30,000.00) dollars USD. In no event shall Consultant be responsible for payment of any kind and any other obligation under Client's credit card, all of which credit card obligations shall be solely that of Client. Furthermore, unless Consultant provides written consent: (i) at no time shall Client Pause its Store or allow for a Suspension, such terms being defined or referenced on the Walmart website or in other written materials made available to Client; and (ii) Client shall not allow its Store to remain shut down for more than ninety (90) days during the term of this Agreement.
    (C)     Within thirty (30) days from the commencement of this Agreement, Client shall provide Consultant with only necessary information for the purpose of Consultant carrying out its obligations under this Agreement. Client shall use its best efforts to assist Consultant in obtaining all information deemed necessary by Consultant to implement Consultant's Services.

3. **COMPENSATION**. In consideration for this Agreement, Client shall pay Consultant a one-time consulting fee of fifteen thousand dollars ($15,000.00) USD (the "Fee"), via wire transfer or ACH to Consultant's bank



E-Commerce Consulting Agreement
Page 1 of 9

**Client Initials** _____.

ONE UP, LLC © 2021



DocuSign Envelope ID: 43E6572C-338A-4488-B5F3-7D7253175174

account. One-half of the Fee ($7,500.00) is due within 72 hours of execution of this Agreement and the second half of the Fee ($7,500.00) is due at the time of applying for the store. **Except as expressly permitted under Section 10, the Fee is non-refundable.**

    (A) Client shall also thereafter, beginning in the month following the month in which the Fee is paid, pay Consultant two hundred and forty nine dollars ($249.00) USD per month (the "Maintenance Fee"), and fifty percent (50%) of the Net Profit from Client's Store per month (the "Ongoing Commission"). Client shall not be responsible for payment of the Ongoing Commission or the Maintenance Fee if, other than due to breach of this Agreement by Client, there is no activity in Client's Store for said month (or a portion thereof, where such portion exceeds 15 days).

    (B) Consultant shall invoice Client monthly, and Client has seventy-two (72) hours to remit payment.

4. **TERM** – This Agreement shall commence on the last date of execution by both parties and shall continue in effect for a period of one (1) year (the "Initial Term") thereafter. Upon completion of the Initial Term, the Agreement shall automatically extend on a month-to-month basis (the "Option Term") until written notice is provided by either party, to the other party, in accordance with Section 5.

5. **TERMINATION** – Client may terminate this Agreement at any time by providing written notice to Consultant. Consultant may terminate this Agreement, at any time, for cause, with fourteen (14) days written notice to Client. Consultant may terminate the Option Term, without cause, at any time. For this Section, "cause" shall include, but not be limited to: (1) any act or omission by Client, which interferes with the operation of the Store or Consultant's ability to render Services, in Consultant's sole discretion; or (2) Client's breach or threatened breach of any term in this Agreement. If Client breaches any term under this Agreement, independent of any actions Walmart may take from time to time, Consultant may Pause Client's Store, which, Consultant may only reactivate, in Consultant's sole discretion.

6. **NON-DISPARAGEMENT** – During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement, shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true.

7. **SALES / USE TAX** – Consultant does not provide tax reporting or tax management services of any kind. Client is responsible for determining if Client is responsible for collecting and remitting sales or use tax under any applicable state or local law, regulation, or ordinance.

8. **INTELLECTUAL PROPERTY** – Client understands that Client's Store is a service hosted on the Walmart platform and not a distinct or severable product or service that can be ported, removed or installed in or on a different place or platform. Accordingly, Consultant does not hold itself out to have any rights, endorsements, relations, or affiliation with Walmart, or any of Walmart's copyright, trademark, trade dress, trade secret, or any other intellectual property right that Walmart may hold (the "Intellectual Property Rights"). Further, Consultant cannot, and does not, grant or convey to Client any Intellectual Property Rights, whatsoever, in Client's Store, or Walmart, and Consultant holds no legal or equitable rights in Client's Store.

9. **RESTRICTED ACTIVITIES** – Client acknowledges that during the Term of this Agreement Client will have access to Consultant's Confidential Information which, if disclosed, could assist in competition against Consultant by third parties. Client recognizes the highly competitive nature of Consultant's business, services, and its trade secrets, and that Consultant conducts its business electronically, through e-commerce, and throughout the United States. Therefore, Client agrees that *the following restrictions on Client's activities* are necessary to protect the good will, Confidential Information, and other legitimate business interests of Consultant, which restrictions are fair and supported by adequate consideration:

    (A)    Non-Competition. Client on behalf of itself and its directors, officers, members or shareholders, employees, agents, and representatives agrees and warrants that during the Term of this Agreement, and for two (2) years following the termination of this Agreement (the "Restricted Period"), Client shall not be involved, directly or indirectly, whether as owner, partner, investor, consultant (paid or unpaid), agent, employee, co-venturer or otherwise, with any business that manages, operates, or promotes e-commerce



E-Commerce Consulting Agreement
Page 2 of 9

Client Initials _____.

DocuSign Envelope ID: 43E6572C-338A-4488-B5F3-7D7253175174

stores or e-commerce transactions on behalf of third parties anywhere in the United States, regardless of whether Client is physically located within the United States or outside of the United States.

(B)     Non-Solicitation. During the Restricted Period, Client agrees that it will not, directly, or indirectly through another Person: (i) induce or attempt to induce any employee or contractor of Consultant to leave the employ or contract of Consultant, or in any way interfere with the relationship between Consultant and any of its employees or contractors, or (ii) induce or attempt to induce any customer, supplier, client, distributor, vendor, licensee, or other business relation of Consultant to cease doing business with Consultant, or in any way interfere with Consultant's relationship with any such party.

(C)     Non-Disclosure. The Parties agree not to use, reveal, make available, nor disclose, whether directly or indirectly, to any third party, other than the Party's attorney or tax accountant, any Confidential Information for any purpose except as approved in writing by Consultant. Further, the Parties shall (a) not assist nor enable anyone to access or use any of Confidential Information; and (b) not use nor exploit any of the Confidential Information for any purpose whatsoever except in accordance with the terms of this Agreement. For purposes of this Agreement, the Party disclosing the Confidential Information shall be referred to as "Disclosing Party," and the Party receiving the Confidential Information shall be referred to as "Receiving Party."

(i)     Notwithstanding the foregoing, Receiving Party will: 1) promptly notify the Disclosing Party, to the extent legally permissible, if Receiving Party becomes required by court order to disclose any Confidential Information; 2) cooperate with Disclosing Party if Disclosing Party decides to oppose or to seek to restrain such disclosure; and 3) subject to the foregoing, only disclose that information which its counsel advises it is legally compelled to disclose.

(ii)     If at Disclosing Party's request, Receiving Party is unable to obtain a protective order or other injunctive relief above with respect to the Confidential Information referred to therein and Receiving Party is thereafter required by court order to disclose such Confidential Information, Receiving Party may disclose only such Confidential Information as is expressly required by the court order.

(D)     Maintenance of Confidential Information. The Receiving Party agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of Disclosing Party's Confidential Information. Without limiting the foregoing, Receiving Party shall take at least those measures that Receiving Party takes to protect its own confidential information. Receiving Party shall also immediately notify Disclosing Party, in writing, of any unauthorized use or disclosure of the Confidential Information.

(E)     Confidentiality Term: Regardless of any termination of this Agreement, the parties expressly acknowledge and agree that their respective rights and obligation under this Section 9 shall last for a period of two (2) years following the expiration of this Agreement or permissible termination of this Agreement; *provided,* however, that Client's duties of confidentiality thereunder with respect to Consultant's trade secrets shall survive such expiration and such duties of confidentiality shall continue and not expire so long as such Confidential Information is deemed a trade secret as a matter of law.

(F)     In signing this Agreement, Client acknowledges that he/she/it has carefully read, consulted with legal counsel, and considered all the terms and conditions of this Agreement, including the restraints imposed on Client, throughout the United States, under this Section 9. Client agrees that all such restraints are necessary for the reasonable and proper protection of Consultant, and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area (i.e., throughout the United States). Client further acknowledges that, were Client to breach any of the covenants contained in this Section 9, however caused, the damage to the Consultant would be irreparable. Client therefore agrees that Consultant, in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any such breach or threatened breach, without having to post bond, together with reasonable attorneys' fees incurred in enforcing Consultant's rights hereunder.

10. **REPLACEMENT STORE.** If Client's Store is closed due to no fault of Client, Consultant agrees to manage a replacement store for Client for the remainder of the Agreement. In such event, Consultant shall continue to consult with Client consistent with the terms of this Agreement.

11. **LIMITATION OF LIABILITY**



Client Initials

E-Commerce Consulting Agreement
Page 3 of 9

ONE UP, LLC © 2021

DocuSign Envelope ID: 43E6572C-338A-4488-B5F3-7D7253175174

(A) UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF LIABILTY SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO. SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S PRIOR WRITTEN APPROVAL.

(B) CONSULTANT ASSUMES NO LIABILITY FOR OR RELATING TO THE DELAY, INTERRUPTION, CORRUPTION OR FAILURE OF PRODUCT, DATA OR INFORMATION TRANSMITTED IN CONNECTION WITH THE STORE, INCLUDING WITHOUT LIMITATION ANY ACT OR FAILURE TO ACT BY WALMART OR ANY FORCE MAJEURE CONDITION (INCLUDING BY WAY OF EXAMPLE ONLY, ANY PUBLIC HEALTH ISSUE).

(C) AS A LIQUIDATED DAMAGES REMEDY AND NOT AS A PENALTY, SINCE DAMAGES TO CLIENT RESULTING FROM BREACH OF THIS AGREEMENT BY CONSULTANT ARE DIFFICULT AND IMPRACTICAL, IF NOT IMPOSSIBLE TO CALCULATE, CONSULTANT SHALL ONLY BE LIABLE TO THE EXTENT OF ACTUAL DAMAGES INCURRED BY CLIENT, NOT TO EXCEED A TOTAL OF $5,000.00 USD. AGREEMENT TO THIS PROVISION IS A MATERIAL INDUCEMENT TO CONSULTANT AGREEING TO ENTER INTO THIS AGREEMENT WITH CLIENT. THIS PROVISION 11.(C) SHALL PREVAIL IN THE EVENT OF ANY CONFLICT OR INCONSISTENCY WITH ANY OTHER PROVISION IN THIS AGREEMENT.

12. **DISCLAIMERS AND RELEASE**

(A) CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT.

(B) Without limiting the foregoing, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability, or the completeness, of any matter within the scope of this Agreement, including but not limited to the Store, the products therein, or the data, information, content, software, technology, graphics, or communications provided on or through the Store; (2) the satisfaction of any regulation (government or otherwise) requiring disclosure of information on the products provided through or in connection with the Store or the approval or compliance of the Store or any software or information and content contained in the Store; or (3) that the Store will satisfy Client's economic needs and requirements or reach any particular level of sales, income, or net profits.

(C) Business Risk – Client hereby understands that the creation and potential growth of the Client's Store carries financial and other risks. Client hereby understands that e-commerce is an ever-changing industry that



Client Initials _____.

E-Commerce Consulting Agreement
Page 4 of 9

ONE UP, LLC © 2021

DocuSign Envelope ID: 43E6572C-338A-4488-B5F3-7D7253175174

is subject to numerous business risks, including but not limited to: (i) a changing legal environment in which regulations can emerge or change that affects the commercial sale of products through Walmart and/or Client's Store; (ii) economic changes that affect consumer spending, the emergence of recessions due to economic and other issues (including public health issues) and the like; (iii) changes in the popular appeal of and demand for different types of Walmart products; (iv) changes in Walmart's terms and conditions, which can materially affect or even interfere with the marketability of Client's Store or its products; (v) changes in international politics or economies, which may affect, among other things, the ability to package, distribute and ship Walmart products, and the costs thereof; (vi) market forces, including increased and changing levels of competition for any given product from other sellers of such product; (vii) unforeseen events, force majeure, public health concerns, and other external events that could affect the performance of any Walmart Store. Client hereby understands that there are no guarantees made by Consultant or otherwise as to the Store's sales, income, or profitability at any time, and acknowledges that Client is at risk of a total loss of his, her or its investment. Client acknowledges the substantial risks generally involved with an e-commerce business. Client recognizes that there is a possibility that subsequent to the execution of this Agreement, Client may discover facts or incur or suffer claims which were unknown or unsuspected at the time this Agreement was executed, and which if known by Client at that time may have materially affected Client's decision to execute this Agreement. By operation of this Agreement, and in particular the disclaimers of Consultant contained in the preceding subsections, Client assumes any and all risks of such unknown facts and such unknown and unsuspected claims and expressly releases Consultant for any liability which Consultant could have had in connection therewith in the absence of the release herein provided by Client to Consultant. Consultant encourages Client to only invest funds that Client can afford to invest in an illiquid basis over a longer term and perhaps ultimately lose, and to consult Client's legal and/or business advisors prior to investing in the Store.

(D) Walmart Terms and Conditions – Client hereby understands that Walmart, from time to time, with or without cause, can and does suspend accounts for various reasons, some of which may not be obvious or justified in Client's view. In event Client's Store is suspended, Company will assist in sending an appeal on behalf of the Client and working with Walmart to remedy the situation at no extra cost. Consultant makes no representations or warranties of any kind, however, that Walmart will in such cases return Client's Store to active status. Furthermore, Client agrees and understands that Consultant makes no guarantees or representations regarding the Store in relation to any Walmart policy, whether currently in effect or as may be amended by Walmart from time to time. Client understands that Consultant has no control over or input in when and whether Walmart elects to change any of its policies. However, the Services provided by Consultant to Client pursuant to this Agreement shall where practical be consistent with Walmart's current policies.

13. **GENERAL PROVISIONS**

(A) Non-exclusivity - Each party is free to contract with others with respect to the subject matter of this Agreement subject to the limitations as to Client under Section 6 and Section 9 of this Agreement.

(B) Relationship of the Parties – Nothing herein contained shall constitute a partnership or a joint venture between the Parties. Consultant is performing its services to Client as an independent contractor and not as Client's agent or employee. There is no third-party beneficiary to this Agreement.(C)

(C) Notices - All notices to either party shall be sent electronically to the email address(es) provided by each Party to the other and as otherwise set forth below. All notices to Consultant shall be sent to help@oneup.services. If to Client, notice shall be sent electronically to redstoneecom1@gmail.com ,

Alternatively, such written notice will also be deemed given upon personal delivery, or on receipt or refusal if sent by U.S. first class certified or registered mail, postage prepaid, return receipt requested, or by a recognized private delivery service, to the addresses stated on Page 1 of this Agreement.

(D) Severability, Headings - If any provision is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect. In such event, the Parties hereby acknowledge their intent to make such invalidated provision, or part of such provision, as to be deemed replaced with a valid provision or part of provision that most closely approximates and gives effect to the intent of the invalid provision. Any such modification shall revise the existing invalid provision, or part thereof, only as much as



Client Initials _____ .

E-Commerce Consulting Agreement
Page 5 of 9

ONE UP, LLC © 2021

DocuSign Envelope ID: 43E6572C-338A-4488-B5F3-7D7253175174

necessary to make the invalidly-held provision otherwise valid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or extent of any section of this Agreement.

(E)     Dispute Resolution - Except where otherwise expressly set forth in this Agreement, any dispute or claim arising out of or relating to this Agreement shall only be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Miami-Dade County, Florida. Any arbitration proceeding, determination, or award, shall be confidential, and neither Party may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses of such arbitration proceeding will be divided equally between the parties, though each Party will bear its own expense of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration (except where attorneys' fees and costs shall be awarded pursuant to Section 13.(L)). IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either Party more than one (1) year after the cause of action arose.

(F)     Amendment.  This Agreement cannot be amended except in writing and signed by both Parties.

(G)     Electronic Signatures - This Agreement may be executed by electronic means and in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all such counterparts together will constitute one and the same instrument.

(H)     Governing Law; Jurisdiction - This Agreement, the negotiations thereunder, and performance thereof shall be interpreted, construed and enforced in all respects in accordance with the laws of the State of Florida without reference to principles of conflicts of laws. Client hereby irrevocably consents to the personal jurisdiction of and agrees that the sole venue for any dispute arising in connection to this Agreement shall be the courts of competent jurisdiction (State and federal) located within Miami-Dade County, Florida. Client agrees not to commence or prosecute any such action, claim or proceeding other than in such aforementioned courts. The parties hereto agree that Florida law shall apply regardless of any choice or conflicts of law principles. Client agrees that Miami-Dade County, Florida is a convenient forum, and waives any objection to same under *forum non conveniens* principles.

(I)     Waiver - The failure of any party to insist on or enforce strict performance of any provision of this Agreement, or to exercise any right or remedy under this Agreement or applicable law shall not be construed as a waiver or relinquishment of the right to assert or rely upon any such provision, right or remedy.

(J)     Force Majeure - Neither Party shall be responsible for any failure to perform beyond its reasonable control, including, without limitation acts of God, national health emergency, acts or omissions of civil or military authority, civil disturbances, wars, strikes or other labor disputes, fires, transportation contingencies, or interruptions in telecommunications, internet services, or third-party vendors.

(K)     Entire Agreement - This Agreement constitutes the entire agreement between the parties and supersedes all prior and contemporaneous oral and written agreements relating to the subject matter herein.

(L)     Attorneys' Fees – If either party breaches this Agreement and one party brings any action (including appeal) against the breaching party in connection with this Agreement, the substantially prevailing party in such action shall be entitled to recover his/her/its cost of the action and reasonable attorneys' fees.

(M)     Injunctive Relief - In the event of a breach or threatened breach of Sections 9(C) or 9(D), the aggrieved party shall immediately be entitled to pursue in any court of competent jurisdiction specific performance, injunctive relief, damages, or such other remedies and relief as may be available, regardless of any contrary provision of this Agreement. Additionally, due to the difficulty of measuring damages in the event of a breach of this Agreement by Client, the parties agree that, in the event of a breach of either Section 6 or Section 9 by Client, Client shall owe Consultant total liquidated damages in the amount of Fifty Thousand Dollars ($50,000.00) per breach. The Parties further agree that (i) the liquidated damage amount due from Client as above set forth is not a penalty but is an arms-length negotiated amount under the circumstances, and



Client Initials _____.

E-Commerce Consulting Agreement
Page 6 of 9

ONE UP, LLC © 2021

DocuSign Envelope ID: 43E6572C-338A-4488-B5F3-7D7253175174

(ii) this Section shall not be construed as a waiver of prohibition of any other remedies of Consultant in the event of a breach of this Agreement by Client.

(N)     Independent Counsel - The Parties acknowledge that each has been advised to seek, and each has had sufficient opportunity to seek, independent legal counsel possessing industry experience in connection with this matter.  The Parties have either sought such counsel or voluntarily waived such right to do so. Accordingly, in interpreting this Agreement, no weight shall be placed upon either party. Furthermore, the parties equally drafted this agreement; thus, the Agreement shall be construed neutrally, and no rule of construction shall apply to the disadvantage of any Party.

(O)     Assignment – Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party. Prior to any such assignment, said assignee shall execute an agreement identical to this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, and assigns. Any purported assignment or delegation by either party in violation of the foregoing shall be null and void ab initio and of no force and effect.

(P)     Cure - If at any time either Client believes the terms of this Agreement are not being fully performed, prior to seeking or commencing any relief expressly permitted under this Agreement, Client shall notify Consultant in writing of the specific nature of such claim, and Consultant receiving such notice shall have thirty (30) days from receipt of the notice to cure such claimed breach.

(Q)     Indemnification – Client agrees to indemnify, defend, and save and hold harmless Consultant, including its respective insurers, directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, in connection with or relating to the matters referred to in this Agreement, resulting from or relating directly or indirectly to Client's breach of this Agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to Client, and shall survive expiration or termination of this Agreement.

(R)     Survival – Any Section in this Agreement that requires survival shall survive the termination of this Agreement for the maximum period permitted by applicable law.

(S)     Client Data Management – Unless Consultant receives Client's prior written consent, Consultant shall not: (i) access, process, or otherwise use Client's Data other than as necessary to facilitate Consultant's Services; (ii) give any of its employees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performance of Consultant under this Agreement; or (iii) give any other third-party access to Client Data except as necessary for  such third-party  to facilitate performance under this Agreement. Consultant shall not erase Client Data, or any copy thereof, without Client's express written consent and shall follow Client's written instructions regarding retention and erasure of Client Data so long as it does not interfere with the performance of Consultant's Services and performance under this Agreement. Client possesses and retains all right, title, and interest in and to Client Data, and Consultant's use and possession thereof is solely in furtherance of Consultant's Services and on Client's behalf. Consultant shall comply with all applicable laws and regulations governing the handling of Client Data and shall not engage in any activity that would place Client in violation of any applicable law, regulation, or government request, or judicial process.

(T)     Waiver of Jury Trial. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THING). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS



Client Initials _____.

E-Commerce Consulting Agreement
Page 7 of 9

ONE UP, LLC © 2021

DocuSign Envelope ID: 43E6572C-338A-4488-B5F3-7D7253175174

AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

    (U)    Ministerial Services – In furtherance of Client's obligations under Section 2, Consultant may offer Client guidance and referrals to third-party vendors. Additionally, Consultant may, in its discretion, and at no additional fee to Client, offer Client assistance in fulfilment of the obligations in Section 2 ("Ministerial Act"). Before Consultant commences any Ministerial Act, Consultant shall obtain Client's written consent. Client agrees to reimburse Consultant for expenses incurred in carrying out a Ministerial Act. In the event Consultant offers to engage in a Ministerial Act, Client hereby agrees to indemnify, defend and save and hold harmless Consultant from any cost, claim, damage or liability (including attorneys' fees and court costs) related to the Ministerial Act. Client also waives any claims against Consultant that may be related to the Ministerial Act. Client accepts that this indemnification and waiver of all liability related to the Ministerial Act is a material inducement for Consultant to make any offer to Client for such Ministerial Act, and without such indemnification and waiver from Client, Consultant would not make any such offer of assistance to Client to engage in the Ministerial Act. The foregoing indemnity of Client shall survive expiration of the Term of this Agreement or its earlier termination.

14. **DEFINITIONS** – Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

    **IN WITNESS WHEREOF**, this Agreement is deemed executed as of the of the last execution date below.

**CLIENT:**
By: _Brian Hanc_
authorized representative and agent for service of process
Date: _3/16/2021_

Principal of Client acknowledges and agrees to be bound by all of the provisions of this Agreement applicable to Client, as if expressly a party hereto. Accepted and Agreed to by Principal of Client:

By: _Brian Hanc_
Print Name: _Brian Hanc_ , individually

**ONE UP, LLC**
By: _Michael J. Walding Jr._
Michael J. Walding, Jr., CEO, *authorized representative and agent for service of process*
Date: _3/16/2021_

Client Initials _BH_ .

E-Commerce Consulting Agreement
Page 8 of 9

ONE UP, LLC © 2021

DocuSign Envelope ID: 43E6572C-338A-4488-B5F3-7D7253175174

## EXHIBIT A

**Definitions:** Words or phrases which are initially capitalized or are within quotation marks in the e-commerce consulting agreement ("Agreement") shall have the meanings provided in this Exhibit A.

(A)     "Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

(B)     "Confidential information" means any and all information of the Company that is not generally known to the public or those with whom the Company competes or does business, or with whom they plan to compete or do business, and any and all information, publicly known publicly known in whole or in part or not, which, if disclosed would assist in competition against them including without limitation: Consultant's proprietary business information and all information disclosed or made available by Consultant to Client, either directly or indirectly, in writing, orally, by demonstration, or by inspection of tangible or intangible objects, including without limitation documents, files, texts, emails, phone calls, zoom calls, links, source code, software, charts, graphs, and any other form of communication. Confidential Information also includes information disclosed by Client to Consultant. Confidential Information shall not include any information (a) which Client can establish was publicly known and made generally available in the public domain prior to the time of disclosure, other than as a result of an improper disclosure by a party hereto, or (b) was in Client's possession on a non-confidential basis prior to its disclosure.

(C)     "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store *after* deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Walmart fees related to Client's store.

(D)     "Pause" means the Store is inactive, and Consultant is unable to render its services to Client as provided under the Agreement.

(E)     "Prohibited Action" means any affirmative action or inaction taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store.

(F)     The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Walmart transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

(G)     The term "Store" means the Client's wholly owned e-commerce location on the Walmart online platform where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Walmart).

(H)     "Suspension" means an action or actions by Walmart which inactivates or freeze Client's Store, and which thereby results in an inability for Client to access Client's Store which results in no access or sales activity through the Store, other than where due to the occurrence of a Prohibited Action.



Client Initials _____.

E-Commerce Consulting Agreement
Page 9 of 9

ONE UP, LLC © 2021